**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ALEXANDRA KUSEN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

JAMES H. HERBERT, II, HAFIZE GAYE ERKAN, MICHAEL J. ROFFLER, OLGA TSOKOVA, MICHAEL D SELFRIDGE, NEAL HOLLAND, and KPMG, LLP,

Defendants.

Case No. 3:23-cv-2940-AMO

**NOTICE OF MOTION AND MOTION TO INTERVENE BY FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST REPUBLIC BANK AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

CLASS ACTION

Judge: Hon. Araceli Martínez-Olguín

Date: January 11, 2024
Time: 2:00 p.m.
Place: Courtroom 10 – 19th Floor
450 Golden Gate Avenue,
San Francisco, CA 94102

# Exhibit 1

**FEDERAL DEPOSIT INSURANCE CORPORATION**
**AS RECEIVER FOR FIRST REPUBLIC BANK**
Joshua H. Packman (D.C. Bar No. 1015463 admitted per Civil L.R. 11-2)
(jpackman@fdic.gov)
3501 Fairfax Drive
Arlington, VA 22226
Tel: (703) 474-1435

*Counsel for Defendant Federal Deposit Insurance Corporation as Receiver for First Republic Bank*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ALEXANDRA KUSEN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

JAMES H. HERBERT, II, HAFIZE GAYE ERKAN, MICHAEL J. ROFFLER, OLGA TSOKOVA, MICHAEL D SELFRIDGE, NEAL HOLLAND, and KPMG, LLP,

Defendants.

Case No. 3:23-cv-2940-AMO

**DECLARATION OF PETER L. BARTER**

CLASS ACTION

Judge: Hon. Araceli Martínez-Olguín

**DECLARATION OF PETER L. BARTER**

I, PETER L. BARTER, declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am employed by the Federal Deposit Insurance Corporation ("FDIC"). Among my responsibilities, I am the assigned Claims Agent for the FDIC as Receiver for First Republic Bank ("FDIC-R" or "Receiver") with respect to non-depositor claims. Based on my review of FDIC-R records, I have personal knowledge of the facts set forth in this declaration, which is submitted in support of the FDIC-R's motions to intervene in and to dismiss the above-referenced action.

2. As Claims Agent, I am responsible for overseeing the administrative claims process for the First Republic Bank Receivership. As part of my job, I accept, log, and track administrative claims that are filed with the First Republic Bank Receivership.

3.      On May 1, 2023, the California Department of Financial Protection and Innovation closed First Republic Bank ("First Republic" or the "Bank") and appointed the FDIC as the Bank's receiver.  The FDIC accepted that appointment on May 1, 2023.  True and correct copies of the appointment letter and the FDIC's acceptance are attached hereto as Exhibit A.

4.      In its capacity as First Republic's Receiver, and pursuant to the requirements of 12 U.S.C. § 1821(d)(3)(B)(i), the FDIC-R established September 5, 2023 as the "Claims Bar Date." The Claims Bar Date is the deadline for filing any administrative claims, as well as supporting proof, with the Receiver.

5.      In its capacity as First Republic's Receiver, and pursuant to the requirements of 12 U.S.C. § 1821(d)(3)(B), the FDIC-R prepared a Publication Notice to Creditors and Depositors of First Republic Bank, San Francisco, CA, advising creditors and claimants against First Republic of the requirement that any such claims be submitted to the FDIC-R by the Claims Bar Date.  A true and correct copy of the Publication Notice to Creditors and Depositors of First Republic Bank is attached hereto as Exhibit B.

6.      Pursuant to the requirements of 12 U.S.C. § 1821(d)(3)(B), the FDIC-R published the Publication Notice to Creditors and Depositors of First Republic Bank on May 8, 2023; June 9, 2023; and July 7, 2023, in the *Boston Globe*, the *Los Angeles Times*, the *New York Times*, the *San Francisco Chronicle*, and the *Wall Street Journal*.  *See* Exhibit B.

7.      I have been informed that individuals and entities listed below have filed a complaint or motion to appoint lead plaintiff and to appoint lead counsel in the above-referenced action:

  a.   Alexandra Kusen;

  b.   Strategic Capital Investments, LLC, and McCadden Investments, LLC, which from supporting documents filed on the docket I understand are managed by Morris Clement and Solomon Monderer, respectively;

  c.   Rami E. Geffner, R E Geffner Family LP, and New Life Ahead LLC;

  d.   Chaim Weiss and Sophie Shutze;

       e.      Philippe D. Katz, on his own behalf and as assignee of Moses Marx, as well as Terumah Foundation, United Equities Commodities Co., 111 John Realty Corp., and Marneu Holding Co.;

       f.      John Tu, on his own behalf and as assignee of Artificial Intelligence Markets PTY Limited;

       g.      Alecta Tjänstepension Ömsesidigt;

       h.      Hal Collier, on his own behalf and as assignee of Nancy Collier, as well as Nsecur 303 Limited Partnership, and C1 Bundle, Limited Partnership; and

       i.      Gaurav Singh.

8.      On August 4, 2023, counsel for the FDIC-R sent a letter to counsel for the individuals and entities listed above in Paragraph 7 requesting that they voluntarily dismiss the above-referenced action. A true and correct copy of the letter sent by counsel for the FDIC-R on August 4, 2023, is attached hereto as Exhibit C.

9.      On August 30, 2023, Hal Collier filed an administrative claim in the amount of $987,000 with the FDIC-R and described the basis for the claim as "loss on First Republic stock and options."

10.      On September 5, 2023, Alecta Tjänstepension Ömsesidigt filed an administrative claim in an amount to be determined with the FDIC-R and described the basis for the claim as "aris[ing] under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder."

11.      From my review of the Receiver's records pertaining to administrative claims filed with the FDIC-R regarding the First Republic Bank Receivership, none of the other individuals or entities listed above in Paragraph 7 have filed administrative claims with the FDIC-R.

12.      As of today's date, the FDIC-R has made no determination regarding Mr. Collier's administrative claim, and the claim is currently pending review. The 180-day statutory claims determination period for that claim began to run on August 30, 2023, the date it was filed with the FDIC-R, and will expire on February 26, 2024. 12 U.S.C. § 1821(d)(5)(A).

13.     As of today's date, the FDIC-R has made no determination regarding the administrative claim submitted by Alecta Tjänstepension Ömsesidigt, and the claim is currently pending review.  The 180-day statutory claims determination period for that claim began to run on September 5, 2023, the date it was filed with the FDIC-R, and will expire on March 4, 2024.  12 U.S.C. § 1821(d)(5)(A).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 30, 2023, at Avon, Colorado.

Peter Barter
Digitally signed by Peter Barter
Date: 2023.10.30 09:00:05 -06'00'

Peter L. Barter

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ALEXANDRA KUSEN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

JAMES H. HERBERT, II, HAFIZE GAYE ERKAN, MICHAEL J. ROFFLER, OLGA TSOKOVA, MICHAEL D SELFRIDGE, NEAL HOLLAND, and KPMG, LLP,

Defendants.

Case No. 3:23-cv-2940-AMO

**DECLARATION OF PETER L. BARTER**

CLASS ACTION

Judge: Hon. Araceli Martínez-Olguín

# Exhibit A

**STATE OF CALIFORNIA**

**DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION**

| In the Matter of<br><br>FIRST REPUBLIC BANK | APPOINTMENT AND TENDER OF APPOINTMENT AS RECEIVER |
|---|---|

## I. FINDINGS

The Commissioner of Financial Protection and Innovation of the State of California (the "Commissioner") finds:

1. The Commissioner took possession of the property and business of First Republic Bank (the "Bank") and ordered that the Bank be liquidated. The Order Taking Possession of Property and Business and Order of Liquidation are each hereby referred to and by this reference incorporated herein and the findings therein are hereby adopted as findings herein.

2. The deposit accounts of the Bank are insured by the Federal Deposit Insurance Corporation (the "FDIC"), in accordance with the Federal Deposit Insurance Act.

3. The FDIC is qualified to act as the receiver of the Bank.

4. It is in the best interests of all those impacted by the Order of Possession and Order of Liquidation to appoint and to tender to the FDIC the appointment as receiver of the Bank.

## II. APPOINTMENT AND TENDER OF APPOINTMENT

On the basis of the Findings set forth above and pursuant to Financial Code Section 620, the Commissioner appoints and tenders to the FDIC the appointment as receiver of the Bank.

DATED: May 1, 2023
San Francisco, California

Clothilde V. Hewlett

CLOTHILDE V. HEWLETT
Commissioner
Department of Financial Protection and Innovation


FDIC
Federal Deposit
Insurance Corporation

May 1, 2023

Ms. Clothilde "Cloey" V. Hewlett, Commissioner
California Department of Financial Protection & Innovation (DFPI)
One Sansome Street, Suite 600
San Francisco, CA 94104

Subject: First Republic Bank
San Francisco, CA – In Receivership
Acceptance of Appointment as Receiver

Commissioner Hewlett,

Please be advised that the Federal Deposit Insurance Corporation accepts its appointment as Receiver of the captioned depository institution, in accordance with the Federal Deposit Insurance Act, as amended.

Sincerely,

FEDERAL DEPOSIT INSURANCE CORPORATION

By: ______________________

Name: George R. Fritz
Receiver-in-Charge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ALEXANDRA KUSEN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

JAMES H. HERBERT, II, HAFIZE GAYE ERKAN, MICHAEL J. ROFFLER, OLGA TSOKOVA, MICHAEL D SELFRIDGE, NEAL HOLLAND, and KPMG, LLP,

Defendants.

Case No. 3:23-cv-2940-AMO

**DECLARATION OF PETER L. BARTER**

CLASS ACTION

Judge: Hon. Araceli Martínez-Olguín

# Exhibit B

# Officials say lithium-ion batteries sparked two recent fires

**By Kate Armanini**
GLOBE CORRESPONDENT

Two recent fires in Medford and New Bedford that displaced 10 people were sparked by lithium-ion batteries, which power cell phones and other consumer products, state officials said.

In Medford, two battery-powered scooters started a four-alarm fire April 30, displacing four residents, the state fire marshal's office said Thursday.

The fire burned for more than two hours and caused significant structural damage to the two-family home on Allston Street, officials said. Investigators said that the blaze spread rapidly from the scooters in a laundry room on the first floor.

"Lithium-ion batteries contain a tremendous amount of power in a small package," Medford Fire Chief John E. Freedman said in a statement. "When they burn, they burn extremely hot, release toxic gases, and can re-ignite even after the fire has been extinguished. It's vitally important to use, store, and charge them safely according to the manufacturer's instructions."

In New Bedford, charging lithium-ion batteries sparked a fire that swept through an apartment on Wednesday, displacing six residents, officials said.

At 11:38 a.m., crews arrived to find smoke in a wood-frame apartment on Hathaway Boulevard, fire officials said. Firefighters put out the blaze in the basement of the unit, officials said. No one was injured, and the Red Cross assisted the residents who were displaced.

"Once overhaul began, crews determined they had extinguished a fire involving lithium-ion batteries," officials said. The batteries were taken to a recycling plant in secure containers, officials said. State fire officials urge residents to practice safety when using the batteries, an increasingly common cause of fires in recent years.

The number of fires caused by lithium-ion batteries in Massachusetts has increased in recent years. There were 13 lithium-ion battery fires last year, compared to nine in 2018.

The batteries can start fires and release toxic gases. They also can reignite, making the fires difficult to extinguish, officials said. They're used in many mobile devices, including cellphones, wireless headphones, electric cars, and e-scooters.

"Lithium-ion batteries are growing in use, and they power everything from pocket-sized devices to motor vehicles," State Fire Marshal Peter J. Ostroskey said in the statement. "Choose items that are listed by a nationally recognized testing lab like Underwriters Laboratories (UL) or Intertek (ETL). The lab's mark is a sign that the device has been tested to meet certain safety requirements." Ostroskey urges residents to store e-bikes outdoors and charge cell phones directly from a wall outlet, among other safety steps.

*Kate Armanini can be reached at kate.armanini@globe.com. Follow her on Twitter @KateArmanini.*

NEW BEDFORD FIRE DEPARTMENT

**Crews placed lithium-ion batteries into secure containers after an apartment fire Wednesday in New Bedford, officials said.**

> The state fire marshal urges residents to store e-bikes outdoors and charge cell phones directly from a wall outlet.

# Islamophobia incidents rising in public schools, report finds

**▶BULLYING**
*Continued from Page B1*

school, said teachers he attempted to confide in would either brush off these incidents or contribute to the harassment by making statements about Muslims "being too radical" and violent.

"When I was a student, I didn't seek any civil rights counsel from organizations like CAIR," he said, though he said his family and other families of color would report such incidents to school staff. "But the school was never willing to do anything about it."

After a group of students attempted to provoke him into a fight, he said he filed a police report to begin documenting his experiences of Islamophobia.

"I would be issued death threats, empty death threats," he said. "They got to the point where they threatened to rape my sister and tie her down to a table and just do horrific things to her."

CAIR's 2022 report also includes complaints about students being unfairly disciplined and perceived as potential terrorists compared to non-Muslim classmates.

"If a child is acting out in a way where there's a potential for violence, of course that needs to be taken seriously," said Dougan. "But what we're seeing is overreactions, and is it because Muslim children are unfairly labeled as more likely to engage in some sort of juvenile-level terrorist act?"

The report also cites how Muslim girls report that their schools failed to protect them from bullies targeting them and their head covering, noting one case where an eighth-grader was issued a dress code violation for wearing a hijab on her first day of school.

As the Globe previously reported, the Muslim family said their eighth-grader came home in tears after receiving the infraction and noted that hijab was misspelled as "jihab" on the School Uniform Compliance Form.

The incident sparked an outcry in the local community, with many accusing the Mystic Valley Regional Charter School of mishandling the situation and being insensitive of religious attire.

According to CAIR's bullying report of Massachusetts Muslim Youth from 2021, 17 percent of students reported having their hijab tugged, pulled on, or other forms of offensive touching.

Dougan also noted the new spike in hate crime and harassment numbers from the "last five or six years."

Most cases of anti-Muslim harassment and assault start out as random encounters, she said, occurring at places most wouldn't expect to deal with hate, such as grocery stores or gas stations.

One such incident included in the group's report was that of a Melrose city councilor who was called a terrorist by a woman at a gas station. When the councilor's husband confronted the woman, she allegedly shoved him so she could take a photo of their car.

One CAIR client, a father who filed a complaint after experiencing anti-Muslim harassment, wrote: "I am writing this complaint with friend of mine who help me with the English yet the racist and ill treatment of my family and I is a subject that can be understood by any language."

*Ashley Soebroto can be reached at ashley.soebroto@globe.com.*

***This Mother's Day...***

**HONOR A WOMAN IN YOUR LIFE WITH A GIFT TO WOMEN IN NEED**

Each Mother's Day card supports a week of healthy lunches for a guest of **Women's Lunch Place**.

The artwork was created by a guest and the back of the card tells her story!

A $25 donation includes one card, mailed to you or the recipient.

women's lunch place

mothersdaycards.org

Access your Globe account online:
bostonglobe.com/subscriber

The Boston Globe

notices
&more
boston.com/classifieds

LEGAL NOTICES LEGAL NOTICES

(SEAL)
**THE COMMONWEALTH OF MASSACHUSETTS**
**LAND COURT**
**DEPARTMENT OF THE TRIAL COURT**
**22 SM 003897**
**ORDER OF NOTICE**

To: Mary Clark

and to all persons entitled to the benefit of the Servicemembers Civil Relief Act, 50 U.S.C. c. 50 §3901 (et seq):

Bank of New York Mellon Trust Company, N.A., as Trustee for Mortgage Assets Management Series I Trust

claiming to have an interest in a Mortgage covering real property in Billerica, numbered 12 Priscilla Lane, given by Norman R. Clark, Mary Clark to Financial Freedom Senior Funding Corporation, a subsidiary of Indy Mac Bank, F.S.B., dated May 14, 2007, and recorded in the Middlesex County (Northern District) Registry of Deeds in Book 21247, Page 28, and now held by the Plaintiff by assignment, has/have filed with this court a complaint for determination of Defendant's/Defendants' Servicemembers status.

If you now are, or recently have been, in the active military service of the United States of America, then you may be entitled to the benefits of the Servicemembers Civil Relief Act. If you object to a foreclosure of the above-mentioned property on that basis, then you or your attorney must file a written appearance and answer in this court at Three Pemberton Square, Boston, MA 02108 on or before January 30, 2023, or you may lose the opportunity to challenge the foreclosure on the ground of noncompliance with the Act.

Witness, Gordon H. Piper, Chief Justice of this Court on December 19, 2022.
Attest: Deborah J. Patterson
Recorder
22847

(SEAL)
**THE COMMONWEALTH OF MASSACHUSETTS**
**LAND COURT**
**DEPARTMENT OF THE TRIAL COURT**
**22 SM 003766**
**ORDER OF NOTICE**

To:Jason Moore

and to all persons entitled to the benefit of the Servicemembers Civil Relief Act, 50 U.S.C. c. 50 §3901 (et seq):

NewRez LLC d/b/a Shellpoint Mortgage Servicing,

claiming to have an interest in a Mortgage covering real property in Boston (Dorchester), numbered 274 1/2 Norfolk Street, given by Jason Moore to Mortgage Electronic Registration Systems, Inc., as nominee for Intercontinental Capital Group, Inc., dated October 11, 2019, and recorded in Suffolk County Registry of Deeds in Book 61908, Page 90, and now held by plaintiff by assignment, has/have filed with this court a complaint for determination of Defendant's/Defendants' Servicemembers status.

If you now are, or recently have been, in the active military service of the United States of America, then you may be entitled to the benefits of the Servicemembers Civil Relief Act. If you object to a foreclosure of the above-mentioned property on that basis, then you or your attorney must file a written appearance and answer in this court at Three Pemberton Square, Boston, MA 02108 on or before January 23, 2023, or you may lose the opportunity to challenge the foreclosure on the ground of noncompliance with the Act.

Witness, Gordon H. Piper, Chief Justice of this Court on December 9, 2022.
Attest: Deborah J. Patterson
Recorder
22-003145

**TRUST CITATION**
**Docket No. SU124484**
**Commonwealth of Massachusetts**
**The Trial Court**
**Suffolk Probate and Family Court**
**24 New Chardon St. Boston, MA 02114**
**617-788-8300**

In the matter of: Henry O. Peabody, School for Girls
To all interested persons:
A Petition has been filed by: William T. Simonds of Concord, MA, requesting the Court Approve the 74th through 80 Trust Accounts.

You have the right to obtain a copy of the Petition from the Petitioner or at the Court You have a right to object to this proceeding. To do so, you or your attorney must file a written appearance and objection at this Court before 10:00a.m. on May 25, 2023
This is NOT a hearing date, but a deadline by which you must file a written appearance and objection if you object to this proceeding. If you fail to file a timely Written appearance and objection followed by an Affidavit of Objections within thirty (30) clays of the return date, action may be taken without further notice to you.

WITNESS, Hon. Brian J. Dunn, First Justice of this Court
Date: April 04, 2023
Vincent Procopio, Register of Probate

Notice is hereby given under Chapter 138 of the Massachusetts General laws that an application has been received from Brookline Sky, Inc., dba Omori Izakaya, for the sale of stock to existing shareholders, change of officers/directors, and change of liquor license manager for the premises located at 195 Washington Street, a.k.a. 4-6 Station Street, Brookline, MA 02245. Proposed manager Shenrong Huang. A hearing will be conducted at 6:30 PM on Tuesday, May 16, 2023, at the Town of Brookline, 333 Washington Street, 6th floor, Brookline, MA 02445. Participants can also join via Zoom. The link for the Zoom can be obtained through the Town of Brookline Select Board's office.

**New Listings Everyday**

FOR SALE

boston.com/realestate

LEGAL NOTICES LEGAL NOTICES LEGAL NOTICES

FDIC

**PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA**

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

Client Name:
Advertiser:
Section/Page/Zone: Metro/B005/NZ
Description:

Ad Number:
Insertion Number:
Size:
Color Type:

The Boston Globe

Publication Date: 05/08/2023

This E-Sheet is provided as conclusive evidence that the ad appeared in the Boston Globe on the date and page indicated. You may not create derivative works, or in any way exploit or repurpose any content.

Los Angeles Times

**Publication Date: 05/08/2023**

This electronic tearsheet confirms the ad appeared in the Los Angeles Times on the date and page indicated. You may not create derivative works, or in any way exploit or repurpose any content.

| | |
|---|---|
| Ad Number: | 7930577-1 |
| Insertion Number: | |
| Size: | 3 x 11 |
| Color Type: | B&W |

| | |
|---|---|
| Client Name: | / PO# R5020020,  R5020 |
| Advertiser: | Miller Advertising |
| Section/Page/Zone: | Legal/B004/LA |
| Description: | First Repub R5020020, R5020021,R502 |

# Residents fume over decades of illegal dumping

**[Trash,** from B1]

illegally dumped garbage and the city's failure to clean it up. "It's dangerous for my kids," a Watts resident told The Times 30 years ago. "We know it can be better than this."

A city garbage truck operator, who requested anonymity because he was not authorized to speak to the media, said Watts is infamous as an illegal dumping site. "Who honestly wants to go above and beyond when if I pick it up today [and] come back tomorrow, there might be twice as much?"

The L.A Sanitation and Environment department declined repeated requests for an interview but said in a statement that it "has been keenly aware of the problem of illegal dumping."

The statement said 98% of calls for service are fulfilled on the weekly trash collection day, a statistic backed up by publicly available data.

LA Sanitation said that it is hiring more crews citywide to clean up illegal dumping and that it has created specialized crews that "proactively identify and address chronic areas where illegal dumping of materials and trash consistently happens." It did not say whether those areas will include Watts, and it declined to explain how those crews would actually work.

All of which leaves Watts residents feeling maddeningly powerless. The city knows the problem is severe and says it's taking action, yet the trash just keeps

spilling out onto sidewalks, alleys and streets.

As a result, many residents have become numb to the trash they see all around them, said John Jones, who served as field deputy for Watts under former City Councilmember Joe Buscaino and now runs a local nonprofit bicycling club. When Jones worked for the City Council, he'd kick off community meetings with a reminder: "Call 311." But some residents would "get tired of not seeing anything happen," he said, and just give up.

## Big trucks and railroad tracks

Trash accumulates in Watts for several reasons, said George Magallanes, newly elected Councilmember Tim McOsker's deputy district director for Watts.

Big trucks, often with their license plates removed, pull into Watts in the dead of night and jettison their loads to avoid paying fees for legal disposal, Magallanes said, adding, "They know they can dump it in this community and nobody will care."

Watts is also densely populated, he said, with tenants crammed into rental units generating more trash than their bins can hold. And evictions occur more frequently in communities of color such as Watts, with displaced tenants often abandoning household items on the curb.

Union Pacific railroad tracks that cut through the

center of Watts have proved to be an irresistible magnet for illegal dumping. Magallanes stood next to a cabinet, electric fan and whiteboard dumped beside the rail line, while across the tracks was another pile of litter, including a broken toilet. "This is nothing," he said.

The city and Union Pacific have been embroiled in a years-long bureaucratic battle over who is supposed to clean up the tracks, leaving residents with no clear target for their complaints.

The railroad has jurisdiction over most of its track right of way that runs through Watts, and while it works to keep the area clean, the company told The Times, it must coordinate with LA Sanitation for tasks such as picking up furniture and other big items.

Magallanes said he believes the problem is simpler. Union Pacific, he said, doesn't "want to take responsibility."

Magallanes said the city doesn't have enough sanitation trucks to keep up with all the service requests: "If I hired 20 extra trucks of sanitation in Watts, do you think there'd be a piece of wrapper on the floor? No."

McOsker pointed to a citywide "dearth in the number of sanitation workers," but said in an interview that he is pushing "to redeploy them in an equitable way." He said he is working with LA Sanitation to allocate more funding and assign more sanitation personnel to Watts.

"I'm hopeful that Tim is

> 'They know they can dump it in this community and nobody will care.'
>
> — GEORGE MAGALLANES,
> newly elected Councilmember Tim McOsker's deputy district director for Watts

going to keep his promises," said Timothy Watkins, president and chief executive of the Watts Labor Community Action Committee. "But I'm also skeptical because as good as it sounds, it sounds good every time one of them is running for office." LA Sanitation did not answer questions about McOsker's proposals but said it works with "all council districts to meet their requests."

In 2008, Mayor Antonio Villaraigosa ordered a review of illegal dumping and the Los Angeles Police Department launched a task force after The Times reported that refuse, including dead animals, festered for weeks in alleys in Watts and adjacent neighborhoods.

In 2014, then-City Atty. Mike Feuer announced the formation of a "strike force" to battle illegal dumping in the city's hardest-hit areas.

In 2015, Mayor Eric Garcetti launched a $5-million "Clean Streets Initiative," which promised to use data-driven ratings — similar to New York's — that would measure the cleanliness of every city street. That's the data that show Watts has actually gotten worse since 2016.

Two years ago, the city controller found that LA Sanitation was "struggling to keep up with the high demand" for illegal dumping service requests, and a year ago the City Council approved funding to double the teams devoted to illegal dumping.

## 'Making a person feel less than'

On a recent drive through Watts, Watkins pointed out piles of cardboard, tires and discarded furniture on the sidewalk. "This is life in Watts," he said.

L.A. County's public health website warns that illegally dumped items draw "rats and insects that can spread diseases to humans."

Along the railroad tracks, Watkins identified mounds of dirt, of various colors, that he said he tested for toxins: "My tests show everything from antimony to manganese, along with lead, chromium, arsenic."

The trash also poses a fire hazard. A mound of trash burst into flames next to one of Watkins' buildings in 2016, causing extensive property damage.

Real estate agent Rene Mexia said illegal dumping devalues property in Watts. "I've had property tours set up where I'm standing out there to meet someone and they pretty much do a U-turn, just because of the way it looks," Mexia said.

Then there's the psychological toll. "Kids walk right past [the trash] like it's normal," said Phillip Lester of the Watts Neighborhood Council. "It's an unconscious psychological pain, making a person feel less than."

A 2015 analysis by The Times found that residents of low-income neighborhoods such as Watts received slower and poorer street cleaning service than wealthier L.A. ZIP Codes.

In Watts, residents do something that would be all but unthinkable in the city's wealthy enclaves: volunteer to walk the streets and pick up garbage. "If you're not taking care of yourself around here, it's not happening," said Lester, who leads regular trash pickups.

## Transforming trash into pieces of art

Marcela Oliva, a professor of architecture at Los Angeles Trade-Technical College, knelt in a garden near the railroad tracks, watching two children collect pipes, broken glass, colorful shards of plastic and other pieces of trash, then align them on the back of a tile. "They are using the trash to create art," Oliva said.

Oliva and her class of Trade-Tech students — many of whom grew up in Watts — recently developed a proposal for a three-mile "nature walk" along the Watts train tracks. The proposed project would install trees for shade, artistic benches and canopies, vertical trellises to grow food, and solar-powered lights equipped with cameras for capturing illegal dumpers in the act.

Oliva is also pushing to get more dumpsters into Watts, which local artists could decorate with murals. "Even the dumpsters can be beautiful," Oliva said.

A hundred years ago, an Italian tile setter named Sabato Rodia walked along the railroad tracks, collecting rebar, soda bottles and broken pottery.

"On weekends and at nighttime, under lights he strung up, he was building something strange and mysterious," Watts resident Charles Mingus, the jazz legend, wrote in his autobiography. Rodia's project became the famous Watts Towers.

In the 1960s, Watts-based artist Noah Purifoy, whose work has been exhibited in museums worldwide, created visual art and sculpture from materials salvaged around the neighborhood.

"In Watts, [junk] was extremely accessible," he recalled. "Garbage day was a time when people put their trash out, but it was often not picked up, and so it stayed there for weeks. In some places, there was no pickup at all."

*This article was reported and edited in conjunction with the investigative journalism program at USC. The reporters may be contacted at aduhbins@usc.edu and cabelloc@usc.edu.*



## MARKETPLACE
### JOBS · REAL ESTATE · MORE
latimes.com/placead
To place an ad call 1.800.234.4444
Los Angeles Times

**Don't let the phone stop ringing**
Advertise with LA Times Classified
(800) 234-4444

**FREON WANTED**
Certified buyer looking to buy R11, R12 & most all Call Xiomara at 312-697-1976.

---

### FDIC

**PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA**

On May 1, 2023 (the "Closing Date"), the California Department of Financial Protection and Innovation closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver on or **before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
First Republic Bank
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent 10543

Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. You may have your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at JPMorgan Chase Bank, Columbus, OH by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024**, federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

---

**JPMorgan Chase Bank, N.A. has assumed the deposits of First Republic Bank**

On May 1, 2023, the California Department of Financial Protection and Innovation closed First Republic Bank and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. JPMorgan Chase Bank, N.A. then entered into an agreement with the FDIC to acquire the substantial majority of assets and assume the deposits and certain other liabilities of First Republic Bank from the FDIC.

Deposits formerly held at First Republic Bank have been transferred to JPMorgan Chase Bank, N.A. Transferred deposits remain protected by FDIC deposit insurance going forward up to applicable insurance coverage limits. First Republic Bank clients should continue banking at First Republic preferred banking offices and ATMs, online at FirstRepublic.com and on the mobile banking app. Clients can also continue using their same checks, debit and ATM cards. For questions, clients should contact their First Republic team or call (888) 408-0288.

**About JPMorgan Chase Bank, N.A.**

JPMorgan Chase Bank, N.A. operates branches in 48 U.S. states and Washington, D.C., and is a wholly owned subsidiary of JPMorgan Chase & Co., a leader in financial services for more than 200 years. JPMorgan Chase & Co. had $3.7 trillion in assets as of December 31, 2022.

**JPMorgan Chase & Co.**

Deposit products and related services are offered by JPMorgan Chase Bank, N.A. Member FDIC. ©2023 JPMorgan Chase & Co.

---

**Your exclusive guide to SoCal real estate listings.**
Advertise Today
LA Times Classified
(800) 234-4444









**A TORN** trash bag sits along the 11100 block of South Central Avenue last week in the Watts neighborhood.

Gary Coronado Los Angeles Times

Nxxx,2023-05-08,B,002,Bs-BW,E1

# *No End in Sight for Hollywood Writers' Strike*

FROM FIRST BUSINESS PAGE

ing to stay out until something changes because they can't afford not to."

The Alliance of Motion Picture and Television Producers, which bargains on behalf of studios, streaming services and networks, has maintained that it hopes "to reach a deal that is mutually beneficial to writers and the health and longevity of the industry." Privately, however, member companies say they are prepared to weather a strike of at least 100 days. The most recent writers strike, which began in 2007 and ended in 2008, lasted that long.

"It's fair to say there's a pretty big gap," Bob Bakish, chief executive of Paramount Global, told analysts and investors on a conference call on Thursday. Paramount and its CBS subsidiary are prepared to "manage through this strike," he added, "even if it's for an extended duration."

Both sides have insisted that the other needs to make the first move to restart talks. None are scheduled. For the moment, media companies have turned to contract renewal negotiations with the Directors Guild of America, which start on Wednesday. That contract expires on June 30.

Like writers, directors want more money, especially regarding residual payments (a type of royalty) from streaming services, which have rapidly expanded overseas. Before streaming, writers and directors (and other creative contributors, including actors) could receive residual payments whenever a show was licensed, whether that was for syndication, an international deal or DVD sales. In the streaming era, as global services like Netflix and Amazon have been reluctant to license their series, those distribution arms have been cut off.

In addition to raises, however, writers want media companies — Netflix, in particular — to make structural changes to the way they do business. The companies — Netflix, in particular — say that is a bridge too far.

The W.G.A. has proposals for mandatory staffing and employment guarantees, for instance. The union contends that the proposals are necessary because entertainment companies are increasingly relying on what is known in Hollywood slang as a miniroom. In one example of a miniroom, studios hire a small group of writers to develop a series and write several scripts over two or three months. Because they have not officially ordered the series, studios pay writers less than if they were in a large, traditional writers' room.

And given the relatively short duration of the position, those writers are then left scrambling to find another job if the show is not picked up. If a show does get a green light, fewer writers are sometimes hired because blueprints and several scripts have already been created.

MARK ABRAMSON FOR THE NEW YORK TIMES

**A picket line in Burbank, Calif., on Thursday. One analyst speculated that the strike could delay the fall TV season.**

"While the W.G.A. has argued" that mandatory staffing and duration of employment "is necessary to preserve the writers' room, it is in reality a hiring quota that is incompatible with the creative nature of our industry," the studio alliance said in a statement on Thursday.

Writers responded with indignation. "We don't need the companies protecting us from our own creativity," said Mr. Keyser, whose writing credits include "Party of Five" and "The Last Tycoon." "What we need is protection from them essentially eliminating the job of the writer."

Writers also want companies to agree to guarantee that artificial intelligence will not encroach on writers' credits and compensation. Such guarantees are a nonstarter, the studio alliance has said, instead suggesting an annual meeting on advances in the technology. "A.I. raises hard, important creative and legal questions for everyone," the studios said on Thursday. "It's something that requires a lot more discussion, which we have committed to doing."

Mr. Keyser's response: Go pound sand.

"This is exactly what they offered us with the internet in 2007 — let's chat about it every year, until it progresses so far that there's nothing we can do about it," he said.

In that case, have fun on the picket lines, studio executives have said privately: It's going to be hot out there in July.

Over the last week, media companies conveyed an air of business as usual. On Thursday, HBO hosted a red carpet premiere for a documentary, while the Fox broadcast network announced a survivalist reality show called "Stars on Mars" hosted by William Shatner.

"3 . . . 2 . . . 1 . . . LIFT OFF!" the network's promotional materials read.

With the exception of late-night shows, which immediately went dark, Mr. Bakish assured Wall Street, "consumers really won't notice anything for a while." Networks and streaming services have a large amount of banked content. Reality shows, news programs and some scripted series made by overseas companies are unaffected by the strike. Most movies scheduled for release this year are well past the writing stage.

> *'Any hope that this would be fast has faded.'*
>
> Tara Kole, a founding partner of JSSK, an entertainment law firm.

Shares climbed on Friday for every company involved with the failed contract talks; investors tend to like it when costs go down, which is what happens when production slows, as during a strike.

If the strike drags into July, analysts pointed out, studios can exit pricey deals with writers under "force majeure" clauses of contracts.

"The sorry news for writers is that, in declaring a strike, they may in fact be helping the streaming giants and their parent companies," Luke Landis, a media and internet analyst at SBV MoffettNathanson, wrote in a report on Wednesday.

Writers, however, succeeded in making things difficult for studios over the first week. Apple TV+ was forced to postpone the premiere of "Still," about Michael J. Fox and his struggle with Parkinson's disease, because Mr. Fox refused to cross a picket line. In Los Angeles, writers picketed the Apple TV+ set for "Loot," starring Maya Rudolph, causing taping to halt. In New York, similar actions disrupted production for shows like "Billions," the Showtime drama. Other affected shows included "Stranger Things" on Netflix, "Hacks" on HBO Max and the MTV Movie & TV Awards telecast on Sunday, which was scheduled to go forward without a host after Drew Barrymore pulled out, citing the strike.

"The corporations have gotten too greedy," Sasha Stewart, a writer for the Netflix documentary series, "Amend: The Fight for America" as well as "The Nightly Show With Larry Wilmore," said from a picket line last week. "They want to break us. We have to show them we will not be broken."

Writers went into the strike energized. But a rally at the Shrine Auditorium in Los Angeles on Wednesday seemed to supercharge the group, in part because leaders from other entertainment unions turned out to support them — and in fiery fashion. During the 2007 strike, writers were largely left to stand alone, while a union representing camera operators, set electricians, makeup artists and other crafts workers blasted the writers for causing "devastation."

Ellen Stutzman, chief negotiator for the writers, received a standing ovation from the estimated 1,800 people who attended the rally. During the session, writers suggested expanding picket lines to the homes of studio chief executives and starting a public campaign to get people to cancel their streaming subscriptions.

Some writers realized that Teamsters locals, which represent the many drivers that studios rely on to transport materials (and people), would not cross picket lines. So they started to picket before dawn to intercept them. (The W.G.A. has advised a 9 a.m. starting time.) At least one show, the Apple TV+ dystopian workplace drama "Severance," was forced to shut down production on Friday as a result of Teamsters drivers' refusing to cross.

# Clearing Up the Confusion Over Mortgage Fee Changes

FROM FIRST BUSINESS PAGE

credit still pays.

"You still get a better rate and loan pricing if you make a higher down payment and have better credit," said Bob Broeksmit, president and chief executive of the Mortgage Bankers Association, an industry trade group.

In fact, the mortgage pricing update — which apply to loans backed by Fannie Mae and Freddie Mac, the two quasi-governmental entities that guarantee or purchase the majority of mortgages across the country — is old news. It has been baked into what borrowers pay for months.

The fees were recalibrated in January, when the regulator that oversees Fannie and Freddie — the Federal Housing Finance Agency, known as the F.H.F.A. — introduced new pricing charts that lay out how fees are applied to different borrowers and loan types. But the change may have resurfaced now because the updated fees became effective for loans delivered to Fannie and Freddie on May 1. Given the time it takes to close new loans and home purchases, the new fee menus had already been incorporated into mortgages for a while.

There's little borrowers can do to control the market forces that drove up interest rates on mortgages in the past year. They stood at 6.4 percent as of Friday, nearly twice their level at the start of last year. But your financial profile — your credit scores, the size of your down payment — also factors into how much you pay for a loan. That's where these fees come into play.

### The fees have been in place since 2008.

Depending on how borrowers stack up, they will pay a separate fee on a mortgage backed by Fannie Mae and Freddie Mac.

Those fees, which are a percentage of the loan amount, are often layered on top of a borrower's base mortgage rate; and the better your credit score, the less you generally pay. In other words, the riskier the loan is deemed to be, the higher the fee.

These costs aren't new. They date back to the 2008 financial crisis, when housing prices plunged and mortgage defaults soared, devastating Fannie Mae and Freddie Mac. These fees helped shore up the companies' finances and are now used to pay for the guarantees these companies provide.

Under the new pricing structure, mortgage borrowers with higher credit scores — and down payments of about 15 percent to just under 20 percent — saw fees climb the most, while those with lower scores and down payments had the most significant declines. Critics seized on the seeming inequity of it all, including a chart that focused on how much prices were *changing* — but not the actual end costs.

Broadly speaking, a borrower's costs on the average $300,000 loan were projected to rise 0.04 percentage points, or $10 a month.

But the specifics will vary based on your circumstances. Consider a borrower with a 740 credit score and a down payment of 20 percent. On a $300,000 mortgage, her upfront fee will rise to $2,625, or 0.875 percent of the loan, from $1,500, or 0.5 percent. If the borrower didn't pay the fee at closing, it could be baked into her interest rate — and the higher charge would add roughly 0.125 percentage points to the overall rate, or $25 a month, according to calculations by Mark Maimon, a senior vice president at NJ Lenders.

The change is more significant for a borrower with a score of 630 and a down payment of just under 5 percent — the upfront fee drops to 1.75 percent of the loan amount from 3.5 percent. On a $300,000 loan, that translates to $5,250, down from $10,500.

If they chose to incorporate the fee into their mortgage rate, the second borrower would now pay about one percentage point less, shaving about $193 from their monthly payment.

The bottom line: The borrower in the stronger financial position will still pay much less in fees, or half the amount paid by the individual with the lower score and down payment.

The pricing also reflects factors that may not be obvious: People with down payments of less than 20 percent are required to buy private mortgage insurance (which, according to Freddie Mac, can add $30 to $70 a month for every $100,000 you borrow). That means they pay more, in total, than those with down payments of 20 percent or more.

The insurance protects the lender, not the borrower — that, in turn, reduces some of the risk of borrower default to Fannie or Freddie and shifts it to the private insurer. "So those who put down less than 20 percent pose less risk," according to a recent paper by Jim Parrott of the Urban Institute, "and should pay less in fees."

### The misinformation fixated on creditworthiness.

Those nuances aren't easily explained in short clips on social media. Instead, many critics figured that less creditworthy borrowers were getting a break at the expense of those with higher scores.

"Did you ever think in a million years that having good credit would actually punish you if you were buying or refinancing a home?" one outraged TikTok user asked.

Such sentiments — or some version of them — gained traction on cable television, social media and elsewhere. "We're hurting the good people," Mr. Carlson said during his segment.

Sandra Thompson, the director of the F.H.F.A., explained in a statement meant to "set the record straight" on why the agency made the changes, which began with a review of Fannie and Freddie's pricing and programs in 2021 (it was last updated in 2015). The agency reiterated that it had recalibrated the fees on its most traditional mortgages to better reflect the risks of the loans and to strengthen its finances.

"Higher-score borrowers are not being charged more so that lower-score borrowers can pay less," Ms. Thompson said in the statement.

### The mission is to make homeownership more accessible.

Providing lower and moderate income people with a sustainable path to homeownership is part of Fannie and Freddie's longstanding mission. And the F.H.F.A. said it made other changes to help support those goals.

At the beginning of last year, the agency said it would raise fees on loans that weren't exactly central to that mission: It increased pricing on vacation home loans, larger mortgages, as well as on borrowers who refinanced their loans and withdrew cash from their home equity. "It is through those increases that we were able to eliminate fees for certain home buyers that are lower or moderate income," according to F.H.F.A. officials.

Gary Acosta, a co-founder and the chief executive of the National Association of Hispanic Real Estate Professionals, said he thinks borrowers on the margins were paying an excessive amount in fees in relation to the risk they added to Fannie and Freddie's mortgage portfolios. But he doesn't think the price changes are meaningful enough to make a big difference.

"It is not clear that these price adjustments are going to result in more borrowers being able to participate in homeownership," Mr. Acosta said. These borrowers may still be more likely to find better pricing through the Federal Housing Administration, he said, a government agency that insures mortgages made largely to first-time homeowners, often with small down payments and lower scores than Fannie or Freddie will permit.

Mark Calabria, a former director of the F.H.F.A. and a senior adviser at the Cato Institute, a libertarian think tank, also expects the pricing changes to have minimal effects on the broader housing and mortgage markets.

But there are practical takeaways. People living in higher-cost areas who need larger mortgages to finance their homes, for example, may be better off getting mortgages through providers that hold the loans in their own portfolios instead of selling them to Fannie or Freddie.

"It still pays for you to build your credit and to shop around," said Mr. Calabria, "even more now."

**FDIC**

**PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA**

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | |
|---|---|
| In re: TEHUM CARE SERVICES, INC.,[1] | Chapter 11 |
| Debtor. | Case No. 23-90086 (CML) |

**NOTICE OF DEADLINES FOR THE FILING OF PROOFS OF CLAIM**

**THE CLAIMS BAR DATE IS AUGUST 14, 2023**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

***Deadlines for Filing Proofs of Claim.*** On May 2, 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. 499] (the "Bar Date Order") establishing certain deadlines for the filing of proofs of claim ("Proofs of Claim") in the chapter 11 case of Tehum Care Services, Inc. f/k/a Corizon Health, Inc. (the "Debtor").

***The Bar Dates.*** Pursuant to the Bar Date Order, ***all*** entities (including governmental units), including individuals, partnerships, estates, and trusts that have a claim or potential claim against the Debtor that arose prior to February 13, 2023, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on or before ***August 14, 2023 (the "Claims Bar Date")***. All entities holding claims arising from the Debtor's rejection of executory contracts and unexpired leases are required to file Proofs of Claim by ***the date that is (a) the later of the Claims Bar Date, and (b) the date that is thirty (30) days following entry of the order approving the Debtor's rejection of the applicable executory contract or unexpired lease (the "Rejection Damages Bar Date")***. All entities holding claims affected by an amendment to the Debtor's Schedules are required to file Proofs of Claim by ***the later of (a) the Claims Bar Date, and (b) the date that is thirty (30) days from the date on which the Debtor mails notice of the amendment to the Schedules (the "Amended Schedules Bar Date")***.

**ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM ON OR BEFORE THE CLAIMS BAR DATE SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.**

***Filing a Proof of Claim.*** Each Proof of Claim must be filed, including supporting documentation, by either (i) electronic submission through PACER (Public Access to Court Electronic Records at http://ecf.txsb.uscourts.gov), (ii) electronic submission using the interface available on the Claims and Noticing Agent's website at www.kccllc.net/tehum or (iii) if submitted through non-electronic means, by U.S. Mail or other hand delivery system, so as to be ***actually received*** by the Claims and Noticing Agent on or before the Claims Bar Date, or any other applicable Bar Date, at the following addresses: **If by First-Class Mail:** Tehum Care Services, Inc. Claims Processing Center, c/o KCC, 222 N Pacific Coast Highway, Suite 300, El Segundo, CA 90245 –or– **If by Hand Delivery or Overnight Mail:** Tehum Care Services, Inc. c/o KCC, 222 N Pacific Coast Highway, Suite 300, El Segundo, CA 90245.

**PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED.**

***Contents of Proofs of Claim.*** Each Proof of Claim must: (1) be written in legible English; (2) include a claim amount denominated in United States dollars; (3) clearly identify the Debtor against which the claim is asserted (4) conform substantially with the Proof of Claim form provided by the Debtor or Official Form 410; (5) be signed by the claimant or by an authorized agent or legal representative of the claimant on behalf of the claimant, whether such signature is an electronic signature or is ink; and (6) include as attachments any and all supporting documentation on which the claim is based.

***Electronic Signatures Permitted.*** Proofs of Claim signed electronically by the claimant or an authorized agent or legal representative of the claimant may be deemed acceptable for purposes of claims administration. Copies of Proofs of Claim, or Proofs of Claim sent by facsimile or electronic mail will not be accepted.

***Additional Information.*** If you have any questions regarding the claims process and/or you wish to obtain a copy of the Bar Date Notice, a proof of claim form or related documents you may do so by: (i) calling the Debtor's restructuring hotline at (866) 967-0491 (Toll-Free) or (310) 751-2691 (International); or (ii) visiting the Debtor's restructuring website at: www.kccllc.net/tehum.

[1] The last four digits of the Debtor's federal tax identification number is 8853. The Debtor's service address is: 205 Powell Place, Suite 104, Brentwood, Tennessee 37027.

Ad Number: 6331227001
Insertion Number: 6331227001
Size: F1/4
Color Type: CMYK

Advertiser: Legal Notice
Agency: Miller Advertising
Section-Page-Zone(s): A-5-All
Description: FIRST REPUBLIC BANK

San Francisco Chronicle
Monday, May 8, 2023

# Hundreds celebrate culture at lowrider show

By Danielle Echeverria

Bay Area rap, reggaeton and cumbia music rang through the Mission District on Saturday as people of all ages gathered for a Cinco de Mayo car show and block party where they admired dozens of pristine lowriders and celebrated both Latino and Bay Area culture.

Local artists, shops and chefs had booths lined on both sides of Harrison Street behind John O'Connell High School, selling food or handmade goods and reuniting with old friends.

"We're out here trying to build community," Cutberto Ramirez said. "This is the place to be."

Ramirez, who organized the event with the San Francisco Lowriders Council, runs the clothing brand Hella Paisa, which celebrates Latino and Mexican culture with a California spin. He said he was excited to get all of his friends and vendors out to the event to showcase their products to the Mission community.

"It's about celebrating our people," he said with infectious passion.

One of the vendors, first-year college student Samantha Castellon, was excited that the event provided an opportunity to sell her handmade jewelry and candles, meet new people and learn more about being a small-business owner.

"I found my passion in art," said Castellon, 18. She explained that, when she was diagnosed with Type 1 diabetes as a 9-year-old, making art helped her cope. Now, she said, she hopes her products can help people do the same.

"I want to help people heal spiritually," she said, adding that she hopes to be an ob-gyn someday. "I put a lot of work into each piece I make, and I really hope people enjoy them."

In the high school parking lot off Harrison Street, dozens of lowriders were parked, hoods open, for passersby and car enthusiasts to enjoy, discuss and photograph before they cruised in the Mission later in the afternoon. Proceeds from the car show benefit the high school.

A crowd favorite was Abel Rueda's 1962 Impala, painted with intricate designs in 49ers red and gold. Every detail was thought out — the metal throughout the car, including the door handles, the armrests inside and the engine, was engraved.

Rueda, who is from San Jose and has shown many cars before, said getting the car to this point took 12 years.

"I'm proud of it," he said.

The event also featured several performances, including baile folklórico, mariachi and traditional Aztec dance. Ariane Cortés, who teaches mariachi in the San Francisco Unified School District, said celebrating through music is important to teach children, including her daughter Camila, who was performing with Mariachi La Misión.

"It's so important to teach youth the joy of making music together," she said.

Camila, who has been playing the violin for 11 years, said her parents got her into music and that playing with the mariachi band is an important experience for them to share.

"It's very cultural," she said. "It's good to express that."

*Reach Danielle Echeverria: danielle.echeverria@sfchronicle.com; Twitter: @DanielleEchev*

Photos by Felix Uribe/Special to The Chronicle

**A spectator looks at the lowriders in the Mission District of San Francisco on Saturday. Hundreds attended the Cinco de Mayo celebration of Latino and Bay Area culture. Local artists, shops and chefs had booths lined on both sides of Harrison Street.**

**A Chevy Bel-Air dropped to the floor at the car show, which featured dozens of lowriders. Proceeds from the event benefit John O'Connell High School.**

## JPMorgan Chase Bank, N.A. has assumed the deposits of First Republic Bank

On May 1, 2023, the California Department of Financial Protection and Innovation closed First Republic Bank and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. JPMorgan Chase Bank, N.A. then entered into an agreement with the FDIC to acquire the substantial majority of assets and assume the deposits and certain other liabilities of First Republic Bank from the FDIC.

Deposits formerly held at First Republic Bank have been transferred to JPMorgan Chase Bank, N.A. Transferred deposits remain protected by FDIC deposit insurance going forward up to applicable insurance coverage limits. First Republic Bank clients should continue banking at First Republic preferred banking offices and ATMs, online at FirstRepublic.com and on the mobile banking app. Clients can also continue using their same checks, debit and ATM cards. For questions, clients should contact their First Republic team or call (888) 408-0288.

**About JPMorgan Chase Bank, N.A.**

JPMorgan Chase Bank, N.A. operates branches in 48 U.S. states and Washington, D.C., and is a wholly owned subsidiary of JPMorgan Chase & Co., a leader in financial services for more than 200 years. JPMorgan Chase & Co. had $3.7 trillion in assets as of December 31, 2022.

JPMORGAN CHASE & CO.

Deposit products and related services are offered by JPMorgan Chase Bank, N.A. Member FDIC.
©2023 JPMorgan Chase & Co.

FDIC

## PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

# Top AI Researchers Debate Next Steps

Conference in Africa covers technology's promise and peril for poorer nations

By Karen Hao

KAREN HAO/THE WALL STREET JOURNAL

**The competition of ideas was a design feature of this year's convening of a major AI research conference in Africa for the first time.**

KIGALI, Rwanda—Amid growing talk of the promise and peril of artificial intelligence, more than 2,000 researchers and engineers from around the world gathered in Rwanda last week to debate contrasting visions for the technology's future.

One vision is to build ever-more-powerful systems such as ChatGPT that aim to exceed human intelligence to boost worker productivity and economic growth. The other is to create more-targeted, small-scale AI solutions to local and global challenges, including tackling climate change, improving healthcare and preserving biodiversity.

The competition of ideas was in part a design feature of this year's convening of a major AI research conference in Africa for the first time. The organizers wanted researchers, predominantly from the U.S. and China and wealthy corporations, to reckon with the realities of societal problems present on the continent, while giving African researchers a voice in the discussion.

"It's become obvious that in order to bring the potential benefits of AI to everyone, we need everyone to be part of it," said Yoshua Bengio, nicknamed one of the godfathers of AI, who sits on the conference organizers' board and was among those who pushed to locate it in Africa.

The arrival of ChatGPT months before the gathering has added urgency to discussions on the trajectory of AI and its near- and long-term impacts. Its release kicked off a global frenzy among the biggest tech companies from **Alphabet**'s Google to **Baidu** to develop their own so-called generative AI technologies, software that produces text and images that is stirring worries about job replacement and the rapid proliferation of misinformation.

Largely absent in Kigali yet present on everyone's lips was ChatGPT developer OpenAI, which has polarized the global AI community over whether to embrace or resist the company's trajectory.

On Monday, Geoffrey Hinton, another "godfather of AI" who wasn't in Rwanda, said he was leaving Google to speak more freely about the risks of AI development. Mr. Hinton has said in media interviews that he is concerned about the long-term existential threats of the technology to humanity.

At the conference, many researchers from Africa and other developing and minority populations said they were instead concerned about the immediate challenges that AI poses to their societies.

The current trend toward generative AI models threatens to exacerbate the dominance of the U.S. and China in AI development, leaving Africa behind or having to deal with the problems it creates, the researchers said. Such consequences include facing greater disinformation in African elections and the disappearance of their languages in digital technologies, they said.

Many researchers also were concerned about the lagging development of beneficial AI solutions that could help improve the basic quality of life for people around the world.

Girmaw Abebe Tadesse, an Ethiopian researcher in **Microsoft**'s Nairobi, Kenya, office, highlighted the critical data issues—such as error-filled medical forms—that hold back AI development for improving maternal care and eliminating child mortality in developing countries.

He also presented success stories including one that combined high-quality data with statistical analyses to discover that the southern region of Nigeria had a lower child mortality rate than the country's average. It enabled researchers to engage in more-focused investigations as to why and devise solutions for elsewhere.

Mr. Bengio said he hoped this year's conference setting would provoke researchers to move away from profit-driven AI advancements toward AI for social good applications.

"There have been a lot of discussions about the risks of AI, and I've been part of those discussions," he said. "But there are not enough discussions about what we need to do to put AI to really good use."

There were 261 attendees from Africa, up from only 16 in 2019, the last time the annual International Conference on Learning Representations, was held in person before the pandemic, the organizers said.

Over the years, the largest and most prestigious annual AI research conferences have typically been held in the U.S. or Canada, close to Silicon Valley, which remains an outsize force in AI research.

African researchers were often unable to attend as they had trouble getting visas, drawing criticism over an absence of their perspectives in developing one of the most powerful and transformative technologies.

Prominent researchers, including AI ethicist Timnit Gebru, have pointed to the concentration of research into a few dominant players in Silicon Valley and the lack of inclusion of non-Western researchers or those from marginalized groups. In 2017, Ms. Gebru, who grew up in Ethiopia before arriving in the U.S. as a refugee, founded an affinity group called Black in AI to bring more diversity into the community.

Rwanda typically gives visas to researchers, regardless of company or country. The country, marred by brutal genocide in 1994, is now a budding hub of African AI research through new research centers and government programs aimed at attracting international talent.

The resulting mix was a study in contrasts: **Huawei** employees chatted with Google counterparts despite U.S.-China tech tensions, resource-strapped academics lamented to friends at wealthy companies and African researchers challenged Western peers to look beyond the perspectives of coastal elites in developed countries.

On Friday, Ms. Gebru hosted a panel on the limitations of large language models—the technology that underpins ChatGPT—in handling African languages, which have

> The arrival of ChatGPT has added urgency to talks on AI's trajectory.

been increasingly excluded from the digital world because of a lack of data needed for current AI technologies. Ms. Gebru gained public prominence when she said she was fired by Google after she co-wrote a paper criticizing the exploding resource demands and environmental impacts of such models, which also underpin Google's search engine. Internally, Google characterized her departure as a resignation.

During a separate panel, Vukosi Marivate, the data science chair at the University of Pretoria in South Africa and program chair of the conference, said African researchers were fighting the threat of losing their native languages. "We're racing against the clock" before English takes over and African languages cease to exist, he said after the event.

**Watch a Video**

Scan this code for a video on how AI can be used to improve daily tasks.

# Meta to Divest Startup It Bought for $1 Billion

By Marc Vartabedian And Jeff Horwitz

When **Meta Platforms** closed a deal last year to acquire business-software provider Kustomer for $1 billion, the tech giant had high hopes for how it could integrate the services of the startup.

Meta said the acquisition would enable companies to use its messaging apps for customer service, helping fulfill its longstanding ambition to turn its platforms into e-commerce giants.

But a little over a year later, Meta is parting ways with Kustomer in a rare transaction in which Meta is trading its ownership of Kustomer for a passive minority stake in the company with no guaranteed payment in return, according to people familiar with the matter.

The terms of the deal represent a significant downgrade from how Meta previously viewed the unit.

Meta is giving **Redpoint Ventures**, **Battery Ventures** and **Boldstart Ventures** stakes in the newly independent company in exchange for funding its continued operations, the people familiar with the matter said.

Those three firms will jointly put $60 million of capital into Kustomer to cover its operating costs, according to the people. Meta will remain the single largest stakeholder in the new company but won't have a seat on its board.

The deal values Kustomer at $250 million.

The deal is slated to close May 15, according to internal communications reviewed by The Wall Street Journal.

The venture firms, each of which had previously invested in Kustomer before its initial sale, will potentially have the opportunity to cash out shares in the same company twice, an anomaly in the venture world.

A person familiar with the company's divestiture efforts said Meta had chosen to maintain a stake in a Kustomer spinout rather than outright sell the company to other suitors.

The Journal reported in March that Meta was planning to divest itself of Kustomer as the tech giant looks to refocus on its core business.

ADVERTISEMENT

**The Marketplace**

To advertise: 800-366-3975 or WSJ.com/classifieds

**PUBLIC NOTICES**

**FDIC**

**PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA**

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

**NOTICE OF SALE**

SUPREME COURT - COUNTY OF NEW YORK
MICHAELANGELP GIIK FLATIRON LLC, NEW TRIPLE CROWN LLC, FLATIRON NEWMARK PARTNERS LLC and FLAT IRON ACQUISITION LLC, Plaintiffs -against- NRS FLATIRON ACQUISITION LLC, Defendant. Pursuant to an Interlocutory Judgment entered herein and dated January 6, 2023 I, the undersigned Referee will sell at public auction to be held at the portico located at the top of the front steps of the New York County Courthouse located at 60 Centre Street, New York, New York or such other space in said Courthouse as the Court may designate on May 23, 2023 at 2:30 p.m. the real property located at 175 Fifth Avenue, New York, New York, being the building known as The Flatiron Building and described as follows: Block 851, Lot 1 on the tax map of the Borough of Manhattan, and more particularly described as follows:
ALL that certain plot, piece or parcel of land, lying and being in the Borough of Manhattan, County City and State of New York, and being more particularly bounded and described as follows:
BEGINNING at the corner formed by the intersection of the northerly side of East 22nd Street and easterly side of Fifth Avenue.
THENCE easterly along the northerly side of East 22nd Street, 85 feet 8 inches to the westerly side of Broadway.
THENCE northerly along the westerly side of Broadway, 214 feet 6 inches to the southerly side of Madison Square South;
THENCE westerly along the southerly side of Madison Square South, 2 feet to the easterly side of Fifth Avenue;
THENCE southerly along the easterly side of Fifth Avenue, 197 feet 6 inches to the point or place of BEGINNING.
The Premises will be sold subject to the provisions of the said Interlocutory Judgment and Terms of Sale, which may be reviewed on the New York County Supreme Court's electronic docket under Index Number 654176/2021. Each bidder must satisfy the referee that, if it is the high bidder at the auction, it has a bank check or money order in the amount of $100,000 that it can tender as a deposit to the referee immediately after the conclusion of the auction, and that it will have the financial capability of closing the purchase of the property within the time frame set by the Interlocutory Judgment and Terms of Sale. The purchaser shall pay the charge for recording the deed to be given by the Referee, any charge or tax (excluding any applicable real property transfer taxes) upon the delivery or recording of said deed, and the reasonable charge of the Referee for drawing the deed. The reasonable costs of the Referee's actions are expenses of the sale and shall be paid by the Referee from the proceeds of the sale.
At the conclusion of the auction sale, the successful bidder will be required to (i) tender a deposit of $100,000 in the form of a bank check or money order made payable to "**PETER A. AXELROD, ESQ., REFEREE**", (ii) satisfy the referee that it has the financial capability to close the purchase of the property within the time frame set by the Interlocutory Judgment and Terms of Sale, and (iii) agree to be bound by the terms of the Interlocutory Judgment and Terms of Sale, including but not limited to the terms specifying the successful bidder's liability for damages in the event of a default; and to pay a down payment of ten percent (10%) of the amount of the successful bid as detailed in the Interlocutory Judgment and Terms of Sale. Please consult the Interlocutory Judgment and Terms of Sale for other conditions applicable to this auction.
PETER A. AXELROD, ESQ., Referee
260 Madison Avenue, 15th Floor
New York, New York 10016

**NOTICE OF SALE**

**NOTICE OF SALE: 2 PRIME FLORIDA HOTELS**
*UNENCUMBERED of MANAGEMENT*

**Holiday Inn Palm Beach Airport - Auction Date: July 12, 2023**
- 199-key Hotel with recently renovated guestrooms approved for conversion to Crowne Plaza
- Exceptional location minutes from Palm Beach International Airport (PBI) along Interstate-95
- Adjacent 2.3-acre parcel of developable land included in the sale with Commercial Zoning (OC –Office Commercial)

**Daytona Beach, Tapestry Collection by Hilton - Auction Date: August 4, 2023**
- 110-room oceanfront Hotel with best-in-class Hilton affiliation
- Beachfront location provides guests with direct access to Daytona's famous beaches
- Unobstructed ocean views from every guestroom

*For Bid Procedures & Additional Auction Information:*
**Alexander Bauman | RobertDouglas**
(212) 220-2723 | abauman@robert-douglas.com
**Kyle Stevenson | Berkadia**
(786) 646-2591 | kyle.stevenson@berkadia.com
***Berkadia Real Estate Advisors LLC Florida RE Lic #CQ1043330***

**SHOWROOM**

ADVERTISE TODAY

(800) 366-3975
sales.showroom@wsj.com

For more information visit:
wsj.com/classifieds

© 2023 Dow Jones & Company, Inc.
All Rights Reserved.

THE WALL STREET JOURNAL.

**THE MARKETPLACE**

ADVERTISE TODAY

(800) 366-3975
For more information visit:
wsj.com/classifieds

© 2023 Dow Jones & Company, Inc.
All Rights Reserved.

Client Name:
Advertiser:
Section/Page/Zone: Classified/C007/NZ
Description:
Ad Number:
Insertion Number:
Size:
Color Type:
The Boston Globe
Publication Date: 06/09/2023
This E-Sheet is provided as conclusive evidence that the ad appeared in the Boston Globe on the date and page indicated. You may not create derivative works, or in any way exploit or repurpose any content.

# Classifieds Marketplace

boston.com/classifieds notices & more

jobs cars homes pets stuff

Search Classifieds 24/7 at www.boston.com/classifieds • Call 617.929.1500 to Advertise

## LEGAL NOTICES

### FDIC PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver on **or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

---

**NOTICE OF INITIAL SITE INVESTIGATION AND TIER II CLASSIFICATION**

**155 NORTH BEACON STREET
BOSTON, MASSACHUSETTS
RTN 3-37494**

A release of oil and/or hazardous materials has occurred at this location, which is a disposal site as defined by M.G.L. c. 21E, § 2 and the Massachusetts Contingency Plan, 310 CMR 40.0000. To evaluate the release, a Phase I Initial Site Investigation was performed pursuant to 310 CMR 40.0480. The site has been classified as Tier II pursuant to 310 CMR 40.0500. On 05 June 2023, **IQHQ-155 Beacon, LLC** filed a Tier II Classification Submittal with the Department of Environmental Protection (MassDEP). To obtain more information on this disposal site, please contact **Kyle Block, LSP,Haley & Aldrich, Inc., 465 Medford Street, Suite 2200, Boston, Massachusetts, 617-886-7400**.

The Tier II Classification Submittal and the disposal site file can be viewed at MassDEP website using Release Tracking Number RTN 3-0037494 at https://eeaonline.eea.state.ma.us/portal#!/search/wastesite or at **MassDEP Northeast Regional Office, Bureau of Waste Site Cleanup, 150 Presidential Way, Woburn, Massachusetts, 01801, 978-694-3200**.

Additional public involvement opportunities are available under 310 CMR 40.1403(9) and 310 CMR 40.1404.

---

**(SEAL)**
**COMMONWEALTH OF MASSACHUSETTS**
**LAND COURT**
**DEPARTMENT OF THE TRIAL COURT**
Docket Number: 20 SM 001765
**ORDER OF NOTICE**

TO: **Kristen D. Ridgley, Individually, as Personal Representative of the Estate of Marjorie R. Snell, as Personal Representative of the Estate of John Vincent Ridgley Sr., and as Attorney in Fact for William Ridgley, Frederick Ridgley Jr., Martin Flax, Esq., Guardian ad Litem for William Ridgley, Maxine R. LaDouceur, Joan Sneed, Mildred Zingone, Michael Perkins, Jacqueline Suzanne Ridgley a/k/a Jacqui Ridgley, John Ridgley, Jr., Heirs Devisees or Legal Representatives of the Estate of Lawrence Ridgley, Heirs, Devisees, or Legal Representative of the Estate of Elaine Jenkins, Heirs, Devisees, or Legal Representative of the Estate of Rowena Perkins, and Heirs, Devisees, or Legal Representative of the Estate of Douglas Ridgley**

and to all persons entitled to the benefit of the Servicemembers Civil Relief Act, 50 U.S.C. c. 50 §3901 (*et seq*)

**U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT**

claiming to have an interest in a Mortgage covering real property in Burlington, numbered 121 A Wilmington Road, given by Marjorie R. Snell to Financial Freedom Senior Funding Corporation, a subsidiary of IndyMac Bank, FSB, dated October 14, 2004, and registered with Middlesex County (Southern District) Registry District of the Land Court as Document Number 1352999, and noted on Certificate of Title 119187 and in Book 43922, Page 36, and now held by Plaintiff by assignment, have filed with this court a complaint for determination of Defendants' Servicemembers status.

If you now are, or recently have been, in the active military service of the United States of America, then you may be entitled to the benefits of the Servicemembers Civil Relief Act. If you object to a foreclosure of the above-mentioned property on that basis, then you or your attorney must file a written appearance and answer in this court at Three Pemberton Square, Boston, MA 02108on or before 07/17/2023 or you may lose the opportunity to challenge the foreclosure on the ground of noncompliance with the Act.

Witness, Gordon H. Piper, Chief Justice of this Court on 06/02/2023.

Attest:
Deborah J. Patterson
Recorder

---

Boston's best jobs

The Careers Section of The Boston Sunday Globe

---

**Commonwealth of Massachusetts**
**Executive Office of Health and Human Services**

**NOTICE OF PUBLIC HEARING**

Under the authority of M.G.L. c. 118E and in accordance with M.G.L. c. 30A, the Executive Office of Health and Human Services (EOHHS) will hold a remote public hearing on Friday, July 7, 2023, at 11 a.m. relative to the adoption of amendments to the following regulation.

**101 CMR 323.00: Rates for Hearing Services**

The proposed regulation contains rates effective for dates of service on or after November 1, 2023. There is no fiscal impact on cities and towns.

Under M.G.L. Chapter 118E, Section 13D, the Executive Office of Health and Human Services (EOHHS) is required to establish and periodically review the rates to be paid by governmental units for non-institutional health care services, including rates of payment for hearing services. EOHHS performed a review of the payment rates set forth in 101 CMR 323.00 and proposes to increase certain hearing services rates by a prospective cost adjustment factor (CAF) of 2.71%. For hearing services that currently have rates established as adjusted acquisition cost (AAC) plus mark-up, the mark-up will be increased by 2.71%. Dispensing fees covered under the regulation will be increased by an additional 5% administrative adjustment. Certain bone-anchored hearing aid (BAHA) services (procedure codes L8691, L8693, and L8694) will be set at 100% of the corresponding Medicare January 2023 rates. The rate for the remaining BAHA service (procedure code L8692) will be set at individual consideration (I.C.). All other rates are proposed to remain at their current levels.

The estimated aggregate annual fiscal impact of the proposed amendments is $212,000. The amendments are not anticipated to impose new costs on small businesses, and any impact on small business providers will vary based on the volume of services provided.

EOHHS is making these changes, subject to federal approval, to ensure that payments are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities, and to ensure that payment rates are consistent with efficiency, economy, and quality of care.

To register to testify at the hearing and to get instructions on how to join the hearing online, go to www.mass.gov/service-details/executive-office-of-health-and-human-services-public-hearings. To join the hearing by phone, call (646) 558-8656 and enter meeting ID 935 397 8200# when prompted.

You may also submit written testimony instead of, or in addition to, live testimony. To submit written testimony, please email your testimony to ehs-regulations@mass.gov as an attached Word or PDF document or as text within the body of the email with the name of the regulation in the subject line. All written testimony must include the sender's full name, mailing address, and organization or affiliation, if any. Individuals who are unable to submit testimony by email should mail written testimony to EOHHS, c/o D. Briggs, 100 Hancock Street, 6th Floor, Quincy, MA 02171. Written testimony will be accepted through 5:00 p.m. on July 7, 2023. EOHHS specifically invites comments as to how the amendments may affect beneficiary access to care for MassHealth-covered services.

To review the current draft of the proposed regulation, go to www.mass.gov/service-details/executive-office-of-health-and-human-services-public-hearings or request a copy in writing from MassHealth Publications, 100 Hancock Street, 6th Floor, Quincy, MA 02171.

Special accommodation requests may be directed to the Disability Accommodations Ombudsman by email at ADAAccommodations@mass.gov or by phone at (617) 847-3468 (TTY: (617) 847-3788 for people who are deaf, hard of hearing, or speech disabled). Please allow two weeks to schedule sign language interpreters.

EOHHS may adopt a revised version of the proposed regulation taking into account relevant comments and any other practical alternatives that come to its attention.

In case of inclement weather or other emergency, hearing cancellation announcements will be posted on the MassHealth website at www.mass.gov/service-details/executive-office-of-health-and-human-services-public-hearings.

June 9, 2023

---

LEGAL NOTICE
MORTGAGEE'S SALE OF REAL ESTATE

By virtue of and in execution of the Power of Sale contained in a certain mortgage given by Kianga Dancy to Discover Bank, dated April 26, 2018 and recorded in Suffolk County Registry of Deeds in Book 59635, Page 156 (the "Mortgage") of which mortgage Discover Bank is the present holder, for breach of conditions of said mortgage and for the purpose of foreclosing the same, the mortgaged premises located at 21 Old Morton Street, Mattapan (Boston), MA 02126 will be sold at a Public Auction at 1:00 PM on July 6, 2023, at the mortgaged premises, more particularly described below, all and singular the premises described in said mortgage, to wit:

THE LAND WITH THE BUILDINGS THEREON, SITUATED IN DORCHESTER, BOSTON, SUFFOLK COUNTY, MASSACHUSETTS, KNOWN AND NUMBERED AS 21 OLD MORTON STREET BOUNDED AND DESCRIBED AS THE FOLLOWING:
NORTHERLY BY LAND NOW OR FORMERLY OF HEIRS OF HENRY J. PACKARD, SEVENTY-NINE (79) FEET;
EASTERLY BY OLD MORTON STREET (FORMERLY KNOWN AS MORTON STREET, FOREST HILL AVENUE AND ALSO NEPONSET STREET) THIRTY-NINE AND ONE HALF (39.50) FEET;
SOUTHERLY BY LAND NOW OR FORMERLY OF DAVID DYER, SEVENTY-NINE (79) FEET; AND
WESTERLY BY LAND NOW OR FORMERLY OF HARRISON PEASLEE, FORTY-ONE (41) FEET.

For mortgagor's title see deed recorded with the Suffolk County Registry of Deeds in Book 48310, Page 77.

The property will be sold subject to a mortgage in the principal sum of $283,000.00 given to Quicken Loans Inc. dated November 7, 2017 recorded with the Suffolk County Registry of Deeds in Book 58796, Page 168.

The premises will be sold subject to any and all unpaid taxes and other municipal assessments and liens, and subject to prior liens or other enforceable encumbrances of record entitled to precedence over this mortgage, and subject to and with the benefit of all easements, restrictions, reservations and conditions of record and subject to all tenancies and/or rights ofparties in possession.

Terms of the Sale: Cashier&'s or certified check in the sum of $5,000.00 as a deposit must be shown at the time and place of the sale in order to qualify as a bidder (the mortgage holder and its designee(s) are exempt from this requirement); high bidder to sign written Memorandum of Sale upon acceptance of bid; balance of purchase price payable by certified check in thirty (30) days from the date of the sale at the offices of mortgagee's attorney, Korde & Associates, P.C., 900 Chelmsford Street, Suite 3102, Lowell, MA or such other time as may be designated by mortgagee. The description for the premises contained in said mortgage shall control in the event of a typographical error in this publication.

Other terms to be announced at the sale.

Discover Bank
Korde & Associates, P.C.
900 Chelmsford Street
Suite 3102
Lowell, MA 01851
(978) 256-1500
Dancy, Kianga, 23-042099

---

**80101500**
**CITY OF BOSTON**

**PROPERTY MANAGEMENT DEPARTMENT (PMD)**
**M. G. L. c 30B**

**Request for Proposals**
**Lease for Furnished Office Spaces**

EV00012548
Contact Information
PMD Bid Counter
pmdbidinfo@boston.gov
617-635-4560

The City is seeking proposals from qualified owners of real property for the lease of an office space of approximately 7,500 sf of net usable square feet (ft).

The space needs to be a furnished office space and can be divided into multiple floors. The term of the lease entered into shall be a two (2) year period, commencing August 1, 2023, and terminating July 31, 2025, with an option to renew for two (2) additional one (1) year terms, to be exercised in 1-year increments.

The term of the lease entered into shall be a two (2) year period, commencing August 1, 2023, and terminating July 31, 2025, with an option to renew for two (2) additional one (1) year terms, to be exercised in 1-year increments.

The Lease for Furnished Office Spaces RFP will be available **beginning June 5, 2023,** and may be obtained by visiting the Supplier Portal at boston.gov/procurement and searching for Event **EV00012548.** Technical and price proposals should be submitted virtually through the Supplier Portal. Submission instructions are further detailed in the RFP.

Proposals must be **submitted no later than 12 p.m. on July 3, 2023.**

Eamon Shelton, Commissioner
(June 5, June 12, 2023)

---

**(SEAL)**
**THE COMMONWEALTH OF MASSACHUSETTS**
**LAND COURT**
**DEPARTMENT OF THE TRIAL COURT**
**Docket Number: 23 SM 002273**
**ORDER OF NOTICE**

To: Vicky M. Sung

and to all persons entitled to the benefit of the Servicemembers Civil Relief Act, 50 U.S.C. c. 50 §3901 (et seq):

Specialized Loan Servicing LLC

claiming to have an interest in a Mortgage covering real property in Wilmington, numbered 12 Westdale Avenue, given by Vicky M. Sung to Mortgage Electronic Registration Systems, Inc., as nominee for Bank of America, N.A., dated June 6, 2014, and recorded in the Middlesex County (Northern District) Registry of Deeds in Book 28226, Page 85, as modified by a certain modification agreement dated December 27, 2017, and recorded with said Middlesex County (Northern District) Registry of Deeds in Book 31824, Page 181, and now held by the Plaintiff by assignment, has/have filed with this court a complaint for determination of Defendant's/Defendants' Servicemembers status.

If you now are, or recently have been, in the active military service of the United States of America, then you may be entitled to the benefits of the Servicemembers Civil Relief Act. If you object to a foreclosure of the above-mentioned property on that basis, then you or your attorney must file a written appearance and answer in this court at Three Pemberton Square, Boston, MA 02108 on or before July 17, 2023, or you may lose the opportunity to challenge the foreclosure on the ground of noncompliance with the Act.

Witness, Gordon H. Piper, Chief Justice of this Court on June 5 2023.
Attest:
Deborah J. Patterson
Recorder
23801

---

LEGAL NOTICE
MORTGAGEE'S SALE OF REAL ESTATE

By virtue of and in execution of the Power of Sale contained in a certain mortgage given by Carolyn H. Madan to MetLife Home Loans, a Division of MetLife Bank, N.A., dated October 21, 2010 and recorded in Bristol County (Northern District) Registry of Deeds in Book 19061, Page 326 (the "Mortgage") of which mortgage Mortgage Assets Management, LLC is the present holder by Assignment from MetLife Home Loans, a Division of MetLife Bank, N.A. to Nationstar Mortgage LLC dated March 1, 2013 and recorded at said Registry of Deeds in Book 20887, Page 211, and Assignment from Nationstar Mortgage LLC to Nationstar Mortgage LLC d/b/a Champion Mortgage Company dated August 3, 2015 and recorded at said Registry of Deeds in Book 22457, Page 210, and Assignment from Nationstar Mortgage LLC d/b/a Champion Mortgage Company to Wilmington Savings Fund Society, FSB, not individually, but solely as Trustee for Nationstar HECM Acquisition Trust 2020-1 dated September 30, 2021 and recorded at said Registry of Deeds in Book 27444, Page 121, and Assignment from Wilmington Savings Fund Society, FSB, not individually, but solely as Trustee for Nationstar HECM Acquisition Trust 2020-1 to Nationstar Mortgage LLC D/B/A Champion Mortgage Company dated November 8, 2022 and recorded at said Registry of Deeds in Book 28201, Page 255, and Assignment from Nationstar Mortgage LLC d/b/a Champion Mortgage Company to Mortgage Assets Management, LLC dated January 21, 2022 and recorded at said Registry of Deeds in Book 27695, Page 60, and Assignment from Wilmington Savings Fund Society, FSB, not individually, but solely as Trustee for Nationstar HECM Acquisition Trust 2020-1 to Mortgage Assets Management, LLC dated February 16, 2023 and recorded at said Registry of Deeds in Book 28300, Page 23, for breach of conditions of said mortgage and for the purpose of foreclosing the same, the mortgaged premises located at 263 Ware Street, Mansfield, MA 02048 will be sold at a Public Auction at 10:00 AM on July 7, 2023, at the mortgaged premises, more particularly described below, all and singular the premises described in said mortgage, to wit:

A certain tract of land in Mansfield, Bristol County, Massachusetts, situated on the Westerly side of Ware Street, as shown on a "Plan of Land in Mansfield, Bristol Co. Mass. Owned by Dorothy L. York. Scale 1" = 20', September 15, 1956", duly recorded with Bristol County Northern District Registry of Deeds and bounded and described as follows:

EASTERLY by Ware Street, as shown on said plan, 120 feet;

SOUTHERLY by land now or formerly of Dorothy L. York, as shown on said plan, 305.00 ft.;

WESTERLY by land now or formerly of Dorothy L. York, as shown on said plan, 83.02 ft.; and

NORTHERLY by land now or formerly of Lester Packard, as shown on said plan, 305.00 feet.

For title reference see Deed recorded at Book 4537, Page 282.

For mortgagor's title see deed recorded with the Bristol County (Northern District) Registry of Deeds in Book 4537, Page 282.

The premises will be sold subject to any and all unpaid taxes and other municipal assessments and liens, and subject to prior liens or other enforceable encumbrances of record entitled to precedence over this mortgage, and subject to and with the benefit of all easements, restrictions, reservations and conditions of record and subject to all tenancies and/or rights of parties in possession.

Terms of the Sale: Cashier's or certified check in the sum of $5,000.00 as a deposit must be shown at the time and place of the sale in order to qualify as a bidder (the mortgage holder and its designee(s) are exempt from this requirement); high bidder to sign written Memorandum of Sale upon acceptance of bid; balance of purchase price payable by certified check in thirty (30) days from the date of the sale at the offices of mortgagee's attorney, Korde & Associates, P.C., 900 Chelmsford Street, Suite 3102, Lowell, MA or such other time as may be designated by mortgagee. The description for the premises contained in said mortgage shall control in the event of a typographical error in this publication.

Other terms to be announced at the sale.

Mortgage Assets Management, LLC
Korde & Associates, P.C.
900 Chelmsford Street
Suite 3102
Lowell, MA 01851
(978) 256-1500
Madan, Estate of Carolyn H., 22-041068

---

**COMMONWEALTH OF MASSACHUSETTS**

MIDDLESEX, SS. SUPERIOR COURT NO. 2381CV00910

TO: Trainor Construction Co., Inc. d/b/a Trainor Construction:

WHEREAS a civil action has begun against you by said Plaintiff, Allied Paving Corporation, in which said Plaintiff demands judgment against you in the sum of $87,185.00, plus interest, attorney's fee and costs. All that is set forth in the Plaintiff's Complaint filed in said Court on March 30, 2023.

Accordingly, WE COMMAND YOU if you intent to make any claim or defense, that on August 14, 2023, or within twenty (20) days from said day, to file your written appearance and written answer and other lawful pleadings to be served upon Kevin S. Sullivan, Esq., Law Offices of Kevin S. Sullivan, LLC, Fletcher Street Professional Center, 9 Fletcher Street, Suite A, Chelmsford, MA 01824, and also to file your written appearance and written answer and other lawful pleadings in the Office of the Clerk of Court, at Middlesex Superior Court, 370 Jackson Street, 7th Floor, Lowell, MA 01852, and further that you defend against the suit according to law if you intend any defense, and that you do and receive what the Court shall order and adjudge therein.

Hereof fail not, at your peril, or as otherwise said suit may be adjudged and orders entered in your absence.

It appearing to this Court that no personal service of the Complaint has been made on the said Defendant, it is ORDERED that notice of this suit be given to you by publication of an attested copy hereof in the Boston Globe, a newspaper published in Suffolk County, Commonwealth of Massachusetts, once a week for four successive weeks, the last publication to be at least twenty days before said return date of August 11, 2023.

Entered: May 11, 2023 By the Court, (Ellis, J.)

A TRUE COPY ATTEST:

Robert E. MacIntyre - Deputy Assistant Clerk

---

**(SEAL)**
**THE COMMONWEALTH OF MASSACHUSETTS**
**LAND COURT**
**DEPARTMENT OF THE TRIAL COURT**
**Docket Number: 23 SM 002271**
**ORDER OF NOTICE**

To: Gregory M. Mardirosian

and to all persons entitled to the benefit of the Servicemembers Civil Relief Act, 50 U.S.C. c. 50 §3901 (et seq):

Specialized Loan Servicing LLC

claiming to have an interest in a Mortgage covering real property in Waltham, numbered 20 Whitman Road, Unit No. 2-4, Garden Grove Condominium, given by Gregory M. Mardirosian to Mortgage Electronic Registration Systems, Inc., as nominee for LoanDepot.com, LLC, dated September 6, 2019, and registered at the Middlesex County (Southern District) Registry District of the Land Court as document number 1823164, and noted on certificate of title number U25509 and now held by the Plaintiff by assignment, has/have filed with this court a complaint for determination of Defendant's/Defendants' Servicemembers status.

If you now are, or recently have been, in the active military service of the United States of America, then you may be entitled to the benefits of the Servicemembers Civil Relief Act. If you object to a foreclosure of the above-mentioned property on that basis, then you or your attorney must file a written appearance and answer in this court at Three Pemberton Square, Boston, MA 02108 on or before July 17, 2023, or you may lose the opportunity to challenge the foreclosure on the ground of noncompliance with the Act.

Witness, Gordon H. Piper, Chief Justice of this Court on June 5 2023.
Attest:
Deborah J. Patterson
Recorder
23502

---

**ADVERTISEMENT**
**CITY OF BOSTON**
**TRANSPORTATION DEPARTMENT**

**Invitation for Bids**
**Installation and Maintenance of Pavement Markings for District Two**

EV00012582
**Contact Information**
Nick Gove
nicholas.gove@boston.gov

The City of Boston (City), acting by and through its Commissioner of Transportation, invites electronic bids for the service generally described above, and particularly as set forth in Bid Documents (Documents). These contracts are procured under the provisions of Chapter 30, Section 39M of the Massachusetts General Laws and are subject to the Prevailing Wage Rates. Note: The City did not have an eligible and response bidder for District Two in the Invitation for Bid (IFB) for Installation and Maintenance of Pavement Markings advertised on May 8, 2023.

The Documents shall be available on the City of Boston website at boston.gov/supplierportal (Bid Event EV00012582) beginning at **10:00am on June 12**, 2023. Completed documents must be signed and submitted electronically to the above bid event number via the City of Boston Supplier Portal containing all sections and pages of the Documents **no later than 12:00pm on June 28, 2023**.

The term of the contract shall be for approximately eight months starting on or about July 1, 2023 to February 29, 2024, with two optional one-year terms renewable at the City's sole discretion.

Nicholas S. Gove, Deputy Chief of Streets for Transportation

---

**MORTGAGEE'S NOTICE OF SALE OF REAL ESTATE**

By virtue and in execution of the Power of Sale contained in a certain Mortgage given by Grace L. Brown to Washington Mutual Bank, FA, dated August 14, 2007 and recorded with the Norfolk County Registry of Deeds at Book 25100, Page 102, subsequently assigned to HOMEWARD RESIDENTIAL, INC. by JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, SUCCESSOR IN INTEREST BY PURCHASE FROM THE FDIC AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA by assignment recorded in said Norfolk County Registry of Deeds at Book 31037, Page 336, subsequently assigned to OCWEN LOAN SERVICING, LLC by HOMEWARD RESIDENTIAL, INC. F/K/A AMERICAN HOME MORTGAGE SERVICING, INC. by assignment recorded in said Norfolk County Registry of Deeds at Book 31767, Page 264, subsequently assigned to SELECT PORTFOLIO SERVICING, INC. by OCWEN LOAN SERVICING, LLC by assignment recorded in said Norfolk County Registry of Deeds at Book 35087, Page 113, subsequently assigned to Federal Home Loan Mortgage Corporation as Trustee for Seasoned Credit Risk Transfer Trust, Series 2017-1 by Select Portfolio Servicing, Inc. by assignment recorded in said Norfolk County Registry of Deeds at Book 37073, Page 177 for breach of the conditions of said Mortgage and for the purpose of foreclosing same will be sold at Public Auction at 11:00 AM on June 23, 2023 at 284 Prospect Street, Norwood, MA, all and singular the premises described in said Mortgage, to wit:

The land in said Norwood, with the buildings thereon, being shown as Lot Numbered 13, on a
plan entitled "Plan of House Lots in Norwood, Mass., belonging to Fred E. Fisher, March 1898,
Robert Rogers", recorded with Norfolk Registry of Deeds as Plan No. 937 in Plan Book 20, being more particularly bounded and described as follows:
NORTHWESTERLY by Prospect Street, 61.74 feet;
NORTHEASTERLY by a Line running No. 49 degrees 36' West, 127 feet;
NORTHEASTERLY again, 18.33 feet;
SOUTHEASTERLY by Lot numbered 12 on said plan. 77 feet;
SOUTHWESTERLY and by Lot numbered 14, on said plan, 120.98 feet.
Containing, according to said plan, 9,321 square feet of land.
Subject to easements, restrictions and covenants of record if they affect the locus and are in full force and effect, expressly not intending nor meaning to extend the same in the event that they have expired by operation of law or otherwise.
For title, see deed of Frederick D. Ransow and Grace L. Brown recorded with said Deeds in Book 10294, Page 024.
Property Address:
284 Prospect Street
Norwood, MA 02062
TAX ID # 1-22-15

The premises are to be sold subject to and with the benefit of all easements, restrictions, encroachments, building and zoning laws, liens, unpaid taxes, tax titles, water bills, municipal liens and assessments, rights of tenants and parties in possession, and attorney's fees and costs.

TERMS OF SALE:
A deposit of FIVE THOUSAND DOLLARS AND 00 CENTS ($5,000.00) in the form of a certified check, bank treasurer's check or money order will be required to be delivered at or before the time the bid is offered. The successful bidder will be required to execute a Foreclosure Sale Agreement immediately after the close of the bidding. The balance of the purchase price shall be paid within thirty (30) days from the sale date in the form of a certified check, bank treasurer's check or other check satisfactory to Mortgagee's attorney. The Mortgagee reserves the right to bid at the sale, to reject any and all bids, to continue the sale and to amend the terms of the sale by written or oral announcement made before or during the foreclosure sale. If the sale is set aside for any reason, the Purchaser at the sale shall be entitled only to a return of the deposit paid. The purchaser shall have no further recourse against the Mortgagor, the Mortgagee or the Mortgagee's attorney. The description of the premises contained in said mortgage shall control in the event of an error in this publication. TIME WILL BE OF THE ESSENCE.

Other terms, if any, to be announced at the sale.

Federal Home Loan Mortgage Corporation as Trustee for Seasoned Credit Risk Transfer Trust, Series 2017-1

Present Holder of said Mortgage,
By Its Attorneys,
ORLANS PC
PO Box 540540
Waltham, MA 02454
Phone: (781) 790-7800
19-003488

---

Public Shade Tree Removal Hearing

In accordance with Chapter 87 of the Massachusetts General Laws, a Public Shade Tree Removal Hearing will be held via Zoom

On: Thursday, June 15th at 10:00AM
At: https://watertown-ma.zoom.us/j/82882442414

This hearing is to consider the proposed removal of three trees as part of the Arsenal St Project.

The species and Diameter at Breast Height (DBH) are as follows: 14"DBH Norway Maple
Location: **Irving Park opp. 19 South Irving Park**
Requested by: Superintendent of Public Works
Reason for hearing: Proposed removal for sidewalk installation.

**Questions or concerns regarding this posting should be directed to the Tree Warden's office at (617) 972-6420 or email: mmicieli@watertown-ma.gov**

**Mike Micieli, Tree Warden** **Date Posted Thursday, June 8th**

---

Notification is hereby given that Bank of America National Association, 100 North Tryon Street, Suite 170, Charlotte, Mecklenburg County, NC, 28202, has filed an application with the Comptroller of the Currency on June 9, 2023, as specified in 12 CFR 5 of the Comptroller's Licensing Manual, for permission to relocate its domestic branch as follows:

•From: 100 Cambridgeside Place SPC S203, Cambridge, Middlesex County, MA - 02141
•To: 113 First Street, Cambridge, Middlesex County, MA - 02141

Any person wishing to comment on this application may file comments in writing with the Director for Large Bank Licensing, Office of the Comptroller of the Currency, 400 7th Street S.W., Mail Stop 10E-2, Washington, DC 20219, within 30 days after the date of this publication. The public may find information about the filing in the OCC's Weekly Bulletin available at www.occ.gov. Additionally, the public portion of the filed application is available upon request.

---

jobs boston.com/monster

stuff boston.com/classifieds

## Professional

N & D Ballet LLC seeks
**Chinese Classic/Folk Dance Instructors**
In house position at Lexington MA. Apply nadballetinfo@gmail.com

## Technology/ Engineering

Sensata Technologies, Inc. has an opening for an
**Automation and Control Design Engineer**
in Attleboro, MA to design, test, install and maintain prod. line mfg. equip. in a global environment. Bach. Deg (or foreign eqiv.) in Elec. Eng'g, Electro. Eng'g or Comp. Sci. + 2 yrs. exp. in Auto. & Ctrls. Design Eng'g OR a Master's deg. WFH 2 days/wk. 20% int'l travel req. EOE. Must have permanent work authorization in the U.S. Apply at sensata.com/careers referencing Job ID 5728108

## HOTEL-RESTAURANT SUPPLY

MR. SMITH BUYS & SELLS NEW & USED RESTAURANT BAR-PIZZA-STORE EQUIPMENT AT OUR WAREHOUSE 80 MYRTLE ST. NO. QUINCY MA 617-770-1600

## TICKETS

**Patriots Tickets Wanted**
Buying all locations! Top $ Paid! Please call 800-786-8425 ext 2.

## WANTED

**CASH FOR RECORDS**
33 LPS & 45's wanted. Call George 617-633-2682

**CASH FOR TOOLS!** Hand or Power. Carpenter, Machinist, Mechanic, Plumber. Rollaways. 1-800-745-8665

pets boston.com/classifieds

## DOGS

**Yellow Lab** Female Pups Avail, first shots & health guar., $1100, 508-717-9854

homes boston.com/classifieds

## REAL ESTATE RESIDENTIAL

**HYANNIS, MA** 142 Bishops Terrace. Open House. 6/10, 11am-2pm. 5BR, 2BA, 2 car garage, built-in pool. $749K. Venture Realty. 508-790-8877

## OUT OF STATE

## NEW HAMPSHIRE RE

**HUCKLEBERRY HILL,** Diamond Ledge, acreage, as is, $1,025,000 or best offer. Call 603-664-2876

**MONADNOCK REGION NH**

Bright and airy, 3+BR, 3BA, custom built log cabin on 10+ acres. Price reduced. Open Houses 10-1 Sat 6/10 and Sun 6/11. Come on up! 177 Rand Road, Rindge, NH. Tieger Realty 603-532-8765. MLS # 4952308. $549,500

## COMMERCIAL

## COMMERCIAL & INDUSTRIAL

**KITTERY, ME** Iconic restaurant for sale. 400' on water, $3.4M 603-661-4880

## RENTALS

All real estate advertising in this newspaper is subject to the Federal Fair Housing act of 1968, the Massachusetts Anti Discrimination Act & the Boston & Cambridge Fair Housing Ordinances which makes it illegal to advertise any preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, ancestry, age, children, marital status, sexual orientation, veterans status, or source of income or any intention to make any such preference, limitation or discrimination.

This newspaper will not knowingly accept any advertising for real estate which is in violation of the law. Our readers are hereby informed that all dwellings advertised in this newspaper are available on an equal opportunity basis. To complain of discrimination call HUD tollfree at 1-800-669-9777. For the N.E. area call HUD at 617-994-8335. The toll-free number for the hearing impaired is 1-800-927-9275.

## VACATION RENTALS

**OCEAN FRONT**

4BR, 2BA home, 7 mi No. of Kennebunkport. Weekly Rental starting at $3695. Cronkite Realty 207-967-0600

Los Angeles Times

Publication Date: 06/09/2023

This electronic tearsheet confirms the ad appeared in the Los Angeles Times on the date and page indicated. You may not create derivative works, or in any way exploit or repurpose any content.

Ad Number: 7930577-2
Insertion Number:
Size: 3 x 11
Color Type: B&W

Client Name: / PO# R5020020, R5020
Advertiser: Miller Advertising
Section/Page/Zone: Legal/B004/LA
Description: First Repub R5020020, R5020021,R502

# MARKETPLACE

JOBS · REAL ESTATE · MORE

latimes.com/placead | To place an ad call 1.800.234.4444

## Collectibles and Memorabilia

**Baseball Cards**
Cash paid 4 pre1975. Buying all SPORTS CARDS of any size collections. (310)614-3312

## Auctions

**Natural and Resin Live Edge Tables**
Auction
Saturday, June 10th, 11:30
2095 California Ave
Corona, CA 92881
or
Online / auctions4america.com

Live Natural Edge Table Tops
Straight Edge Table Tops
Epoxy Resin Tables
Cookie Cut Coffee Tables
Leather Chairs
Rounded Back Molded Wood Chairs
Monkey Pod Wood Tables
South American Walnut Tables

## Estate Sales

**Garage sale June 10**
FROM 7AM-12PM AT 4715 Sanford dr. Culver City

## Rummage Sales/ Swap Meets

**GIANT RUMMAGE SALE at St Luke's Of The Mountains**
Supporting the St Luke's Centennial Anniversary. Books, clothing, kitchen items, cameras, jewelry, medical equipment, furniture, car rims, collectibles and much more.
2563 Foothill Blvd La Crescenta
June 10th 8:00am-4:00pm

## Miscellaneous Merchandise

FREON WANTED: Certified buyer looking to buy R11, R12, R22 & more! Call Xiomara at 312-697-1976.

## Out of State

**Colorado Home - $443,000!!!**
3bd 2ba 1,694 sq ft... in excellent condition and close to Mountains!!!
Details at: aaronrussell316.wixsite.com/home
ph 520-375-3543 Pp

## Name Change

**ORDER TO SHOW CAUSE FOR A CHANGE OF NAME**
**CASE NO. 23CHCP00237**

**Petitioner or Attorney (name, state, bar, and address):**
Anna Laham
10513 Langdon Ave. Mission Hills, Ca. 91345
**TO ALL PERSONS INTERESTED:**
Petitioner Anna Laham filed a petition with this court for a decree changing names as follows:
**Present Name**
Ana Guzman De Laham
**Proposed Name**
Anna Laham
**THE COURT ORDERS** that all persons interested in this matter appear before this court at the hearing indicated below to show cause, if any, why the petition for change of name should not be granted. Any person objecting to the name changes described above must file a written objection that includes the reasons for the objection at least two days before the matter is scheduled to be heard and must appear at the hearing to show cause why the petition should not be granted. If no written objection is timely filed, the court may grant the petition without a hearing.

## Name Change

**NOTICE OF HEARING**
DATE: 8-09-2023
TIME: 8:30 a.m.
DEPT: f47
ROOM:
**The address of the court is:** SUPERIOR COURT OF CALIFORNIA County of CA 9425 Penfield Ave. Chatsworth A copy of this Order to Show Cause shall be published at least once each week for four successive weeks prior to the date set for hearing on the petition in the following newspaper of general circulation, printed in this county.
Dated: Jun 07 2023
David D Celfound
Judge of the Superior Court
Published in the Los Angeles Times 06/09/23, 06/16/23, 06/23/23, 06/30/23

## Business Names

**Fictitious Business Name Statement NO.: 2023 108291**
The following person is doing business as:
**Fictitious Business** Name(s) Protopia Studios 2019 N Vista Del Mar Ave, Hollywood, CA 90068. **Registered Owner** (S): Protopia, Inc. 2019 N Vista Del Mar Ave, Hollywood, CA 90068. **Business is conducted by:** a Corporation. The registrant commenced to transact business under the fictitious business name or names listed above on **05/2023**. I declare that all information in this statement is true and correct. (A registrant who declares as true information which he or she knows to be false is guilty of a crime) **REGISTRANT/CORP/LLC NAME:** Protopia, Inc. **Signature:** Nathan J. Altman, President. This statement was filed with the County Clerk of **Los Angeles** County on 05/16/2023. **NOTICE**- in accordance with subdivision (a)of section 17920 A Fictitious Name Statement generally expires at the end of five years from the date on which it was filed in the office of the County Clerk except, as provided in subdivision (b) of section 17920, where it expires 40 days after any change in the facts set forth in the statement pursuant to section 17913 other than a change in the residence address of a registered owner. A new fictitious business name statement must be filed before the expiration. The filing of this statement does not of itself authorize the use in this state of fictitious business name in violation of the rights of another under federal state or common law (see section 14411 et seq. Business and Professions code). Dean C. Logan, Los Angeles County Clerk. BY: Alexandra Avilez, Deputy. Published 05/26/23, 06/02/23, 06/09/23, 06/16/23.

**SUMMONS**
**(CITACION JUDICIAL)**
**Case Number (Numero del Caso): 22STCV35256**

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
NHAN TRAN

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTA DEMANDANDO EL DEMANDANTE):**
Marcus Stewart Ettinger and Stephanie E. Ettinger, as individuals and as trustors and trustees of the Marcus S. Ettinger and Stephanie E. Ettinger Living Trust dated August 10, 2021

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.
You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
¡AVISO! Lo han demandado. Si no responde dentro de 30 dias, la corte puede decidir en su contra sin escuchar su version. Lea la informacion a continuacion.
Tiene 30 DIAS DE CALENDARIO despues de que le entreguen esta citacion y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefonica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y mas informacion en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede mas cerca. Si no puede pagar la cuota de presentacion, pida al secretario de la corte que le de un formulario de exencion de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podra quitar su sueldo, dinero y bienes sin mas advertencia.

**The name and address of the court is: (El nombre y direccion de la corte es):**
Stanley Mosk Courthouse
111 North Hill Street
Los Angeles, CA 90012

**The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: (El nombre, la direccion y el numero de telefono del abogado del demandante, o del demandante que no tiene abogado, es):**
Robert A. von Esch IV, Esq.
2201 E Chapman
Fullerton, CA 92831
17144556118

**Date: (Fecha)** 11/04/22

David W. Slayton Clerk (Secretario)
M. Valenzuela Deputy (Adjunto)

## Business Names

**Fictitious Business Name Statement NO.: 2023 2023119501**
The following person is doing business as:
**Fictitious Business** Name(s) Smile US 22395 S Western Ave., Ste 304, Torrance, CA 90501. **Registered Owner** (S): Takashi Yamada 22395 S Western Ave., Ste 304, Torrance, CA 90501. **Business is conducted by:** a Corporation. The registrant commenced to transact business under the fictitious business name or names listed above on **05/31/2023**. I declare that all information in this statement is true and correct. (A registrant who declares as true information which he or she knows to be false is guilty of a crime) **REGISTRANT/CORP/LLC NAME:** Nextcreative USA, Inc.. **Signature:** Takashi Yamada. This statement was filed with the County Clerk of **CA** County on 05/31/2023. **NOTICE**- in accordance with subdivision (a)of section 17920 A Fictitious Name Statement generally expires at the end of five years from the date on which it was filed in the office of the County Clerk except, as provided in subdivision (b) of section 17920, where it expires 40 days after any change in the facts set forth in the statement pursuant to section 17913 other than a change in the residence address of a registered owner. A new fictitious business name statement must be filed before the expiration. The filing of this statement does not of itself authorize the use in this state of fictitious business name in violation of the rights of another under federal state or common law (see section 14411 et seq. Business and Professions code). Dean C. Logan, CA County Clerk. BY: Lakeisha Mccoy, Deputy. Published 06/02/23, 06/09/23, 06/16/23, 06/23/23.

**SUMMONS**
**(CITACION JUDICIAL)**
CASE NUMBER *(Número del Caso)*: 22CHLC25554

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO)*:
EVANGELINA H ESPINOZA

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE)*:
WELLS FARGO BANK, N.A.

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.
You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can located these nonprofit groups at the California Legal Services Web site *(www.lawhelpcalifornia.org)*, the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, or by contacting your local court or county bar association. **NOTE**: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su version. Lea la información a continuación.*
*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presenter una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo prolegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puedo encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de extención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y hiener sin más advertencia.*
*Hay otros requisites legales. Es recommendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remission a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisites para obtener servicios legales gratuitos de un programa de servicios legales sin lines de lucro. Puede encontrar estos grupos sin lines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos extentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
(El nombre y dirección de la corte es):
SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
9425 Penfield Avenue
Chatsworth, CA 91311

The name, address, and telephone number of the plaintiff's attorney, or plaintiff without an attorney, is: (El nombre, la dirección y el número del abogado del demandante, o del demandante que no tiene abodgado, es):
HARLAN M. REESE, ESQ. (CA BAR NO.: 118226)
***REESE LAW GROUP***
3168 Lionhead Avenue
Carlsbad, CA 92010
760/842-5850 (File No. 567200)

DATE *(Fecha)*: 11/15/2022
Sherri R. Carter Executive Officer/Clerk of Court
Clerk *(Secretario)*, by, Deputy *(Adjunto)*
*(SEAL)*
5/26,6/2,6/9, and 6/16/23

**CNS-3702382#**

Published in the Los Angeles Times

## Legal Notices

**LEGAL NOTICE**

**Notice of Payment Card Security Issue At An ALDI Store**

ALDI Inc. recently learned that an unauthorized party gained physical access to a checkout terminal at six ALDI stores located in California and installed a device designed to acquire certain customer payment card information. Based on the company's investigation, ALDI believes the unauthorized party installed a single terminal at each of the following six ALDI stores located at:

- 1352B W Valley Pkwy, Escondido, CA on approximately May 15, 2023.
- 14626 Roscoe Blvd, Panorama City, CA between approximately May 13 and May 15, 2023.
- 5190 Stockdale Hwy, Bakersfield, CA between approximately May 8 and May 15, 2023.
- 203 Towne Center Dr, Compton, CA on approximately May 16, 2023.
- 3330 W. Century Blvd, Inglewood, CA between approximately May 16 and May 17, 2023.
- 22741 Victory Blvd, West Hills, CA on approximately May 17, 2023.

The issue may have affected the payment card information of customers who swiped their cards at the affected terminals during the relevant timeframe, including cardholder names, card numbers, card expiration dates, card pins and security codes. After learning of the issue, ALDI quickly removed the device from the affected terminal at each of the six stores, and took steps to secure the company's systems and determine the nature and scope of the issue. The company also reported the issue to the payment card brands and law enforcement authorities. In addition, ALDI has conducted additional reviews at ALDI stores nationwide to help prevent similar issues. ALDI is alerting customers about this issue so they can take steps to protect themselves. U.S. consumers are entitled under U.S. law to one free credit report annually from each of the three nationwide consumer reporting agencies. To order a free credit report, visit www.annualcreditreport.com or call toll-free at 1-877-322-8228. Additional information about this issue, including recommendations on steps affected customers can take to protect their information, can be found on ALDI's website at https://www.aldi.us/about-aldi/notice-regarding-payment-card-issue/. In addition, customers with questions regarding this issue can call 1-800-325-7894, Monday through Friday from 9 a.m. to 5 p.m. Eastern Time.

**FDIC**
**PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA**

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024**, federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

## Rentals LA Metro Area

**Los Angeles Mommune** Colive with other entrepreneurial single moms in a 5 bedroom, 2 bathroom, 2 story house near DTLA. Rent ranges from $1500 to $1800 and includes utilities, household supplies, biweekly cleaning, and a parking space. 2 rooms available now. Seeking 2 moms with 1 child each under 10. Call/text to schedule tour. Emily Blake, (510) 703-6208

**HOW TO PLACE AN AD**

**Self-service 24/7:**
latimes.com/placead

**Contact us by phone 24/7:**
800-234-4444

**ADVERTISING POLICIES**
**For Los Angeles Times advertising terms and conditions go to:**
www.latimes.com/about/la-ads-terms-20181105-htmlstory.html

Los Angeles Times
**YOUR PERFECT JOB IS WAITING**
Stop wasting time searching for jobs. Find the right jobs with the Los Angeles Times recruitment services.
We work hard to make your job search easy. With our expansive network of distinguished employers from coast to coast and advanced job matching technology, you'll find opportunities that match your skills, your personality and your life.
**Search jobs. Post your resume. Stand out from the crowd.**
**latimes.com/jobs**

**THAT SCRAMBLED WORD GAME**
**By David L. Hoyt and Jeff Knurek**

Unscramble these Jumbles, one letter to each square, to form four ordinary words.

AOLTG

NUSAA

SOSWHO

RIDLEV

Now arrange the circled letters to form the surprise answer, as suggested by the above cartoon.

(Answers tomorrow)

Get the free JUST JUMBLE app • Follow us on Twitter @PlayJumble

©2023 Tribune Content Agency, LLC All Rights Reserved.

Yesterday's Jumbles: BOOTH ELITE GOBLET AFFIRM
Answer: Can you think of a word meaning "physical strength"? You — MIGHT BE ABLE TO

**PETS**
MARKETPLACE
To advertise your pets, log on to placeanad.latimes.com/pets-for-sale
Los Angeles Times

## Dogs

**LABRADOR RETRIEVER** AKC Chocolate Lab puppies M/F, 10 weeks old, shots and health screening completed. Raised in a family home with children. $1800. 805-404-1369

## Dogs

**SHIBA INU** Puppies available. 657-200-9100

**From brokers to buyers. In one place.**
LA Times Real Estate Classified
Advertise Today (800) 234-4444



K Nxxx,2023-06-09,B,003,Bs-BW,E1

THE NEW YORK TIMES **BUSINESS** FRIDAY, JUNE 9, 2023 N B3

**ECONOMY | INTERNATIONAL**

# Resilience of Economy Poses Big Questions for Fed

FROM FIRST BUSINESS PAGE

raise rates at this month's meeting.

In short, the mixed economic signals could make Fed policy discussions fraught in the months ahead. Here's where things stand.

### Interest rates are much higher.

Interest rates are above 5 percent, their highest level since 2007.

After sharply adjusting policy over the last 15 months, key officials, including Jerome H. Powell, the Fed chair, and Philip Jefferson, President Biden's pick to be the next Fed vice chair, have hinted that central bankers could pause to allow themselves time to judge how the increases are affecting the economy.

But that assessment remains a complex one. Even some parts of the economy that typically slow when the Fed raises rates are demonstrating a surprising ability to withstand today's interest rates.

"It's a very complicated, convoluted picture depending on which data points you are looking at," said Matthew Luzzetti, chief U.S. economist at Deutsche Bank, noting that overall growth figures like gross domestic product have slowed — but other key numbers are holding up.

### House prices are wiggling.

Higher interest rates can take months or even years to have their full effect, but they should theoretically work pretty quickly to begin to slow down the car and housing markets, both of which revolve around big purchases made with borrowed cash.

That story has been complicated this time. Car buying has slowed since the Fed started raising rates, but the auto market has been so undersupplied in recent years — thanks in large part to pandemic-tied supply chain problems — that the cool-down has been a bumpy one. Housing has also perplexed some economists.

The housing market weakened markedly last year as mortgage rates soared. But rates have recently stabilized, and home prices have ticked back up amid low inventory. House prices do not count directly in inflation, but

## Economic Indicators Weighing on the Fed

Average hours worked per week
35.0
34.8
34.6
34.4
34.2
34.0
33.8
2008
'10
'12
'14
'16
'18
'20
'22
Employees are working fewer hours, suggesting less labor demand.

Source: Bureau of Labor Statistics | Notes: Data is seasonally adjusted and includes hours worked by full- and part-time private sector employees.

Inflation

Year-over-year percentage change in the Personal Consumption Expenditures index

All items

Excluding food and energy

Inflation remains far above the Fed's 2 percent goal.

+7%, 6, 5, 4, 3, 2, 1, 0; 2019, '20, '21, '22, '23

Source: Bureau of Economic Analysis

Monthly change in jobs
+800,000 JOBS
600,000
400,000
200,000
2021
2022
2023
Employers averaged 190,000 added jobs per month in the decade before the pandemic.

Source: Bureau of Labor Statistics

Federal funds rate

2007 was the last time the Fed's key interest rate was as high as it is today.

15%, 10, 5, 0; 1980, 1990, 2000, 2010, 2020

Source: Federal Reserve

THE NEW YORK TIMES

their turnaround is a sign that it's taking a lot to sustainably cool a hot economy.

### Job signals are confusing.

Fed officials are also watching for signs that their rate increases are trickling through the economy to slow the job market: As it costs more to fund expansions and as consumer demand slows, companies should pull back on hiring. Amid less competition for workers, wage growth should moderate and unemployment should rise.

Some signs suggest that the chain reaction has begun. Initial claims for unemployment insurance jumped to the highest level since October 2021 last week, a report on Thursday showed. People are also working fewer hours per week at private employers, which suggests bosses aren't trying to eke so much out of existing staff.

But other signals have been more halting. Job openings had come down, but edged back up in April. Wages have been climbing less swiftly for lower-income workers, but gains remain abnormally rapid. The jobless rate climbed to 3.7 percent in May from 3.4 percent, but even that was still well shy of the 4.5 percent that Fed officials expected it to hit by the end of 2023 in their latest economic forecasts. Officials will release fresh projections next week.

And by some measures, the labor market is still chugging. Hiring remains particularly strong.

"Everyone talks as if the economy moves in one straight line," said Nela Richardson, chief economist at ADP. "In actuality, it's lumpy."

### Price increases are stubborn.

Still, inflation itself may be the biggest wild card that could shape the Fed's plans this month and over this summer. Officials forecast in March that annual inflation as measured by the Personal Consumption Expenditures index would retreat to 3.3 percent by the end of the year.

That pullback is gradually happening. Inflation stood at 4.4 percent as of April, down from 7 percent last summer but still more than double the Fed's 2 percent goal.

Officials will receive a related and more up-to-date inflation reading for May — the Consumer Price Index — on the first day of their meeting next week.

Economists expect substantial cooling, which could give officials confidence in pausing rates. But if those forecasts are foiled, it could make for an even more heated debate about what comes next.

Quarterly Change in Eurozone G.D.P.

+2.5%
2.0
1.5
1.0
0.5
0
2021
2022
2023

Source: Eurostat | Note: Adjusted for inflation and seasonality THE NEW YORK TIMES

# Price Shocks Sent Eurozone Into Recession

By LIZ ALDERMAN

PARIS — The eurozone slipped into a recession early this year amid the shock of high food and energy prices, Europe's statistics agency reported Thursday. The shallow downturn reflected the challenges facing the European Central Bank as policymakers weigh how to continue curbing high prices without further damaging the economy.

Economic output in the 20 nations that use the euro currency declined 0.1 percent in the first three months of the year, revised data showed, after a fourth-quarter contraction of the same magnitude. It was the first six-month contraction in the eurozone since early in the coronavirus pandemic, creating what economists call a technical recession.

### Why It Matters

Stubbornly high inflation tipped many consumers across the continent into a cost-of-living crisis, prompting them to pull back considerably on spending during the period. Spending in the eurozone fell 0.3 percent in the first three months of this year after falling 1 percent in the previous quarter. Imports were also down sharply as demand for goods and services shrank.

Public spending, which soared during the pandemic lockdowns, also posted a sharp decline, contracting in the first quarter by 1.6 percent from a year earlier.

The downturn mirrors a contraction in Germany, the eurozone's largest economy, which reported last month that data from the first three months of the year showed that its economy had fallen into a recession amid the energy price shock.

But Thursday's report showed a mixed performance across the region, as southern European economies including Spain, Italy and Portugal all posted strong growth rates, while Germany and the Netherlands shrank and France grew only mildly.

Since spring, Europe's overall economy has picked up the pace slightly, and the European Commission has lifted its growth outlook, forecasting expansion of 1.1 percent this year and 1.6 percent in 2024.

"Looking ahead, we think consumers' spending is now rebounding slightly as inflation eases, and we also think government spending will rebound," Claus Vistesen, chief eurozone economist at Pantheon Macroeconomics, wrote in a note. "But this boost likely will be offset by a continued decline in investment, and a further reduction in inventories, reflecting tightening credit standards."

### Background

Governments had hoped to avoid a recession after spending lavishly during the winter months to shield households and businesses from soaring energy and food costs, which had been exacerbated by Russia's war in Ukraine. Across Europe, countries swiftly stockpiled energy reserves, and a mild winter, together with mass conservation efforts, helped avoid the worst.

The strategy has helped drive down the price of energy, and inflation in the eurozone's biggest economies climbed down from record highs. In May, the annual rate of inflation was 6.1 percent, the eurozone's lowest level in more than a year.

But the price of food and a range of services has continued to climb at an uncomfortable pace, raising the odds that the European Central Bank will continue to raise interest rates at its upcoming meetings. The International Monetary Fund has warned that European policymakers' main challenge this year will be to tame inflation without stoking a severe recession.

### What's Next

Analysts said the downturn was mild and unlikely to weigh on an economic recovery from the pandemic, but it nonetheless signaled that growth would remain tepid for the remainder of the year.

The European Central Bank's next monetary policy meeting next Thursday.

# *Retail Workers Are Left Out of New York City's Covid Recovery*

By STEFANOS CHEN

The retail industry in New York City has shed thousands of jobs since the pandemic, even as the rest of the job market has almost fully recovered, according to a new report released on Thursday from the Center for an Urban Future, a public policy think tank.

The study found that in the three years since February 2020, New York City lost 37,800 retail jobs, an 11.1 percent decline, while the overall private employment sector has regained all but 0.8 percent of jobs.

The city's job losses in retail were also far worse than in the rest of the country; nationally, retail jobs were up an average 0.7 percent. Retail jobs are a critical part of the city's job market, particularly for young people of color.

The retail industry — which includes clothing, sporting goods and grocery stores, among others — has been shrinking for years, but the pandemic sped up the growth of online shopping, especially in big cities like New York, where the commercial ecosystem relies on tourism and still-half-empty office buildings, said Jonathan Bowles, the center's director.

### Why It Matters

"New York is on the verge of a crisis, when it comes to jobs that are accessible to New Yorkers without a college degree," Mr. Bowles said, and the decline is contributing to widening racial disparities.

More than 70 percent of the city's 301,700 retail jobs are held by Black, Hispanic and Asian workers, a disproportionate share of whom did not finish college. Over a fifth of that work force is under the age of 25.

In the first quarter of the year, the unemployment rate for Black New Yorkers was 12.2 percent, compared to 1.3 percent for white New Yorkers — the biggest gap this century.

A spokeswoman for City Hall pointed to Mayor Eric Adams's "New New York" plans for economic development, and said that he was "proud to have ushered in a 99 percent recovery of private-sector jobs post-pandemic," but did not address why New York was losing more retail jobs than the national average.

### Background

The industries in New York that are growing — tech, finance, health, legal and accounting services — are not accessible to the work force that has been laid off, Mr. Bowles said.

And growing sectors that are accessible might not meet demand or offer the same level of pay.

The average annual wage across all retail sectors in 2021 was $53,900, according to Dr. James Parrott, the director of economic and fiscal policy at the Center for New York City Affairs at the New School.

Jobs for couriers and messengers, who made $48,180 on average in 2021, have risen more than 20 percent in the last three years, a reflection of an uptick in e-commerce. But that amounted to only 4,300 new jobs, Mr. Bowles said.

The growth of home health care services has also been sharp, with a gain of 41,700 new jobs, but those positions tend to pay far less than some retail jobs.

Home health aides, predominantly women of color, were paid an average $30,560 in 2021, according to Dr. Parrott.

"They're basically getting paid minimum wage," he said.

### What's Next

The working-age population of New York City was down 400,000 people in March and April of 2023, compared to the start of 2020, which hurt retail demand, Dr. Parrott said.

To counter the losses in retail, Mr. Bowles said, the city should invest in job training programs that can help retail workers transition to other fields.

The report also recommended offering tax incentives to encourage in-person shopping and, most crucially, expanding new affordable housing in the five boroughs to increase foot traffic.

*UCC Public Sale Notice*

Please take notice that Jones Lang LaSalle Americas, Inc. ("JLL"), on behalf of Axonic Special Opportunities SBL Master Fund, LP, a Delaware limited partnership ("Axonic SOMF"), Axonic JPM Seller LLC, a Delaware limited liability company ("Axonic JPM"), and Burgundy 523 Offshore Fund, Ltd. (collectively with Axonic SOMF and Axonic JPM, the "Secured Party"), offers for sale by a Uniform Commercial Code public auction to be held on September 7, 2023 at 10 a.m. EST on the front steps of the New York County Supreme Court Building, located at 60 Centre Street, New York, New York 10007, as well as by remote participation via simultaneous audio/video teleconference, 100% of the limited liability company membership interests in Flats East Office Tower LLC (the "Interests"), a Delaware limited liability company (the "Borrower"), which is the sole owner of the property (the "Property") commonly known as the Flats East Office Tower, located at 950 Main St, Cleveland, OH 44113.

The Secured Party, as lender, holds a loan (the "Mezzanine Loan") made to Flats East Office Tower Member LLC, a Delaware limited liability company (the "Mezzanine Borrower"). In connection with the Mezzanine Loan, the Mezzanine Borrower has granted to the Secured Party a first priority lien on the Interests pursuant to that certain Pledge and Security Agreement. The Secured Party is offering the Interests for sale in connection with the foreclosure on the pledge of the Interests. The Mezzanine Loan is subordinate to a mortgage loan and other obligations and liabilities of the Borrower and/or otherwise affecting the Property (the "Senior Loan").

The sale of the Interests will be subject to all applicable third party consents and regulatory approvals, if any, as well as the terms of sale prepared by the Secured Party (the "Terms of Sale"). Without limitation to the foregoing, please take notice that there are specific requirements for any potential successful bidder in connection with obtaining information and bidding on the Interests, including but not limited to, that (1) each bidder must comply with all requirements and restrictions applicable to the sale of the Interests described in the Intercreditor Agreement dated as of December 6, 2018 by and among the holder of the Senior Loan and the Secured Party (the "Intercreditor Agreement"), including but not limited to, that such bidder is a Qualified Transferee within the meaning of the Intercreditor Agreement, and (2) each bidder must deliver such documents and pay such amounts as required by the Intercreditor Agreement and the applicable governing documents relating to the Interests.

The Interests are being offered as a single lot, "as-is, where-is", with no express or implied warranties, representations, statements, or conditions of any kind made by the Secured Party or any person acting for or on behalf of the Secured Party, without any recourse whatsoever to the Secured Party or any other person acting for or on behalf of the Secured Party and each bidder must make its own inquiry regarding the Interests. The winning bidder shall be responsible for the payment of all transfer taxes, stamp duties, and similar taxes incurred in connection with the purchase of the Interests.

The Secured Party reserves the right to credit bid, set a minimum reserve price, reject all bids (including, without limitation, any bid that it deems to have been made by a bidder that is unable to satisfy the requirements imposed by the Secured Party upon prospective bidders in connection with the sale or to whom in the Secured Party's sole judgment a sale may not lawfully be made), terminate or adjourn the sale to another time, without further notice, and to sell the Interests at a subsequent sale, and to impose any other commercially reasonable conditions upon the sale of the Interests as the Secured Party may deem proper. The Secured Party further reserves the right to (1) determine, at any time before, during, or after the sale of the Interests, the qualifications of any bidder, including but not limited to, a prospective bidder's ability to (a) satisfy the Qualified Transferee requirement in the Intercreditor Agreement and (b) close the transaction on the terms and conditions referenced herein and (2) modify the Terms of Sale. The Secured Party further reserves the right to verify that each certificate for the Interests to be sold bears a legend substantially to the effect that such interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and to impose such other limitations or conditions in connection with the sale of the Interests as the Secured Party deems necessary or advisable in order to comply with the Securities Act or any other applicable law.

All bids (other than credit bids made by the Secured Party) must be for cash, and the successful bidder must be prepared to deliver immediately available good funds as required by the Terms of Sale and otherwise comply with the bidding requirements and the Terms of Sale. Further information concerning the Interests, the requirements for obtaining information and bidding on the Interests, and the Terms of Sale can be found at www.950mainaveclevelanduccsale.com or by contacting JLL using the contact information below.

Contact Information for Jones Lang LaSalle Americas, Inc.: Brett Rosenberg, (212) 812-5926, brett.rosenberg@jll.com

**PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA**

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation closed FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024**, federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

Ad Number: 6331228001
Insertion Number: 6331228001
Size: F1/4
Color Type: CMYK
Advertiser: Legal Notice
Agency: Miller Advertising
Section-Page-Zone(s): A-9-All
Description: FIRST REPUBLIC BANK

San Francisco Chronicle
Friday, June 9, 2023

## HOTELS

*From page A1*

in part because of inflation.

The city's highest-spending leisure tourists were from China, and those travelers were barred from returning until the Chinese government ended its strict border policies this year. Corporate travel is also getting cut as tech firms conduct mass layoffs and try to reduce costs, Hise said.

Higher interest rates are also making it harder for owners to refinance.

After Park Hotels, the next-biggest mortgage deadline comes in January 2024, when the Hilton San Francisco Financial District on Kearny Street faces a $97 million loan maturation.

As of March, just $9.3 million of the loan has been paid off, according to filings by owner Portsmouth Square Inc., a subsidiary of InterGroup Corp.

"We are confident that we can achieve the refinancing of this loan," said David Gonzalez, president of Portsmouth Square Inc. He said business has been strong and the hotel has outperformed its neighbors, making it a "very different animal" from Park Hotels' properties, which coincidentally are also managed by Hilton. (Park Hotels itself was spun off from Hilton Worldwide in 2017.)

The 543-room Hilton Financial District hotel was 78% occupied in the first quarter of this year, with an average daily rate of $234. The hotel had a $680,000 loss from operations in the first quarter, compared with a loss of $2.47 million in the first quarter of 2022.

Park Hotels' four San Francisco hotels were only 48% occupied in the first quarter, the second-lowest among its regions. (It also owns the JW Marriott Union Square and the 316-room Hyatt Centric Fisherman's Wharf.)

Hawaii, the company's fullest region, was 88% occupied during that period.

Hilton Union Square was closed for more than a year and Parc 55 was closed for two years at the start of the pandemic, and revenue plunged.

In 2019, the hotels had a combined $354 million in revenue and 92% occupancy, according to figures provided by Alan Reay, president of Atlas Hospitality Group, a hotel consultancy. Revenue dropped to $73 million in 2020, $29 million in 2021 and $145 million in 2022.

Park Hotels confirmed the two hotels would remain open amid any ownership change this year and declined to comment further.

Workers also have contract protections.

"Hotel workers at the Hilton Union Square and Parc 55 will not be affected by any change in the ownership of their hotels. These sales are frequent in the hotel industry, so our union has secured contract language that requires hotel owners and operators to retain staff in the event of a transfer and to negotiate with our union about any impact on workers," said Anand Singh, president of Unite Here Local 2, which represents hotel workers, in a statement. "The economic performance of the hotels is consistent with other large ones in the city. Around 75% of the union's over 15,000 members are back to work, with food and beverage staff the slowest to return."

Reay said potential buyers of the hotels could see an opportunity in turning them into housing.

"Hotels are a lot easier and not as costly to convert as office buildings. Apartment conversion would have much lower expense on operating as there are a lot fewer employees required and better cash flow based on current hotel metrics," he said.

But such a project would require city approvals, and, much like hotel rates, San Francisco apartment rents have also stagnated due to lower demand.

Park Hotels CEO Thomas Baltimore Jr. cited weaker-than-expected convention bookings at Moscone Center, a slow return to the office and street conditions as factors clouding San Francisco's path to recovery.

There's also a seemingly relentless barrage of negative news about stores closing — including two Nordstrom stores shuttering a block from Parc 55 — and crime, including a fatal shooting outside a Walgreens nearby.

The stories reflect major challenges for San Francisco. And they could discourage leisure travels and businesses from visiting the city, Hise said.

"Most downtowns are struggling with this issue" around negative perception, she said. "San Francisco has been getting a lot of the national press."

Numerous hotels around the country, from Portland, Ore., to Minneapolis to New York, have also gone into foreclosure in the past year.

There are bright spots: The city is hosting the Asia-Pacific Economic Cooperation, a high-profile forum for world leaders, at the end of the year. Levi's Stadium in Santa Clara is hosting the 2026 Super Bowl and a portion of the 2026 World Cup, which is expected to boost tourism around the Bay Area.

San Francisco Travel also started a $6 million ad campaign last month to highlight the city's attractions.

"I think it's tough right now," Hise said. "I think that there's positive aspects."

*Reach Roland Li: roland.li@sfchronicle.com; Twitter: @rolandlisf*

Adam Pardee/Special to The Chronicle

**The Parc 55 property is one of two San Francisco hotels for which Park Hotels & Resorts plans to surrender ownership. Park Hotels' four San Francisco hotels were only 48% occupied in the first quarter, the second-lowest among its regions.**

# LEGAL NOTICES

VISIT SFGATE.COM/LEGALNOTICES

## PUBLIC NOTICES

**SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT**
**NOTICE TO PROPOSERS – GENERAL INFORMATION**
**June 6, 2023**
**EMERGENCY ELEVATOR REPAIR SERVICES**
**FOR**
**BART**
**RFP NO. 6M3659A**

The San Francisco Bay Area Rapid Transit District (hereinafter referred to as "BART" or "District") is a California Rapid Transit District intends to engage the services of a ("CONTRACTOR") to provide on-call emergency elevator repair services. The District presently intends to enter into two up to (2) separate three (3) year Agreements with the CONTRACTORs offering the two (2) lowest responsive and responsible proposals, with two (2) one-year options available on each Agreement. BART intends on awarding up to two (2) Agreements from this solicitation.

Accordingly, BART will be accepting proposals ("Proposals") from proposers ("Proposers") for consideration for the selection of a CONTRACTOR to perform the scope of services specified in this Request for Proposals ("RFP").

Proposals must be received by BART by 2:00 PM local time on **Tuesday, July 11, 2023.** Proposals shall be submitted to the following address:

District Secretary's Office
San Francisco Bay Area Rapid Transit District
2150 Webster Street, 10th Floor
Oakland, CA 94612

**REQUIRED REGISTRATION ON THE BART PROCUREMENT PORTAL**

**In order for prospective Proposers to be eligible for award of an Agreement being solicited on the BART Procurement Portal, such Proposers are required to be currently registered to do business with BART on the BART Procurement Portal online at https://suppliers.bart.gov and have obtained Solicitation Documents, updates, and any Addenda issued online so as to be added to the Online Planholders List for this solicitation.**

**If a prospective Proposer is a joint venture or partnership, such entity may register on the BART Procurement Portal with the entity's tax identification number (TIN) and download the Solicitation Documents so as to be listed as an online planholder under the entity's name prior to submitting its Proposal. If such entity has not registered on BART Procurement Portal in the name of the joint venture or partnership prior to submitting its Proposal, provided that at least one of the joint venturers or partners registered online on the BART Procurement Portal and downloaded the Solicitation Documents so as to be added to the Online Planholders List for this solicitation, such entity will be required to register with the entity's TIN as an online planholder following the submittal of Proposals, in order for the entity to be eligible for award of this Agreement.**

**PROPOSERS WHO HAVE NOT REGISTERED ON THE BART PROCUREMENT PORTAL PRIOR TO SUBMITTING A PROPOSAL, (OR FOR A JOINT VENTURE OR PARTNERSHIP AS DESCRIBED ABOVE PRIOR TO AWARD) AND DID NOT DOWNLOAD THE SOLICITATION DOCUMENTS FOR THIS SOLICITATION ONLINE SO AS TO BE LISTED AS AN ONLINE PLANHOLDER FOR THIS SOLICITATION, WILL NOT BE ELIGIBLE FOR AWARD OF THIS AGREEMENT.**

**PRE-PROPOSAL MEETING**

**A Pre-Proposal Meeting will be held**

## PUBLIC NOTICES

**on Monday, June 12, 2023 at 1:00 p.m**. local time via Zoom presentation. All interested parties must RSVP via registering with the Zoom link included within the RFP in order to participate in this Pre-Proposal Meeting. Should there be difficulties in registering, please contact veronica.zamani@bart.gov.

Instructions on attending the Zoom Presentation are included within the RFP. At the Pre-Proposal Meeting, the District's Equity Program(s) will be explained. Prospective Proposers are requested to make every effort to participate in this only scheduled Pre-Proposal Meeting. At the conclusion of the Pre-Proposal Meeting, participants will be given the opportunity to share their contact information to facilitate networking offline.

6/9/23
CNS-3709301#

## PUBLIC NOTICES (NON-GOVERNMENT)

**NOTICE to Creditors**

Estate of Gary Van Wambeke, deceased
Superior Court of CA, San Francisco County Case # PES-23-306212

All persons having claims against the above named estate are required to present them to the Personal Representative or to the Superior Court of California, County of San Francisco on or before Oct. 9 2023, or the claims may be forever barred.

Maria Van Wambeke
Personal Representative
757 Pleasant Valley Rd, Aptos, CA 95003

Published: 06/09 6/16 and 6/23 2023

## NOTICES OF PROBATE

**NOTICE OF PROBATE**

Susan L. Alexander
SBN221646
Weiner Law
12707 High Bluff Drive, Suite 125
San Diego, CA 92130
Telephone: 858-356-9070
Email: susan@weinerlegacylaw.com
Petitioner: AMINA FORTE

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO
400 McAllister Street
San Francisco, CA 94102
PROBATE

ESTATE OF DONALD ISIAH HUGHES, DECEDENT

NOTICE OF PETITION TO ADMINISTER ESTATE OF:
DONALD ISIAH HUGHES
CASE No: PES-23-306282

To all heirs, beneficiaries, creditors, contingent creditors, and persons who may otherwise be interested in the will or estate, or both, of DONALD ISIAH HUGHES.

A Petition for Probate has been filed by AMINA FORTE in the Superior Court of California, County of SAN FRANCISCO.

The petition requests the decedent's will and codicils, if any, be admitted to probate. The will and any codicils are available for examination in the file kept by the court.

The petition requests authority to administer the estate under the Inde-

## NOTICES OF PROBATE

pendent Administration of Estates Act. (This authority will allow the personal representative to take many actions without obtaining court approval. Before taking certain very important actions, however, the personal representative will be required to give notice to interested persons unless they have waived notice or consented to the proposed action.) The independent administration authority will be granted unless an interested person files an objection to the petition and shows good cause why the court should not grant the authority.

A hearing on the petition will be held as follows:

Date: JUNE 14, 2023 at 9:00 A.M., Room 204, SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO, 400 McAllister Street, San Francisco, CA 94102.

If you object to the granting of the petition, you should appear at the hearing and state your objections or file written objections with the court before the hearing. Your appearance may be in person or by your attorney.

If you are a creditor or a contingent creditor of the decedent, you must file your claim with the court and mail a copy to the personal representative appointed by the court within the later of either (1) four months from the date of first issuance of letters a general personal representative, as defined in section 58(b) of the California Probate Code, or (2) 60 days from the date of mailing a personal delivery to you of a notice under section 9052 of the California Probate Code. Other California statutes and legal authority may affect your rights as a creditor. You may want to consult with an attorney knowledgeable in California law.

You may examine the file kept by the court. If you are a person interested in the estate, you may file with the court a Request for Special Notice (form DE-154) of the filing of an inventory and appraisal of estate assets of any petition or account as provided in Probate Code section 1250. A Request for Special Notice form is available from the court clerk.

Attorney for petitioner:
Susan L. Alexander, Esq.
12707 High Bluff Drive, Suite 125
San Diego, CA 92130
Telephone: 858-356-9070
Publication dates:

JUNE 2, 9, 10, 2023

## FICTITIOUS BUSINESS NAMES

**FICTITIOUS BUSINESS NAME STATEMENT**
**FILE NO. 2023-0400482**

Fictitious Business Name(s): 1) Lost & Found Speech Therapy, 2) Wonder Well, 745 8th Avenue, San Francisco, CA 94118, County of San Francisco. Full name of registrant #1: Amy Lee, 745 8th Avenue, San Francisco, CA 94118. This business is conducted by an individual.

The registrant commenced to transact business under the above-listed fictitious business name on N/A.

This statement was filed with the County Clerk of San Francisco on:
May 30, 2023
June 2, 9, 16, 23, 2023

DATEBOOK
SAN FRANCISCO CHRONICLE
Explore the best of the Bay Area with DATEBOOK
DATEBOOK.SFCHRONICLE.COM

## FDIC

### PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

P2JW160000-0-B00500-1--------XA

# COMMODITIES

wsj.com/market-data/commodities

## Futures Contracts

### Metal & Petroleum Futures

| Contract | Open | High hi lo | Low | Settle | Chg | Open interest |
|---|---|---|---|---|---|---|
| **Copper-High (CMX)**-25,000 lbs.; $ per lb. | | | | | | |
| June | 3.7795 | 3.7935 | 3.7550 | **3.7965** | 0.0420 | 1,091 |
| July | 3.7535 | 3.7970 | 3.7345 | **3.7950** | 0.0390 | 108,280 |
| **Gold (CMX)**-100 troy oz.; $ per troy oz. | | | | | | |
| June | 1943.20 | 1969.00 | 1943.10 | **1963.60** | 20.90 | 3,033 |
| July | 1948.60 | 1976.00 | 1948.10 | **1969.90** | 20.00 | 2,894 |
| Aug | 1956.20 | 1985.70 | 1955.20 | **1978.60** | 20.20 | 370,767 |
| Oct | 1977.20 | 2005.00 | 1976.40 | **1998.10** | 20.20 | 12,385 |
| Dec | 1995.00 | 2024.00 | 1994.00 | **2017.20** | 20.10 | 36,821 |
| Feb'24 | 2014.60 | 2042.80 | 2014.60 | **2035.80** | 19.80 | 5,694 |
| **Palladium (NYM)**-50 troy oz.; $ per troy oz. | | | | | | |
| June | 1379.00 | 1379.00 | 1356.00 | **1343.10** | –29.60 | 19 |
| Sept | 1392.00 | 1392.00 ▼ | 1344.00 | **1358.30** | –29.60 | 11,517 |
| **Platinum (NYM)**-50 troy oz.; $ per troy oz. | | | | | | |
| June | ... | | | **1022.00** | –10.70 | 75 |
| July | 1025.00 | 1033.00 | 1010.90 | **1013.90** | –10.70 | 50,628 |
| **Silver (CMX)**-5,000 troy oz.; $ per troy oz. | | | | | | |
| June | 23.520 | 24.265 | 23.520 | **24.264** | 0.825 | 431 |
| July | 23.525 | 24.460 | 23.510 | **24.348** | 0.819 | 91,494 |
| **Crude Oil, Light Sweet (NYM)**-1,000 bbls.; $ per bbl. | | | | | | |
| July | 72.47 | 73.28 | 69.03 | **71.29** | –1.24 | 298,823 |
| Aug | 72.57 | 73.37 | 69.21 | **71.44** | –1.20 | 267,428 |
| Sept | 72.35 | 73.16 | 69.14 | **71.31** | –1.13 | 247,729 |
| Oct | 71.99 | 72.79 | 68.93 | **71.00** | –1.09 | 190,904 |
| Dec | 71.22 | 71.99 | 68.30 | **70.25** | –1.07 | 219,631 |
| Dec'24 | 67.29 | 67.84 | 65.02 | **66.41** | –0.97 | 117,130 |
| **NY Harbor ULSD (NYM)**-42,000 gal.; $ per gal. | | | | | | |
| July | 2.4042 | 2.4263 | 2.3174 | **2.3898** | –.0120 | 72,744 |
| Dec | 2.3956 | 2.4125 | 2.3159 | **2.3768** | –.0181 | 42,099 |
| **Gasoline-NY RBOB (NYM)**-42,000 gal.; $ per gal. | | | | | | |
| July | 2.6421 | 2.6822 | 2.5361 | **2.6127** | –.0285 | 97,485 |
| Aug | 2.5385 | 2.5715 | 2.4458 | **2.5150** | –.0255 | 71,036 |
| **Natural Gas (NYM)**-10,000 MMBtu.; $ per MMBtu. | | | | | | |
| July | 2.334 | 2.380 | 2.277 | **2.352** | .023 | 330,247 |
| Aug | 2.431 | 2.469 | 2.368 | **2.434** | .001 | 124,628 |
| Sept | 2.436 | 2.475 | 2.378 | **2.440** | –.008 | 206,842 |
| Oct | 2.559 | 2.595 | 2.500 | **2.562** | –.011 | 108,950 |
| Nov | 2.998 | 3.030 | 2.938 | **3.001** | –.012 | 66,579 |
| Jan'24 | 3.724 | 3.759 | 3.664 | **3.723** | –.021 | 79,322 |

### Agriculture Futures

| Contract | Open | High hi lo | Low | Settle | Chg | Open interest |
|---|---|---|---|---|---|---|
| **Corn (CBT)**-5,000 bu.; cents per bu. | | | | | | |
| July | 600.00 | 613.25 | 595.25 | **610.25** | 6.00 | 395,424 |
| Dec | 526.00 | 533.50 | 520.25 | **533.00** | 2.25 | 401,761 |
| **Oats (CBT)**-5,000 bu.; cents per bu. | | | | | | |
| July | 344.00 | 361.25 | 338.50 | **356.25** | 12.00 | 2,116 |
| Dec | 346.75 | 368.00 | 346.75 | **363.75** | 11.75 | 1,426 |
| **Soybeans (CBT)**-5,000 bu.; cents per bu. | | | | | | |
| July | 1358.00 | 1371.75 | 1352.00 | **1363.25** | 2.50 | 243,861 |
| Nov | 1175.00 | 1190.50 | 1167.00 | **1189.00** | 10.50 | 226,173 |
| **Soybean Meal (CBT)**-100 tons; $ per ton. | | | | | | |
| July | 404.70 | 408.40 | 401.00 | **404.00** | –1.20 | 145,375 |
| Dec | 365.40 | 366.60 | 362.40 | **365.50** | –.30 | 139,341 |
| **Soybean Oil (CBT)**-60,000 lbs.; cents per lb. | | | | | | |
| July | 50.54 | 52.75 | 50.35 | **52.50** | 2.03 | 137,320 |
| Dec | 48.94 | 50.39 | 48.72 | **50.24** | 1.33 | 146,208 |
| **Rough Rice (CBT)**-2,000 cwt.; $ per cwt. | | | | | | |
| July | 18.30 | 18.80 | 18.28 | **18.78** | .47 | 2,544 |
| Sept | 15.28 | 15.40 | 15.25 | **15.39** | .14 | 4,974 |
| **Wheat (CBT)**-5,000 bu.; cents per bu. | | | | | | |
| July | 616.00 | 629.00 | 611.25 | **626.25** | 9.50 | 179,671 |
| Sept | 627.25 | 641.25 | 623.25 | **639.00** | 11.25 | 100,074 |
| **Wheat (KC)**-5,000 bu.; cents per bu. | | | | | | |
| July | 788.00 | 807.25 | 782.00 | **804.75** | 16.75 | 66,160 |
| Sept | 786.25 | 806.25 | 780.25 | **803.75** | 17.75 | 57,788 |
| **Cattle-Feeder (CME)**-50,000 lbs.; cents per lb. | | | | | | |
| Aug | 239.125 | 240.825 | 238.100 | **238.650** | –.450 | 33,819 |
| Sept | 242.300 | 243.575 | 241.150 | **241.475** | –.800 | 9,718 |
| **Cattle-Live (CME)**-40,000 lbs.; cents per lb. | | | | | | |
| June | 179.675 | 180.325 | 178.500 | **178.775** | –.225 | 11,189 |
| Aug | 173.500 | 174.150 | 171.900 | **172.250** | –.950 | 150,637 |
| **Hogs-Lean (CME)**-40,000 lbs.; cents per lb. | | | | | | |
| June | 87.250 | 87.875 | 86.700 | **87.675** | –.675 | 15,887 |
| Aug | 82.950 | 82.950 | 81.300 | **82.425** | –.675 | 60,020 |
| **Lumber (CME)**-27,500 bd. ft., $ per 1,000 bd. ft. | | | | | | |
| July | 511.00 | 516.00 | 509.00 | **515.00** | 8.00 | 5,253 |
| Sept | 523.00 | 530.50 | 522.00 | **529.50** | 7.50 | 1,950 |
| **Milk (CME)**-200,000 lbs., cents per lb. | | | | | | |
| June | 15.27 | 15.27 ▼ | 15.12 | **15.15** | –.15 | 6,856 |
| July | 16.59 | 16.59 ▼ | 15.87 | **16.07** | –.46 | 6,545 |
| **Cocoa (ICE-US)**-10 metric tons; $ per ton. | | | | | | |
| July | 3,104 | 3,149 ▼ | 3,090 | **3,149** | 46 | 55,166 |
| Sept | 3,091 | 3,160 ▲ | 3,082 | **3,137** | 46 | 132,092 |
| **Coffee (ICE-US)**-37,500 lbs.; cents per lb. | | | | | | |
| July | 186.20 | 196.15 | 184.60 | **194.85** | 9.45 | 51,326 |
| Sept | 181.80 | 191.55 | 180.80 | **190.35** | 8.65 | 73,101 |
| **Sugar-World (ICE-US)**-112,000 lbs.; cents per lb. | | | | | | |
| July | 24.49 | 25.68 | 24.42 | **25.48** | .98 | 293,324 |
| Oct | 24.22 | 25.30 | 24.14 | **25.09** | .85 | 323,993 |
| **Sugar-Domestic (ICE-US)**-112,000 lbs.; cents per lb. | | | | | | |
| July | 41.74 | 41.74 | 41.74 | **41.74** | –.13 | 101 |
| March'24 | 41.87 | 41.87 | 41.87 | **41.87** | –.12 | 2,224 |
| **Cotton (ICE-US)**-50,000 lbs.; cents per lb. | | | | | | |
| July | 85.00 | 86.96 | 84.11 | **84.31** | –.70 | 49,126 |
| Dec | 81.37 | 82.37 | 81.11 | **81.63** | .40 | 105,357 |
| **Orange Juice (ICE-US)**-15,000 lbs.; cents per lb. | | | | | | |
| July | 257.65 | 260.10 | 254.05 | **258.35** | .70 | 6,721 |
| Sept | 249.65 | 252.90 | 247.70 | **250.95** | .85 | 2,022 |

### Interest Rate Futures

| Contract | Open | High hi lo | Low | Settle | Chg | Open interest |
|---|---|---|---|---|---|---|
| **Ultra Treasury Bonds (CBT)**-$100,000; pts 32nds of 100% | | | | | | |
| June | 134-110 | 135-260 | 133-210 | **135-250** | 1-10.0 | 4,596 |
| Sept | 134-190 | 136-040 | 133-260 | **136-020** | 1-11.0 | 1,464,156 |
| **Treasury Bonds (CBT)**-$100,000; pts 32nds of 100% | | | | | | |
| June | 126-090 | 127-160 | 125-230 | **127-150** | 1-05.0 | 10,316 |
| Sept | 126-120 | 127-200 | 125-270 | **127-200** | 1-04.0 | 1,240,536 |
| **Treasury Notes (CBT)**-$100,000; pts 32nds of 100% | | | | | | |
| June | 112-150 | 113-020 | 112-090 | **113-010** | 16.0 | 6,458 |
| Sept | 113-040 | 113-250 | 112-300 | **113-235** | 16.5 | 4,587,385 |
| **5 Yr. Treasury Notes (CBT)**-$100,000; pts 32nds of 100% | | | | | | |
| June | 107-200 | 108-030 | 107-187 | **108-010** | 8.5 | 3,582 |
| Sept | 108-060 | 108-192 | 108-017 | **108-170** | 8.5 | 4,849,029 |
| **2 Yr. Treasury Notes (CBT)**-$200,000; pts 32nds of 100% | | | | | | |
| June | 102-020 | 102-063 | 102-002 | **102-042** | 2.1 | 5,671 |
| Sept | 102-167 | 102-217 | 102-143 | **102-189** | 1.4 | 3,399,624 |
| **30 Day Federal Funds (CBT)**-$5,000,000; 100 - daily avg. | | | | | | |
| June | 94.8825 | 94.8900 | 94.8750 | **94.8850** | ... | 274,422 |
| July | 94.8250 | 94.8400 | 94.8100 | **94.8300** | ... | 380,654 |
| **10 Yr. Del. Int. Rate Swaps (CBT)**-$100,000; pts 32nds of 100% | | | | | | |
| June | 95-070 | 96-025 | 95-070 | **96-015** | 18.5 | 7,290 |
| **Three-Month SOFR (CME)**-$1,000,000; 100 - daily avg. | | | | | | |
| March | 95.0500 | 95.0525 | 95.0500 | **95.0525** | .0025 | 1,013,692 |
| June | 94.7400 | 94.7575 | 94.7225 | **94.7450** | .0000 | 1,268,692 |
| **Eurodollar (CME)**-$1,000,000; pts of 100% | | | | | | |
| June | 94.4675 | 94.4700 | 94.4425 | **94.4600** | –.0075 | 526,261 |

### Currency Futures

| Contract | Open | High hi lo | Low | Settle | Chg | Open interest |
|---|---|---|---|---|---|---|
| **Japanese Yen (CME)**-¥12,500,000; $ per 100¥ | | | | | | |
| June | .7147 | .7214 | .7140 | **.7208** | .0059 | 232,669 |
| Sept | .7250 | .7318 | .7244 | **.7312** | .0059 | 27,776 |
| **Canadian Dollar (CME)**-CAD 100,000; $ per CAD | | | | | | |
| June | .7481 | .7501 ▲ | .7471 | **.7488** | .0008 | 150,032 |
| Sept | .7491 | .7512 | .7482 | **.7499** | .0008 | 11,613 |
| **British Pound (CME)**-£62,500; $ per £ | | | | | | |
| June | 1.2446 | 1.2564 | 1.2439 | **1.2559** | .0116 | 210,063 |
| Sept | 1.2461 | 1.2581 | 1.2457 | **1.2576** | .0116 | 21,812 |
| **Swiss Franc (CME)**-CHF 125,000; $ per CHF | | | | | | |
| June | 1.1003 | 1.1135 | 1.0990 | **1.1132** | .0126 | 43,823 |
| Sept | 1.1116 | 1.1242 | 1.1101 | **1.1240** | .0123 | 1,367 |
| **Australian Dollar (CME)**-AUD 100,000; $ per AUD | | | | | | |
| June | .6656 | .6720 | .6654 | **.6717** | .0059 | 179,558 |
| Sept | .6674 | .6737 | .6673 | **.6734** | .0058 | 19,945 |
| **Mexican Peso (CME)**-MXN 500,000; $ per MXN | | | | | | |
| June | .05747 | .05761 | .05723 | **.05739** | –.00012 | 212,929 |
| Sept | .05647 | .05661 | .05624 | **.05638** | –.00013 | 26,570 |
| **Euro (CME)**-€125,000; $ per € | | | | | | |
| June | 1.0706 | 1.0793 | 1.0703 | **1.0785** | .0076 | 676,282 |
| Sept | 1.0759 | 1.0846 | 1.0756 | **1.0839** | .0076 | 96,916 |

### Index Futures

| Contract | Open | High hi lo | Low | Settle | Chg | Open interest |
|---|---|---|---|---|---|---|
| **Mini DJ Industrial Average (CBT)**-$5 x index | | | | | | |
| June | 33703 | 33908 | 33635 | **33865** | 156 | 95,548 |
| Sept | 34012 | 34203 | 33920 | **34159** | 161 | 4,100 |
| **Mini S&P 500 (CME)**-$50 x index | | | | | | |
| June | 4273.25 | 4302.50 | 4262.75 | **4298.25** | 24.00 | 2,382,944 |
| Sept | 4316.00 | 4346.00 | 4305.75 | **4341.75** | 24.50 | 115,484 |
| **Mini S&P Midcap 400 (CME)**-$100 x index | | | | | | |
| June | 2576.30 | 2578.90 | 2543.80 | **2558.70** | –12.50 | 38,000 |
| Sept | 2598.60 | 2601.80 | 2567.10 | **2581.90** | –13.40 | 62 |
| **Mini Nasdaq 100 (CME)**-$20 x index | | | | | | |
| June | 14316.00 | 14526.75 | 14256.75 | **14503.00** | 171.50 | 275,272 |
| Sept | 14489.75 | 14702.75 | 14425.00 | **14678.75** | 175.50 | 17,431 |
| **Mini Russell 2000 (CME)**-$50 x index | | | | | | |
| June | 1896.90 | 1899.90 | 1868.00 | **1883.30** | –9.10 | 512,518 |
| Sept | 1915.70 | 1918.20 | 1886.20 | **1901.90** | –8.80 | 18,727 |
| Dec | 1921.20 | 1930.60 | 1908.00 | **1919.70** | –4.90 | 109 |
| **Mini Russell 1000 (CME)**-$50 x index | | | | | | |
| June | 2355.10 | 2356.40 | 2335.90 | **2354.80** | 13.20 | 7,502 |
| **U.S. Dollar Index (ICE-US)**-$1,000 x index | | | | | | |
| June | 104.01 | 104.05 | 103.27 | **103.32** | –.74 | 29,326 |
| Sept | 103.63 | 103.63 | 102.88 | **102.92** | –.74 | 4,238 |

Source: FactSet

## Cash Prices | wsj.com/market-data/commodities

Thursday, June 8, 2023

These prices reflect buying and selling of a variety of actual or "physical" commodities in the marketplace—separate from the futures price on an exchange, which reflects what the commodity might be worth in future months.

| | Thursday |
|---|---|
| **Energy** | |
| Coal,C.Aplc.,12500Btu,1.2SO2-r,w | 76.900 |
| Coal,PwdrRvrBsn,8800Btu,0.8SO2-r,w | 14.550 |
| **Metals** | |
| **Gold, per troy oz** | |
| Engelhard industrial | 1967.00 |
| Handy & Harman base | 1966.40 |
| Handy & Harman fabricated | 2182.70 |
| LBMA Gold Price AM | *1963.05 |
| LBMA Gold Price PM | *1967.35 |
| Krugerrand,wholesale-e | 2052.85 |
| Maple Leaf-e | 2101.96 |
| American Eagle-e | 2101.96 |
| Mexican peso-e | 2534.33 |
| Austria crown-e | 1928.55 |
| Austria phil-e | 2062.67 |
| **Silver, troy oz.** | |
| Engelhard industrial | 24.3500 |
| Handy & Harman base | 24.2300 |
| Handy & Harman fabricated | 30.2880 |
| LBMA spot price | *£18.9400 |
| (U.S.$ equivalent) | *23.5850 |
| Coins,wholesale $1,000 face-a | 22506 |
| **Other metals** | |
| LBMA Platinum Price PM | *1035.0 |
| Platinum,Engelhard industrial | 1025.0 |
| Palladium,Engelhard industrial | 1390.0 |
| Aluminum, LME, $ per metric ton | *2169.0 |
| Copper,Comex spot | 3.7965 |
| Iron Ore, 62% Fe CFR China-s | n.a. |
| Shredded Scrap, US Midwest-s,m | n.a. |
| Steel, HRC USA, FOB Midwest Mill-s | n.a. |
| **Battery/EV metals** | |
| BMI Lithium Carbonate, EXW China, =99.2%-v,w | 42425 |
| BMI Lithium Hydroxide, EXW China, =56.5% -v,w | 41800 |
| BMI Cobalt sulphate, EXW China, >20.5% -v,m | 5041 |
| BMI Nickel Sulphate, EXW China, >22%-v,m | 4512 |
| BMI Flake Graphite, FOB China, -100 Mesh, 94-95% -v,m | 688 |
| **Fibers and Textiles** | |
| Burlap,10-oz,40-inch NY yd-n,w | 0.7425 |
| Cotton,1 1/16 std lw-mdMphs-u | 0.8206 |
| Cotlook 'A' Index-t | *95.25 |
| Hides,hvy native steers piece fob-u | n.a. |
| Wool,64s,staple,Terr del-u,w | n.a. |
| **Grains and Feeds** | |
| Barley,top-quality Mnpls-u | n.a. |
| Bran,wheat middlings, KC-u,w | 133 |
| Corn,No. 2 yellow,Cent IL-bp,u | 6.2700 |
| Corn gluten feed,Midwest-u,w | 161.2 |
| Corn gluten meal,Midwest-u,w | 530.4 |
| Cottonseed meal-u,w | 363 |
| Hominy feed,Cent IL-u,w | 175 |
| Meat-bonemeal,50% pro Mnpls-u,w | 450 |
| Oats,No.2 milling,Mnpls-u | 4.0625 |
| Rice, Long Grain Milled, No. 2 AR-u,w | 37.25 |
| Sorghum,(Milo) No.2 Gulf-u | n.a. |
| SoybeanMeal,Cent IL,rail,ton48%-u,w | 403.80 |
| Soybeans,No.1 yllw IL-bp,u | 13.7300 |
| Wheat,Spring14%-pro Mnpls-u | 9.8825 |
| Wheat,No.2 soft red,St.Louis-u | 6.3125 |
| Wheat - Hard - KC (USDA) $ per bu-u | 8.6975 |
| Wheat,No.1soft white,Portld,OR-u | 7.2000 |
| **Food** | |
| Beef,carcass equiv. index | |
| choice 1-3,600-900 lbs.-u | 299.28 |
| select 1-3,600-900 lbs.-u | 277.55 |
| Broilers, National comp wtd. avg.-u,w | 1.4281 |
| Butter,AA Chicago-d | 2.3700 |
| Cheddar cheese,bbl,Chicago-d | 157.00 |
| Cheddar cheese,blk,Chicago-d | 147.25 |
| Milk,Nonfat dry,Chicago lb.-d | 116.25 |
| Coffee,Brazilian,Comp-y | 1.8243 |
| Coffee,Colombian, NY-y | 2.2099 |
| Eggs,large white,Chicago-u | 1.1150 |
| Flour,hard winter KC-p | 21.55 |
| Hams,17-20 lbs,Mid-US fob-u | 0.81 |
| Hogs,Iowa-So. Minnesota-u | 83.75 |
| Pork bellies,12-14 lb MidUS-u | n.a. |
| Pork loins,13-19 lb MidUS-u | 1.0781 |
| Steers,Tex.-Okla. Choice-u | 180.75 |
| Steers,feeder,Okla. City-u,w | 261.25 |
| **Fats and Oils** | |
| Degummed corn oil, crude wtd. avg.-u,w | n.a. |
| Grease,choice white,Chicago-h | 0.5400 |
| Lard,Chicago-u | n.a. |
| Soybean oil,crude;Centl IL-u,w | 0.5200 |
| Tallow,bleach;Chicago-h | 0.5650 |
| Tallow,edible,Chicago-u | n.a. |

KEY TO CODES: A=ask; B=bid; BP=country elevator bids to producers; C=corrected; D=CME; E=Manfra,Tordella & Brookes; H=American Commodities Brokerage Co; K=bi-weekly; M=monthly; N=nominal; n.a.=not quoted or not available; P=Sosland Publishing; R=SNL Energy; S=Platts-TSI; T=Cotlook Limited; U=USDA; V=Benchmark Mineral Intelligence; W=weekly; Y=International Coffee Organization; Z=not quoted. *Data as of 6/7

Source: Dow Jones Market Data

## Exchange-Traded Portfolios | WSJ.com/ETFresearch

Largest 100 exchange-traded funds, latest session

Thursday, June 8, 2023

| ETF | Symbol | Closing Price | Chg (%) | YTD (%) |
|---|---|---|---|---|
| CnsmrDiscSelSector | XLY | 160.37 | 1.48 | 24.2 |
| CnsStapleSelSector | XLP | 73.23 | 0.69 | –1.8 |
| DimenUSCoreEq2 | DFAC | 26.36 | 0.11 | 8.6 |
| EnSelSectorSPDR | XLE | 81.78 | –0.43 | –6.5 |
| FinSelSectorSPDR | XLF | 33.14 | –0.09 | –3.1 |
| HealthCareSelSect | XLV | 130.02 | 0.64 | –4.3 |
| InvscQQQI | QQQ | 353.15 | 1.24 | 32.6 |
| InvscS&P500EW | RSP | 145.33 | 0.04 | 2.9 |
| iShCoreDivGrowth | DGRO | 50.40 | 0.40 | 0.8 |
| iShCoreMSCIEAFE | IEFA | 66.81 | 1.04 | 8.4 |
| iShCoreMSCIEM | IEMG | 49.28 | 0.72 | 5.5 |
| iShCoreMSCITotInt | IXUS | 62.10 | 0.89 | 7.3 |
| iShCoreS&P500 | IVV | 429.68 | 0.58 | 11.8 |
| iShCoreS&P MC | IJH | 254.71 | –0.41 | 5.3 |
| iShCoreS&P SC | IJR | 99.18 | –0.63 | 4.8 |
| iShCoreS&PTotUS | ITOT | 94.52 | 0.50 | 11.5 |
| iShCoreTotalUSDBd | IUSB | 45.47 | 0.51 | 1.2 |
| iShCoreUSAggBd | AGG | 98.20 | 0.53 | 1.2 |
| iShESGAwareUSA | ESGU | 94.21 | 0.63 | 11.2 |
| iShEdgeMSCIMinUSA | USMV | 72.30 | 0.57 | 0.3 |
| iShEdgeMSCIUSAQual | QUAL | 129.15 | 0.43 | 13.3 |
| iShGoldTr | IAU | 37.25 | 1.33 | 7.7 |
| iShiBoxx$HYCpBd | HYG | 74.70 | 0.63 | 1.5 |
| iShiBoxx$InvGrCpBd | LQD | 107.04 | 0.67 | 1.5 |
| iShJPMUSDEmBd | EMB | 85.27 | 0.57 | 0.8 |
| iShMBS | MBB | 93.63 | 0.50 | 0.9 |
| iShMSCIACWI | ACWI | 93.51 | 0.72 | 10.2 |
| iShMSCI EAFE | EFA | 71.64 | 1.06 | 9.1 |
| iSh MSCI EM | EEM | 39.68 | 0.71 | 4.7 |
| iShMSCIEAFEValue | EFV | 48.26 | 1.17 | 5.2 |
| iShNatlMuniBd | MUB | 106.42 | 0.39 | 0.9 |
| iSh1-5YIGCorpBd | IGSB | 50.17 | 0.24 | 0.7 |
| iSh1-3YTreaBd | SHY | 81.43 | 0.16 | 0.3 |
| iShRussMC | IWR | 70.51 | 0.07 | 4.5 |
| iShRuss1000 | IWB | 235.12 | 0.56 | 11.7 |
| iShRuss1000Grw | IWF | 263.06 | 0.93 | 22.8 |
| iShRuss1000Val | IWD | 153.82 | 0.11 | 1.4 |
| iShRussell2000 | IWM | 186.54 | –0.37 | 7.0 |
| iShS&P500Grw | IVW | 67.75 | 0.83 | 15.8 |
| iShS&P500Value | IVE | 155.98 | 0.30 | 7.5 |
| iShSelectDiv | DVY | 113.26 | –0.15 | –6.1 |
| iSh7-10YTreaBd | IEF | 97.29 | 0.67 | 1.6 |
| iShShortTreaBd | SHV | 110.12 | 0.06 | 0.2 |
| iShTIPSBondETF | TIP | 107.86 | 0.49 | 1.3 |
| iSh20+YTreaBd | TLT | 102.06 | 1.17 | 2.5 |
| iShUSTreasuryBd | GOVT | 23.01 | 0.44 | 1.3 |
| JPMEquityPrem | JEPI | 54.51 | 0.18 | 0.0 |
| JPM UltShIncm | JPST | 50.06 | 0.04 | –0.1 |
| ProShUltPrQQQ | TQQQ | 36.18 | 3.43 | 109.1 |
| SPDRBbg1-3MTB | BIL | 91.54 | 0.05 | 0.1 |
| SPDR DJIA Tr | DIA | 338.81 | 0.49 | 2.3 |
| SPDR Gold | GLD | 182.53 | 1.32 | 7.6 |
| SPDRPtfDevxUS | SPDW | 32.79 | 0.92 | 10.4 |
| SPDRS&P500Value | SPYV | 42.00 | 0.31 | 8.0 |
| SPDRPtfS&P500 | SPLG | 50.44 | 0.54 | 12.1 |
| SPDRS&P500Growth | SPYG | 58.85 | 0.87 | 16.1 |
| SPDR S&P 500 | SPY | 429.13 | 0.60 | 12.2 |
| SchwabIntEquity | SCHF | 35.64 | 1.05 | 10.6 |
| SchwabSrtTRmUSTrsr | SCHO | 48.26 | 0.12 | 0.0 |
| SchwabUS BrdMkt | SCHB | 50.13 | 0.50 | 11.9 |
| SchwabUS Div | SCHD | 71.91 | 0.15 | –4.8 |
| SchwabUS LC | SCHX | 50.71 | 0.58 | 12.3 |
| SchwabUS LC Grw | SCHG | 71.56 | 1.06 | 28.8 |
| SPDR S&PMdCpTr | MDY | 467.76 | –0.43 | 5.6 |
| SPDR S&P Div | SDY | 123.31 | –0.19 | –1.4 |
| TechSelectSector | XLK | 165.19 | 1.08 | 32.7 |
| UtilitiesSelSector | XLU | 66.78 | 0.44 | –5.3 |
| VangdInfoTech | VGT | 420.43 | 1.01 | 31.6 |
| VangdSC Val | VBR | 163.05 | –0.49 | 2.7 |
| VangdExtMkt | VXF | 145.93 | –0.01 | 9.8 |
| VangdDivApp | VIG | 157.53 | 0.39 | 3.7 |
| VangdFTSEAWxUS | VEU | 54.51 | 0.85 | 8.7 |
| VangdFTSEDevMk | VEA | 46.13 | 1.03 | 9.9 |
| VangdFTSE EM | VWO | 40.75 | 0.54 | 4.5 |
| VangdFTSE Europe | VGK | 61.88 | 1.16 | 11.6 |
| VangdGrowth | VUG | 269.98 | 0.99 | 26.7 |
| VangdHlthCr | VHT | 240.71 | 0.53 | –3.0 |
| VangdHiDiv | VYM | 105.32 | 0.17 | –2.7 |
| VangdIntermBd | BIV | 75.46 | 0.53 | 1.5 |
| VangdIntrCorpBd | VCIT | 78.82 | 0.63 | 1.7 |
| VangdIntermTrea | VGIT | 59.15 | 0.46 | 1.1 |
| VangdLC | VV | 196.18 | 0.68 | 12.6 |
| VangdMC | VO | 212.43 | 0.04 | 4.2 |
| VangdMC Val | VOE | 134.59 | –0.20 | –0.5 |
| VangdMBS | VMBS | 46.05 | 0.57 | 1.2 |
| VangdRealEst | VNQ | 83.16 | –0.62 | 0.8 |
| VangdS&P500ETF | VOO | 394.37 | 0.60 | 12.2 |
| VangdST Bond | BSV | 75.87 | 0.20 | 0.8 |
| VangdSTCpBd | VCSH | 75.67 | 0.23 | 0.6 |
| VangdShtTmInfltn | VTIP | 47.55 | 0.17 | 1.8 |
| VangdShortTrea | VGSH | 57.96 | 0.14 | 0.2 |
| VangdSC | VB | 195.34 | –0.31 | 6.4 |
| VangdTaxExemptBd | VTEB | 50.02 | 0.28 | 1.1 |
| VangdTotalBd | BND | 72.70 | 0.50 | 1.2 |
| VangdTotIntlBd | BNDX | 48.64 | 0.25 | 2.6 |
| VangdTotIntlStk | VXUS | 56.23 | 0.88 | 8.7 |
| VangdTotalStk | VTI | 213.70 | 0.47 | 11.8 |
| VangdTotWrldStk | VT | 95.29 | 0.61 | 10.6 |
| VangdValue | VTV | 139.84 | 0.19 | –0.4 |
| WisdTrFRTrea | USFR | 50.39 | 0.02 | 0.2 |

## Borrowing Benchmarks | wsj.com/market-data/bonds/benchmarks

### Money Rates

June 8, 2023

Key annual interest rates paid to borrow or lend money in U.S. and international markets. Rates below are a guide to general levels but don't always represent actual transactions.

**Inflation**

| | April index level | Chg From (%) March '23 | April '22 |
|---|---|---|---|
| **U.S. consumer price index** | | | |
| All items | **303.363** | 0.51 | 4.9 |
| Core | **306.899** | 0.47 | 5.5 |

**International rates**

| | Latest | Week ago | 52-Week High | 52-Week Low |
|---|---|---|---|---|
| **Prime rates** | | | | |
| U.S. | **8.25** | 8.25 | 8.25 | 4.00 |
| Canada | **6.70** | 6.70 | 6.70 | 3.70 |
| Japan | **1.475** | 1.475 | 1.475 | 1.475 |
| **Policy Rates** | | | | |
| Euro zone | **3.75** | 3.75 | 3.75 | 0.00 |
| Switzerland | **2.00** | 2.00 | 2.00 | 0.00 |
| Britain | **4.50** | 4.50 | 4.50 | 1.00 |
| Australia | **4.10** | 3.85 | 4.10 | 0.85 |
| **Overnight repurchase** | | | | |
| U.S. | **5.10** | 5.05 | 5.12 | 0.71 |

**U.S. government rates**

| | Latest | Week ago | 52-Week High | 52-Week Low |
|---|---|---|---|---|
| **Discount** | **5.25** | 5.25 | 5.25 | 1.00 |
| **Federal funds** | | | | |
| Effective rate | **5.0800** | 5.0900 | 5.1000 | 0.8300 |
| High | **5.4000** | 5.4000 | 5.4000 | 0.9500 |
| Low | **5.0600** | 5.0600 | 5.0800 | 0.8000 |
| Bid | **5.0800** | 5.0800 | 5.0800 | 0.8300 |
| Offer | **5.1100** | 5.1100 | 5.1200 | 0.8400 |
| **Treasury bill auction** | | | | |
| 4 weeks | **5.090** | 5.130 | 5.840 | 1.040 |
| 13 weeks | **5.220** | 5.300 | 5.300 | 1.230 |
| 26 weeks | **5.250** | 5.290 | 5.290 | 1.710 |

**Secondary market**

| | Latest | Week ago | 52-Week High | 52-Week Low |
|---|---|---|---|---|
| **Fannie Mae** | | | | |
| 30-year mortgage yields | | | | |
| 30 days | **6.366** | 6.282 | 6.812 | 4.321 |
| 60 days | **6.378** | 6.299 | 6.988 | 4.390 |

**Other short-term rates**

| | Latest | Week ago | 52-Week high | 52-Week low |
|---|---|---|---|---|
| **Call money** | **7.00** | 7.00 | 7.00 | 2.75 |
| **Commercial paper (AA financial)** | | | | |
| 90 days | **5.17** | n.a. | 5.29 | 1.33 |
| **Libor** | | | | |
| One month | **5.22243** | 5.16300 | 5.22243 | 1.25471 |
| Three month | **5.53971** | 5.49857 | 5.53971 | 1.72129 |
| Six month | **5.65657** | 5.64743 | 5.66329 | 2.29429 |
| One year | **5.78800** | 5.72543 | 5.88071 | 2.95857 |
| **Secured Overnight Financing Rate** | **5.05** | 5.08 | 5.08 | 0.69 |

| | Latest | Value Traded | 52-Week High | 52-Week Low |
|---|---|---|---|---|
| **DTCC GCF Repo Index** | | | | |
| Treasury | **5.094** | 23.580 | 5.195 | 0.700 |
| MBS | **5.118** | 48.050 | 5.199 | 0.770 |

**Weekly survey**

| | Latest | Week ago | Year ago |
|---|---|---|---|
| **Freddie Mac** | | | |
| 30-year fixed | **6.71** | 6.79 | 5.23 |
| 15-year fixed | **6.07** | 6.18 | 4.38 |

**Notes on data:**

**U.S. prime rate** is the base rate on corporate loans posted by at least 70% of the 10 largest U.S. banks, and is effective May 4, 2023. **Other prime rates** aren't directly comparable; lending practices vary widely by location; **Discount rate** is effective May 4, 2023. **Secured Overnight Financing Rate** is as of June 7, 2023. **DTCC GCF Repo Index** is Depository Trust & Clearing Corp.'s weighted average for overnight trades in applicable CUSIPs. Value traded is in billions of U.S. dollars. **Federal-funds rates** are Tullett Prebon rates as of 5:30 p.m. ET.

Sources: Federal Reserve; Bureau of Labor Statistics; DTCC; FactSet; Tullett Prebon Information, Ltd.

ADVERTISEMENT

# The Marketplace

To advertise: 800-366-3975 or WSJ.com/classifieds

## PUBLIC NOTICES

### PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

## CLASS ACTION

LEGAL NOTICE

**To: All persons who purchased or otherwise acquired CBS Corporation, n/k/a Paramount Global ("CBS"), common stock during the period November 11, 2017, through July 29, 2018, inclusive. Please read this notice carefully and in its entirety.**

In a matter titled *In the Matter of an Investigation by Letitia James, Attorney General of the State of New York, of CBS Corporation and Leslie Moonves*, Assurance of Discontinuance, Assurance No. 22-071 (Nov. 2, 2022), the Attorney General secured a settlement with CBS and its former CEO, Les Moonves. A copy of the settlement is available at https://ag.ny.gov/sites/default/files/final_cbs-moonves_aod_as_executed_by_all_parties.pdf.

Pursuant to the settlement, CBS and Moonves are required to pay restitution to CBS shareholders who bought shares between November 11, 2017, and July 29, 2018.

To submit a claim for restitution, you must submit a Proof of Claim by mail at CBS Securities Settlement Claims Administrator, c/o Gilardi & Co. LLC, PO Box 8040, San Rafael, CA 94912-8040. You may obtain a copy of the Proof of Claim at www.cbssecuritiessettlement.com or by calling 1-888-564-1149. You are required to provide documentation to support all transactions listed on your Proof of Claim. If you fail to execute and submit a properly completed and addressed Proof of Claim, your claim may be rejected, and you may be precluded from any recovery. If you have already submitted a claim in the CBS securities class action settlement in *Construction Laborers Pension Trust for Southern California, et al. v. CBS Corporation, et al.*, No. 1:18-cv-07796-VEC, your submission will be considered and you do not need to resubmit a new claim. If you do not know if you have already submitted a claim, please contact the Claims Administrator to confirm.

BUSINESS OPPORTUNITIES

SPORTS/TECH
Growing U.S. company seeks local entrepreneurs.
Territories available / $50K min.
A TOP 3 2022 Best Tech Startup
Significant revenue opportunity.
For info call 720-434-1599

BUSINESS OPPORTUNITIES

MIAMI
Adult Entertainment Club
Turn-key and newly renovated.
Fully Licensed, 5:00 am license.
$2,975,000
Pat Burnside Realty 305-389-5800

BUSINESS OPPORTUNITIES

20% + RETURN, APPROX.(9) MONTHS
Invest $608,662 Receive $760,827+7% interest
This is Michael Marich with The Capital Group
I've been selling businesses for over (45) years
References Available, Call (916) 772-7309
Email 4michaelmarich@gmail.com

Client Name:
Advertiser:
Section/Page/Zone: Classified/C007/NZ
Description:
Ad Number:
Insertion Number:
Size:
Color Type:
The Boston Globe
Publication Date: 07/07/2023
This E-Sheet is provided as conclusive evidence that the ad appeared in the Boston Globe on the date and page indicated. You may not create derivative works, or in any way exploit or repurpose any content.

# Classifieds Marketplace

jobs | cars | homes | pets | stuff

Search Classifieds 24/7 at www.boston.com/classifieds • Call 617.929.1500 to Advertise

boston.com/classifieds — notices & more

LEGAL NOTICES

## FDIC — PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

(SEAL)

**COMMONWEALTH OF MASSACHUSETTS**

**LAND COURT**

**DEPARTMENT OF THE TRIAL COURT**

Docket Number: 23 SM 002597

**ORDER OF NOTICE**

TO: **Sandra C Gomes, Trustee of the Gomes Family Living Trust and Jorge R Gomes, Trustee of the Gomes Family Living Trust**

and to all persons entitled to the benefit of the Servicemembers Civil Relief Act, 50 U.S.C. c. 50 §3901 (*et seq*)

**J.P. Morgan Mortgage Acquisition Corp.**

claiming to have an interest in a Mortgage covering real property in Medford, numbered 1060 Fellsway a/k/a 1058 Fellsway a/k/a 1058-1060 Fellsway,, given by Sandra C Gomes and Jorge R Gomes to Union Capital Mortgage Business Trust, dated April 7, 2004, and recorded in Middlesex County (Southern District) Registry of Deeds in Book 42472, Page 503, and now held by Plaintiff by assignment, have filed with this court a complaint for determination of Defendants' Servicemembers status.

If you now are, or recently have been, in the active military service of the United States of America, then you may be entitled to the benefits of the Servicemembers Civil Relief Act. If you object to a foreclosure of the above-mentioned property on that basis, then you or your attorney must file a written appearance and answer in this court at **Three Pemberton Square, Boston, MA 02108** on or before 08/14/2023 or you may lose the opportunity to challenge the foreclosure on the ground of noncompliance with the Act.

Witness, Gordon H. Piper, Chief Justice of this Court on 6/28/2023.

Attest:
Deborah J. Patterson
Recorder

Experience Globe.com

**Commonwealth of Massachusetts**
**Executive Office of Health and Human Services**

**NOTICE OF PUBLIC HEARING**

Under the authority of M.G.L. c. 118E and in accordance with M.G.L. c. 30A, the Executive Office of Health and Human Services (EOHHS) will hold a remote public hearing on Friday, July 28, 2023, at 10:00 a.m. relative to the emergency adoption of amendments to the following regulation.

This regulation is being filed on an emergency basis to provide increased funding to resident care facilities to ensure that facilities remain adequately funded and address these COVID-19-related costs.

The proposed amendments contain rates effective for dates of service on or after December 1, 2022. There is no fiscal impact on cities and towns.

**101 CMR 204.00: Rates of Payment to Resident Care Facilities**

The following amendments are proposed to be effective December 1, 2022, and January 1, 2023, or as described below.
The proposed amendments effective December 1, 2022, were calculated according to the following methodology.

- Update the base year from 2019 to 2020.
  - Calculate allowed variable, fixed cost, equity, and working capital per diems using 2020 costs.
  - Cap variable costs at the 85th percentile, or $148.06. With a 13.57% cost adjustment factor (CAF) applied, the cap is at $168.15.
  - Fixed cost and equity components are limited to the amounts described in 101 CMR 204.08(2)(a)1.d.
  - The methodology used to set the proposed rates applies a 90% occupancy standard when calculating per diem costs.

- For each rest home, the preliminary rate is the sum of the components listed above.
- For each rest home, calculate its DTA days percentage by dividing its DTA days by the facility's total resident days, based on the 2020 cost report. The facility's DTA days percentage adjustment is equal to its DTA days percentage multiplied by $13.28.
- For each rest home that had residents who were receiving MassHealth-covered GAFC services as of October 15, 2020, the proposed GAFC adjustment is equal to the GAFC adjustment the facility is receiving on November 30, 2022.
- For each rest home, calculate a new rate effective December 1, 2022, equal to the greater of:
  - The sum of the preliminary rate, the DTA days percentage adjustment, the GAFC adjustment, and a resident care add-on of $8.00;
  - The sum of the facility's certified rate in effect on November 30, 2022 and a resident care add-on of $8.00; or
  - $95.

- If the rate calculated above exceeds the current rate effective November 30, 2022, plus $34, the facility will receive a negative adjustment such that the new rate effective December 1, 2022, will be equal to the current rate effective November 30, 2022, plus $34.
- For rates effective December 1 through December 31, 2022, apply an annualization adjustment of 493.55% of the difference between the new rate and the current rate, to cover the 153 days from July 1 through November 30, 2022.

Proposed amendments effective January 1, 2023:

- Add a provision for Certain COVID-19 Related Costs Add-on Payment for rate year 2023 incorporated in accordance with St. 2022, c. 268, the 2022 "Economic Development" law, including the calculation methodology, permissible uses, and description of further guidance, and which is to be paid to DPH-licensed resident care facilities. Note: This payment is intended to be made in calendar year 2023 and represents approximately half of the $30M identified in St. 2022, c.268, intended for resident care facilities with rates established in 101 CMR 204. EOHHS intends to make subsequent payments pursuant to future amendments to 101 CMR 204.00 using the same or similar methodology and to be made in a subsequent calendar year.
- Align the interim RCC-Q report due date with the nursing facility timeline, specifically, and move the due date from February 1 to March 1.

Additional proposed amendments effective as described below.

- Clarify that this regulation pertains to COVID-19-related costs in addition to rates for services provided by resident care facilities.
- End surveillance testing payments effective April 30, 2023, to align with the end of the DPH requirement for surveillance testing in long-term care facilities.

The amendments to the regulation also describe a Resident Care Cost Quotient (RCC-Q). Beginning in SFY2023, facilities must have an RCC-Q of at least 80%. A downward rate adjustment may be applied in future rate years to facilities that failed to meet the RCC-Q threshold of 80%.

The proposed amendments to 101 CMR 204.00, in conjunction with amendments to residential care unit rates established at 101 CMR 206.00, meet FY23 state budget appropriation requirements. The proposed amendments to 101 CMR 204.00 will result in an approximate annual cost of $9.93 million to eligible resident care providers. Due to the annualization adjustment, the full $9.93 million in fiscal impact is expected to be realized in FY2023.

The proposed amendments to 101 CMR 204.00 effective January 1, 2023, in conjunction with amendments to residential care unit rates established at 101 CMR 206.00, meet St. 2022, c. 268, requirements. The proposed amendments to 101 CMR 204.00 effective January 1, 2023, will result in an approximate one-year increase of $14.135M. These payments will be made from the dedicated reserve line item 1599-6064. Note: EOHHS intends to make additional amendments in subsequent years in accordance with St. 2022, c. 268, and any related fiscal impact will be noted at that time.

To register to testify at the hearing and to get instructions on how to join the hearing online, go to www.mass.gov/service-details/executive-office-of-health-and-human-services-public-hearings. To join the hearing by phone, call (646) 558-8656 and enter meeting ID 935 397 8200# when prompted.

You may also submit written testimony instead of, or in addition to, live testimony. To submit written testimony, please email your testimony to ehs-regulations@mass.gov as an attached Word or PDF document or as text within the body of the email with the name of the regulation in the subject line. All written testimony must include the sender's full name, mailing address, and organization or affiliation, if any. Individuals who are unable to submit testimony by email should mail written testimony to EOHHS, c/o D. Briggs, 100 Hancock Street, 6th Floor, Quincy, MA 02171. Written testimony will be accepted through 5:00 p.m. on Friday, July 28, 2023. EOHHS specifically invites comments as to how the amendments may effect beneficiary access to care for MassHealth-covered services.

To review the emergency regulation, go to www.mass.gov/service-details/executive-office-of-health-and-human-services-public-hearings or request a copy in writing from MassHealth Publications, 100 Hancock Street, 6th Floor, Quincy, MA 02171. To view or download supporting materials, go to www.mass.gov/service-details/proposed-regulations-supporting-materials.

Special accommodation requests may be directed to the Disability Accommodations Ombudsman by email at ADAAccommodations@mass.gov or by phone at (617) 847-3468 (TTY: (617) 847-3788 for people who are deaf, hard of hearing, or speech disabled). Please allow two weeks to schedule sign language interpreters.

EOHHS may adopt a final, revised version of the emergency regulation taking into account relevant comments and any other practical alternatives that come to its attention.

In case of inclement weather or other emergency, hearing cancellation announcements will be posted on the MassHealth website at www.mass.gov/service-details/executive-office-of-health-and-human-services-public-hearings.

July 7, 2023

Notification is hereby given that Bank of America National Association, 100 North Tryon Street, Suite 170, Charlotte, Mecklenburg County, NC, 28202, has filed an application with the Comptroller of the Currency on July 7, 2023, as specified in 12 CFR 5 of the Comptroller's Licensing Manual, for permission to relocate its domestic branch as follows:

•From: 49 Main Street, Franklin, Norfolk County, MA - 02038
•To: 288 Hartford Avenue STE A-170, Bellingham, Norfolk County, MA - 02019

Any person wishing to comment on this application may file comments in writing with the Director for Large Bank Licensing, Office of the Comptroller of the Currency, 400 7th Street S.W., Mail Stop 10E-2, Washington, DC 20219, within 30 days after the date of this publication. The public may find information about the filing in the OCC's Weekly Bulletin available at www.occ.gov. Additionally, the public portion of the filed application is available upon request.

**MORTGAGEE'S SALE OF REAL ESTATE**

By virtue and in execution of the Power of Sale contained in a certain mortgage (the "Mortgage") given by ALBANY ROAD-BRAINTREE LLC, to EAST BOSTON SAVINGS BANK (predecessor in interest to ROCKLAND TRUST COMPANY by virtue of merger with ROCKLAND TRUST COMPANY) dated April 27, 2018, recorded with the Norfolk County Registry of Deeds in Book 35945, Page 393, of which Mortgage the undersigned is the present holder, for breach of the conditions of the Mortgage and for the purpose of foreclosing the same, there will be sold at Public Auction at 1:00 p.m. on the 13th day of July, 2023, at the mortgaged premises located at 100 and 150 Grossman Drive, Braintree, Norfolk County, Massachusetts, all and singular the premises described in the Mortgage,

To wit:

the premises described in Exhibit A hereto;

Exhibit A to the Mortgage reads as follows:

PARCEL 1

A certain parcel of land in Braintree, Norfolk County, Massachusetts; more particularly described as follows:

Commencing at a point in the westerly line of the approved Relocated Grossman's Access Road, to be named Grossman Drive, said point marking a northeasterly corner of property of the Massachusetts Bay Transportation Authority:

Thence North 83º 54' 22" West, a distance of 151.44 feet by properly of the Massachusetts Bay Transportation Authority to a point;

Thence North a 6º 05' 38" East, a distance of 758.05 feet by property of Penn Central Transportation Co. to the southwesterly corner of Lot 1B as shown on said plan;

Thence South 83º 23' 51" East, a distance of 318.11 feet by said Lot 1B to a point;

Thence South 6º 42' 08" West by Grossman Drive, a distance of 306.94 feet to a point;

Thence By a curve to the right having a radius of 370.00 feet, an arc length of 148.08 feet by Grossman Drive to a point of tangency;

Thence South 29" 37' 56" West by Grossman Drive, a distance of 332.10 feet to the point and place of beginning

Said lot being shown as Lot 1A on a plan entitled "Plan of Land on Grossman Drive" by Neil J. Murphy, dated November 20, 1979, and containing 207,679 square feet or 4.77 acres recorded with Norfolk County Registry of Deeds in Book 5705 Page 353.

Together with the right to use Grossman Drive, also known as Relocated Grossman's Access Road for all purposes for which public streets and ways are now or may hereafter be commonly used in the Town of Braintree, for access to and from Union Street, a public way, in common with all others entitled thereto (being those parties having an interest in land located (a) northerly of the insured property; (b) southerly of the insured property; and (c) on the easterly and southeasterly side of Grossman Drive). Said Grossman Drive is also known as Relocated Grossman's Access Road and is shown on a plan entitled: "Relocated Grossman's and Railroad Access Roads Braintree, Mass" dated April 17, 1979, revised January 29, 1980, drawn by Parsons Brinckerhoff, Engineers, Architects and Planners, recorded as Plan No. 127 of 1980 in Plan Book 280.

Together with the rights, agreements, easements and obligations set forth in instrument entitled Agreement by and among Grossman Industrial Properties, Inc., et al. dated February 7, 1980 recorded in Book 5705 Page 326, including without limitation, the right(s) to maintain, repair, replace and renew utility facilities installed in, over and along Grossman Drive, in accordance with the terms and provisions contained therein.

PARCEL 2

Right to use curb cut for access to and from Grossman Drive as shown on plan entitled: "Relocated Grossman's and Railroad Access Roads, Braintree, Mass." drawn by Parsons Brinckerhoff, dated April 17, 1979, revised January, 1980, recorded as Plan No. 127 of 1980 in Plan Book 280.

The mortgaged premises will be sold subject to and with the benefit of all restrictions, easements, improvements, outstanding tax titles, municipal or other public taxes, assessments, liens or claims in the nature of liens, and existing encumbrances of record, created prior to the Mortgage or to which the Mortgage has or shall have been subordinated of record.

Terms of Sale:

A deposit of $150,000.00 will be required to be paid by certified or bank check by the purchaser at the time and place of sale. The balance of the purchase price shall be required to be paid in cash or by certified or bank check within forty-five (45) days at the offices of Pierce Atwood LLP, 100 Summer Street, Boston, Massachusetts 02110.

Other terms to be announced at the sale.

The undersigned holder of the Mortgage reserves the right to reject any and all bids for the mortgaged premises and to continue the foreclosure sale from time to time to such subsequent date or dates as such holder may deem necessary or appropriate. The description of the premises contained in said Mortgage shall control in the event of an error in this publication.

**ROCKLAND TRUST COMPANY**

Present holder of said mortgage

By its Attorney
Christopher J. Currier
Pierce Atwood LLP
100 Summer Street
Boston, MA 02110
617-488-8138

Dated: May 31, 2023

**WANTED TO LEASE**

OFFICE, CLIENT SERVICES; HEARING ROOMS, AND STORAGE (preferably basement) SPACE IN DOWNTOWN BOSTON as shown on the map shown on Attachment C-5, must be located within ¼ mile of an MBTA station; and ½ mile of One Ashburton Place, Boston.

On behalf of the Office of Consumer Affairs and Business Regulation (SCA), Division of Insurance (DOI), Division of Occupational Licensure (DOL), Division of Standards (DOS), Division of Banks (DOB), Division of Telecommunications and Cable (DTC), and Housing & Economic Development IT (HED-IT), the Massachusetts Division of Capital Asset Management and Maintenance invites proposals to lease approximately 60,000 to 90,000 usable square feet of office space in the above-referenced search area for a term of 10 years.

Proposals must be submitted to:

Division of Capital Asset Management and Maintenance
Office of Leasing and State Office Planning
One Ashburton Place
15th Floor, Room 1500
Boston, Massachusetts 02108

or by e-mail to:
leasepropsubmittal.DCAMM@mass.gov

Proposals must be submitted by the deadline of **July 28, 2023, at 2:00 p.m.** Proposals will be opened at that time.

The RFP can be downloaded from www.commbuys.com Under Requests for Proposals (RFP) to Lease Space, click on "COMMBUYS" and then click on "Find It". You may also email leasing.dcamm@mass.gov or call 857-204-1355 to request a copy of the RFP, referencing Project Number 202308700. For further information, call Lorna Moritz, (617) 947-0254 or lorna.moritz@mass.gov. This notice is also available at www.masspublicnotices.org.

**LEGAL NOTICE CITY OF WATERTOWN**

Notice is hereby given pursuant to MGL Chapter 138, that Inversiones Lizeth Corp. dba Las Amigas located at 222 Arsenal St, has applied for a New All Alcohol License.

Description of premises: Approx 2,100 sq foot family style restaurant with seating for 50.

Hours of operation: Monday – Saturday 8:00 am – 12;00 am | Sunday 10:00 am – 12:00 am

**HEARING ON THIS APPLICATION WILL BE HELD ON THURSDAY JULY 20, 2023 AT 7:15 PM, AT CITY HALL 149 MAIN STREET – LOWER HEARING ROOM.**

WATERTOWN LICENSING BOARD
Donna B. Doucette, Chairman

LEGAL NOTICE
MORTGAGEE'S SALE OF REAL ESTATE

By virtue of and in execution of the Power of Sale contained in a certain mortgage given by Jeffrey L. Swanson to Mortgage Electronic Registration Systems, Inc., as mortgagee, acting solely as a nominee for Prospect Mortgage, LLC, dated May 28, 2010 and recorded in Middlesex County (Southern District) Registry of Deeds in Book 54750, Page 586 (the "Mortgage") of which mortgage Bank of America, N.A is the present holder by Assignment from Mortgage Electronic Registration Systems, Inc., its successors and assigns to Bank of America NA dated March 4, 2013 and recorded at said Registry of Deeds in Book 61334, Page 276, and Assignment from Bank of America, National Association to Secretary of Housing and Urban Development dated July 21, 2016 and recorded at said Registry of Deeds in Book 68891, Page 436, and Assignment from Secretary of Housing and Urban Development to Wilmington Savings Fund Society FSB, as Trustee for Stanwich Mortgage Loan Trust A dated November 3, 2016 and recorded at said Registry of Deeds in Book 68891, Page 438, and Corrective Assignment from Secretary of Housing and Urban Development to Bank of America, N.A. dated August 22, 2017 and recorded at said Registry of Deeds in Book 69926, Page 556, and Assignment from Wilmington Savings Fund Society FSB, as Trustee for Stanwich Mortgage Loan Trust A to Bank of America, N.A. dated December 4, 2018 and recorded at said Registry of Deeds in Book 72085, Page 30, for breach of conditions of said mortgage and for the purpose of foreclosing the same, the mortgaged premises located at 122 Waltham Street, Maynard, MA 01754 will be sold at a Public Auction at 1:00 PM on August 4, 2023, at the mortgaged premises, more particularly described below, all and singular the premises described in said mortgage, to wit:

122 Waltham Street, Maynard, MA

A certain parcel of land with the buildings thereon situated on the Northeasterly side of Waltham Street in Maynard, Middlesex County, Massachusetts, being shown as Lot 3 on a plan entitled "Plan of Land in Maynard, Massachusetts, belonging to Herminia DiGeronimo" Oiva E. Hintsa Associates, Engineers, dated March 1955 and recorded with Middlesex South District Registry of Deeds in Book 8492, Page 408, bounded and described as follows:

SOUTHWESTERLY: by Waltham Street, ninety-five feet;
NORTHWESTERLY: by Lot 2 as shown on said plan, two hundred (200) feet;
NORTHEASTERLY: by said Lot 2, eighty-three and 41/100 (83.41) feet;
SOUTHEASTERLY: by land now or formerly of Leo P. and Grace P. Boeske, two hundred and 33/100 (200.33) feet.

Containing according to said plan 17,841 square feet, more or less

For grantors title see deed recorded herewith.

For mortgagor's title see deed recorded with the Middlesex County (Southern District) Registry of Deeds in Book 54750, Page 584, and in Book 69229, Page 155.

The premises will be sold subject to any and all unpaid taxes and other municipal assessments and liens, and subject to prior liens or other enforceable encumbrances of record entitled to precedence over this mortgage, and subject to and with the benefit of all easements, restrictions, reservations and conditions of record and subject to all tenancies and/or rights of parties in possession.

Terms of the Sale: Cashier's or certified check in the sum of $5,000.00 as a deposit must be shown at the time and place of the sale in order to qualify as a bidder (the mortgage holder and its designee(s) are exempt from this requirement); high bidder to sign written Memorandum of Sale upon acceptance of bid; balance of purchase price payable by certified check in thirty (30) days from the date of the sale at the offices of mortgagee's attorney, Korde & Associates, P.C., 900 Chelmsford Street, Suite 3102, Lowell, MA or such other time as may be designated by mortgagee. The description for the premises contained in said mortgage shall control in the event of a typographical error in this publication.

Other terms to be announced at the sale.

Bank of America, N.A
Korde & Associates, P.C.
900 Chelmsford Street
Suite 3102
Lowell, MA 01851
(978) 256-1500
Swanson, Jeffrey L., 18-032168

**Commonwealth of Massachusetts**
**Executive Office of Health and Human Services**

**NOTICE OF PUBLIC HEARING**

Under the authority of M.G.L. c. 118E and in accordance with M.G.L. c. 30A, the Executive Office of Health and Human Services (EOHHS) will hold a remote public hearing on Friday, July 28, 2023, at 9:30 a.m. relative to the proposed repeal of the following regulation.

**101 CMR 452.00: Supplemental Rates for Workforce Investment for Certain Health and Human Services Programs**

There is no fiscal impact on cities and towns.

101 CMR 452.00 will be repealed effective July 1, 2023. Beginning July 1, 2023, the rates for all services described in 101 CMR 452.00 will revert to the applicable rates set forth in the corresponding "parent" rate regulation for each service.

To register to testify at the hearing and to get instructions on how to join the hearing online, go to www.mass.gov/service-details/executive-office-of-health-and-human-services-public-hearings. To join the hearing by phone, call (646) 558-8656 and enter meeting ID 935 397 8200# when prompted.

You may also submit written testimony instead of, or in addition to, live testimony. To submit written testimony, please email your testimony to ehs-regulations@mass.gov as an attached Word or PDF document or as text within the body of the email with the name of the regulation in the subject line. All written testimony must include the sender's full name, mailing address, and organization or affiliation, if any. Individuals who are unable to submit testimony by email should mail written testimony to EOHHS, c/o D. Briggs, 100 Hancock Street, 6th Floor, Quincy, MA 02171. Written testimony will be accepted through 5:00 p.m. on Friday, July 28, 2023. EOHHS specifically invites comments as to how the repeal may affect beneficiary access to care for Mass-Health-covered services.

To review the proposed repeal, go to www.mass.gov/service-details/executive-office-of-health-and-human-services-public-hearings or request a copy in writing from MassHealth Publications, 100 Hancock Street, 6th Floor, Quincy, MA 02171. To view or download related supporting materials, go to www.mass.gov/service-details/proposed-regulations-supporting-materials.

Special accommodation requests may be directed to the Disability Accommodations Ombudsman by email at ADAAccommodations@mass.gov or by phone at (617) 847-3468 (TTY: (617) 847-3788 for people who are deaf, hard of hearing, or speech disabled). Please allow two weeks to schedule sign language interpreters.

In case of inclement weather or other emergency, hearing cancellation announcements will be posted on the MassHealth website at www.mass.gov/service-details/executive-office-of-health-and-human-services-public-hearings.

July 7, 2023

The Massachusetts Bay Transportation Authority (MBTA) is seeking to sell approximately 17,000 square feet of land located at Fawcett Street and Moulton Street, Cambridge, Massachusetts.

To obtain a copy of the Invitation to Bid and become a registered bidder, visit https://www.mbtarealty.com/bid-docs/ or contact MBTA's designated representative:

Greystone Management Solutions
Attn: Bid for Fawcett Street
20 Park Plaza, Suite 1120
Boston, Massachusetts 02116
Email: Procurement@mbtarealty.com

Responses are due no later than **2:00 pm** on **July 14, 2023** at the following address:

Greystone Management Solutions
Attn: Bid for Fawcett Street
20 Park Plaza, Suite 1120
Boston, MA 02116

MBTA reserves the right to reject any and all responses.

stuff
boston.com/classifieds

ANTIQUES

MAY'S ANTIQUE MARKET
BRIMFIELD
July 13th, 14th & 15th
Opening 9 am Thursday
($8 admission)
413-245-9271
maysbrimfield.com

HOTEL-RESTAURANT SUPPLY

MR. SMITH
BUYS & SELLS
NEW & USED
RESTAURANT
BAR-PIZZA-STORE
EQUIPMENT
AT OUR WAREHOUSE
80 MYRTLE ST. NO.
QUINCY MA
617-770-1600

WANTED

CASH FOR RECORDS
33 LPS & 45's wanted.
Call George 617-633-2682

CASH FOR TOOLS! Hand or Power. Carpenter, Machinist, Mechanic, Plumber. Rollaways. 1-800-745-8665

pets
boston.com/classifieds

DOGS

Golden Retriever Pups
Champion parents, ready to go. k9goldens.com
207-831-3195

notices & more
boston.com/classifieds

AUCTIONS

ANTIQUE AUCTIONS

ANTIQUE LOVERS TAKE NOTE
BRIMFIELD IS HERE –
ALL SHOWS JULY 11-16
NEW SHOWS OPEN DAILY
www.brimfieldantique
fleamarket.com FOR INFO
ON INDIVIDUAL SHOWS
2023 SHOW DATES
JULY 11 - 16
SEPTEMBER 5 - 10





Ad Number: 7930577-3
Insertion Number:
Size: 3 x 11
Color Type: B&W
Client Name: / PO# R5020020, R5020
Advertiser: Miller Advertising
Section/Page/Zone: Legal/B004/LA
Description: First Repub R5020020, R5020021,R502
Los Angeles Times
Publication Date: 07/07/2023
This electronic tearsheet confirms the ad appeared in the Los Angeles Times on the date and page indicated. You may not create derivative works, or in any way exploit or repurpose any content.

# Eagles seemed to treat hawk as one of their own

DOUG GILLARD

**THE BABY** hawk named Tuffy was first captured on camera May 20. Something in the last week triggered the mother eagle to go "psycho" and attack the fledgling, observers say. Tuffy's body was found Wednesday.

[**Tuffy,** from B1]

It was assumed that the fuzzy hatchling was plucked from her nest on May 20 as a meal, but that parental instinct somehow trumped hunger when the eagle returned to her lair.

Over the ensuing days, Gillard and a growing number of bird watchers and photographers documented the mother eagle feeding both the young hawk and her own eaglet.

Although red-tailed hawks and bald eagles typically regard each other as enemies, the eagles seemed to treat Tuffy like one of their own — feeding her and even rescuing her as one of her first few flight attempts failed miserably: The mother eagle caught her and managed to get her back into the nest.

But something in the last week triggered the mother eagle to go "psycho" and attack the young hawk, observers say.

On Friday, Gillard filmed the mother eagle swooping into the nest — talons forward and in attack mode — where the young hawk sat begging for food.

On the first go, Tuffy ducked just in time, and she missed. The same thing occurred on a second pass. On the third attempt, she snagged the hawk and flung her out of the nest. Tuffy, however, was able to grab hold of the side of the nest and haul herself back in. The mother then swooped in a fourth time, grabbed her and threw her out of the nest.

Tuffy eventually returned to the nest, Gillard said, and things seemed to have calmed down a bit.

Early Monday, however, Gillard heard Tuffy cry out a few times from a nearby oak tree. Later that morning, a Times reporter and another photographer — Thy Bun from Oakland — spotted her in the shaded bosom of the oak looking listless and with eyes closed.

Soon after, the mother eagle returned to the nest with food for Lola, the eaglet — who hungrily grabbed the fully intact and wriggling squirrel her mom had captured for her. Gillard and Bun assumed Tuffy would join them.

She did not.

"I got my camera ready, hoping to catch her flying to the nest, in order to at least get some leftovers — I knew she must be starving, for she hadn't eaten, probably, since Saturday," Gillard wrote on his Facebook page Tuesday. "To my great surprise, she didn't fly to the nest! In fact, she didn't even make food cries. ... Something was very wrong."

Concerned, Gillard got in his car, raced to an area where he could get cell reception and reached out to Craig Nikitas, a rehabilitator with Bay Area Raptor Rescue, who'd gotten federal permission to perform a rescue.

By this time, a ranger from a nearby park had shown up, as had two additional photographers.

According to Gillard, Nikitas climbed the tree in order to net Tuffy, "who was still completely limp — she made no effort to move away from all the commotion below."

Unfortunately, the tree was old and the slippery moss and bark ripped off under his hands and feet, making the climb dangerous.

The ranger tried but was also foiled by the tree.

So Nikitas reached out to the feds to get permission to trap the hawk, which was granted. He baited a trap with live mice in a nearby field that Tuffy could see from her perch and could have easily accessed with a short flight.

"Then we all waited and waited and waited in hopes Tuffy would come down," wrote Gillard. "Unfortunately, after a long wait, Tuffy was declared 'nonresponsive' and the rescue attempt was over. Tuffy was not expected to survive the night."

Gillard returned Tuesday and Tuffy was gone.

On Wednesday morning, he found her body. He gave the body to Nikitas, who will deliver it to the Wildlife Center of Silicon Valley, where it will be frozen and handed over to state scientists to examine, Gillard said.

David Bird, a professor emeritus at McGill University and raptor biologist, said the likelihood Tuffy was going to survive was next to zero.

Interviewed Monday night, he suspected Tuffy's recent flight performance — looking like a strong hawk — may have triggered the eagle mother to recognize her true identity. And that maybe the two hadn't bonded strongly enough to deter that awakening.

But he said once the mother began attacking her, it was unlikely she'd make it.

"More than half of young raptors don't make it through their first year of life," Bird said. "There's so many things that could kill them: they could starve to death, they can get nailed by a predator, they could fly into a freight train, get caught up in wildfire, smoke, all kinds of things can happen."

And if they don't have parental support — or get injured by a parent, as the case may have been with Tuffy — the odds go way, way down.

"I hate saying that because I know your readers, and people in California in particular, they love a good story," he said. "But as a biologist, you have to look at it rather pragmatically."

As for Gillard, he's devastated. He said it feels as if he's lost a close friend. He's been following and rooting for Tuffy since mid-May — visiting the nest and chronicling her brief, extraordinary life.

On Wednesday afternoon, he said he was at an In-N-Out Burger with Tuffy's body in a box in the back seat of his car.

"When I'm sad, I comfort eat," Gillard said. He's also going to try to relax and take walks and look at birds.

They've brought him comfort in the past, and he's hopeful something new and avian will lift his spirits.

# Overnight climber permits here to stay at Yosemite

[**Yosemite,** from B1]

permit.

"This allows climbers to get early starts on the walls and not be confined to office hours to pick up their permit," McGahey wrote in an email.

"The community is split on whether they want to register for permits or not," said Leslie Chow, a rock climber who also volunteers at the Yosemite Climbing Assn. "Being who our community is, a lot of people don't like rules and it does have some repercussions — it's not spontaneous anymore — but welcome to the 21st century."

He also called it an equity issue, as any other overnight visitor in a designated wilderness area has to get a backcountry permit. But maybe more important, he said, it will help with management of the climbing routes and surrounding regions.

"El Capitan has become so crowded with climbing, we've seen as many as eight parties on the nose at one time — they're stacked up," Chow said. "It's also part of data gathering: Are there things we can do to improve the climbing experience?"

The climbing association is working with park officials to offer the permits at its museum and shop in the nearby town of Mariposa.

"The permit system helps climbing rangers better understand use patterns on big walls," according to the National Park Service. "It will also increase compliance with existing regulations and minimize impacts to wilderness character through improved education."

Climbers can self-register for the permits, which require them to pack out any trash, prohibit the use of motorized drills, and regulate where fires can be lit and how long ropes can remain on rock surfaces.

"Big wall" climbing developed in Yosemite in the 1950s, according to the park, and has soared in popularity in recent years. It gained even more publicity after the 2018 documentary "Free Solo," which showcased climber Alex Honnold's attempt to summit El Capitan's giant granite face without using ropes.

MARKETPLACE
JOBS · REAL ESTATE · MORE

latimes.com/placead
To place an ad call 1.800.234.4444
Los Angeles Times

**Collectibles and Memorabilia**

Baseball Cards
Cash paid 4 pre1975. Buying all SPORTS CARDS of any size collections. (310) 614-3312

**Garage and Yard Sales**

Store Displays & more
Spinning, fixed displays, other stuff. Saturday 8 am - 2 pm No early birds 18601 Liggett St, Northridge 91324.

EMPLOYMENT 1600

**Employment**

Art Instructor: In Art, Inc., an after school fine arts academy, seeking Art Instructor. Must have Bachelor of Arts Degree in Illustration. Send resume to: Attn.: Yeli Bae at 3731 Wilshire Blvd., Suite 512, L.A., CA 90010.

love is...
...when there are never too many cooks in your kitchen!

HOW TO PLACE AN AD

Self-service 24/7:
latimes.com/placead

Contact us by phone 24/7:
800-234-4444

ADVERTISING POLICIES
For Los Angeles Times advertising terms and conditions go to:
www.latimes.com/about/la-ads-terms-20181105-htmlstory.html

**Legal Notices**

FDIC

**PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA**

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

JUMBLE
THAT SCRAMBLED WORD GAME
By David L. Hoyt and Jeff Knurek

Unscramble these Jumbles, one letter to each square, to form four ordinary words.

HAWTE
RIWLH
DAREIT
CLROSL

FOR THE SURFERS, WAITING FOR THE PERFECT WAVE WAS ---

Now arrange the circled letters to form the surprise answer, as suggested by the above cartoon.

(Answers tomorrow)

Yesterday's Jumbles: ALIAS BIRCH TOWARD EXCEED
Answer: When Lasha Talakhadze broke his own world weightlifting record, he — RAISED THE BAR

©2023 Tribune Content Agency, LLC All Rights Reserved.

PETS

MARKETPLACE
To advertise your pets, log on to placeanad.latimes.com/pets-for-sale
Los Angeles Times

**Dogs**

FRENCH BULLDOG Two-month old Frenchies ready for rehoming $3k-$7k. Includes blue, myrle, and exotic fluffies. Healthy pups raised on home-made meals ready for your love. Located in Los Angeles. More info at CaliforniaFluffy-Frenchies.net 3104982887

**Dogs**

GERMAN SHORTHAIRED POINTER Puppies, males, 9 weeks old, health certified. AKC registered 5593590568

**Pet Adoptions**

Registered A.K.C Labrador retrievers shots and deworming included 5622914214

Los Angeles Times
YOUR PERFECT
HIRE
IS WAITING
Extend your reach. Access customized technology. Simplify your search.
latimes.com/jobs

INFLATION | EMPLOYMENT

Inflation vs. Policy Interest Rates
+10%
+8
+6
+4
+2
0
−1
UNITED STATES
CANADA
EUROZONE
BRITAIN
NORWAY
AUSTRALIA
Inflation
Policy rate
'19
'20
'21
'22
'23

Sources: FactSet (policy rates); Organization for Economic Cooperation and Development (inflation rates). | The charts show the most recent central bank policy target rates, and year-over-year changes in consumer price indexes as compiled by the O.E.C.D. as of May. For Australia, the change in consumer prices is for the first quarter of the year.

KARL RUSSELL/THE NEW YORK TIMES

# In a Global Battle to Rein In Prices, Countries Are Walking a Tightrope

FROM FIRST BUSINESS PAGE

not want to overdo it, harming their economies more than is necessary to bring down inflation.

Many central banks are approaching those trade-offs similarly: They are focused on fighting stubbornly high inflation. Officials fear that if they let inflation persist for too long, it could become entrenched and prove even more painful to stamp out.

The leaders of major central banks in North America, Europe and elsewhere have said recently that they expect to continue raising rates, as inflation is moderating but remains well above their typical target rates — which are often around 2 percent.

Officials at the U.S. Federal Reserve have raised their policy rate to just above 5 percent from near zero in March 2022, and they forecast raising it two more times in 2023, to just above 5.5 percent. Policymakers at the European Central Bank, which sets policy for the 20 countries that use the euro, also expect to continue raising rates, which have reached the highest level since 2001. The Bank of England recently surprised investors by raising rates more than expected with its 13th consecutive increase.

Inflation surged substantially in the United States in 2021 but has come down more quickly than in many parts of Europe. That's in part because Europe has more significant exposure to the effects of Russia's invasion of Ukraine, which has pushed up food and energy prices sharply.

But stripping out those volatile prices, so-called core inflation looks stubborn across many countries. That underscores the common problem facing policymakers: Slow-moving prices for services are climbing much more quickly than before the pandemic.

Prices for labor-intensive services like medical care and education tend to track wage gains and the strength of the overall economy. In short, they are the type of price increases that central banks can do something about by raising rates to slow down borrowing, curb spending and ultimately cool the economy.

At a recent gathering of central bankers, Jerome H. Powell, the Fed chair, said that for inflation in the services sector, such as hotels, restaurants and banks, "we are not seeing a lot of progress yet."

Eshe Nelson contributed reporting.

# *Labor Market Is Cooling Off, But Millions of Jobs Remain*

By J. EDWARD MORENO

Job openings fell in May while the number of workers quitting their jobs increased, the Labor Department reported Thursday.

There were 9.8 million job openings in May, down from 10.3 million in April, according to the Job Openings and Labor Turnover Survey, known as JOLTS. The report shows that the labor market is maintaining ample opportunities for workers, but that it is losing momentum.

"This is a labor market that is moderating, where things are cooling down, but is still hot," said Nick Bunker, the director of North American economic research at the job search website Indeed.

The quits rate, which is often used to gauge a worker's confidence in the job market, increased in May, particularly in the health care, social assistance and construction industries. A rise in quitting often signals workers' confidence that they will be able to find other work, often better paying. But fewer workers are quitting their jobs than were doing so last year at the height of what was called the "great resignation."

Layoffs were relatively steady after decreasing in previous months, a sign that employers are hesitant to let go of workers.

**Why It Matters: The Fed's next move on interest rates is unclear.**

Policymakers at the Federal Reserve have worried about the strength of the labor market as they continue to tackle stubbornly high inflation.

The Fed chose to leave interest rates unchanged in its June meeting after 10 consecutive increases. The JOLTS report is one of several factors that will inform the Fed's next decision on rates.

Some economists worry that the Fed will push interest rates too high and set off a recession.

But the JOLTS report as well as previous economic temperature checks have led others to believe that a "soft landing" — an outcome in which inflation eases to the Fed's goal of 2 percent without a recession — is within reach. The biggest question is whether wage growth can continue to cool as workers switch jobs, said Aaron Terrazas, chief economist at the career site Glassdoor.

"A tight labor market does not necessarily have to be inflationary," he said.

**Background: A moderating market retains underlying strength.**

The labor market has remained resilient amid the Fed's efforts to slow down the economy but has shown signs of cooling in recent months. Job openings were down for three consecutive months until April.

Initial jobless claims during the week that ended Saturday, also released by the Labor Department on Thursday, nudged higher from the week before, though the four-week trend shows initial claims declining.

Although job openings are cooling, the reading of 9.8 million in May is high compared with prepandemic levels. In 2019, for example, the monthly totals hovered around seven million.

"To some degree, I worry we've become desensitized to numbers that were once upon a time eye-popping," Mr. Terrazas said.

**What's Next: The June jobs report comes Friday.**

The June employment report — another indicator closely watched by the Fed — will be released by the Labor Department on Friday. Economists surveyed by Bloomberg expect the report to show a gain of 225,000, down from the initial reading of 339,000 for May.

The unemployment rate jumped to 3.7 percent in May, from 3.4 percent a month earlier. Although still historically low, the rate was the highest since October and exceeded analysts' expectations.

Fed policymakers will hold their next meeting July 25-26.

ALEX SLITZ/ASSOCIATED PRESS

College students waiting to speak with representatives of tech companies at a job fair in Atlanta. Many employers remain hesitant to let go of workers.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| SURGALIGN HOLDINGS, INC., *et al.*[1] | ) Case No. 23-90731 (CML) |
| Debtors. | ) (Jointly Administered) |

**NOTICE OF AUCTION, STALKING HORSE AGREEMENT, SALE OR OTHER POTENTIAL TRANSACTION, AND SALE HEARING**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On June 19, 2023, the above captioned debtors and debtors in possession (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

On June 30, 2023, the Bankruptcy Court entered the *Order (A) Establishing Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors' Entry Into Stalking Horse Agreement, (C) Establishing Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Related Notices, (E) Scheduling a Hearing to Consider the Proposed Sale; and (F) Granting Related Relief* [Docket No. 137] (the "**Bid Procedures Order**"),[2] that, among other things: (a) authorized and approved the Debtors' bidding procedures (the "**Bid Procedures**") for the proposed sale (the "**Sale**") of all, or substantially all, of certain of the Debtors' assets (the "**Assets**") or any other type of strategic transaction involving the Debtors and/or the Assets, including, without limitation, a financing process for the potential raising of debt, equity, or hybrid financing or consummation of a sale or restructuring transaction through a chapter 11 plan (any of the foregoing, including a Sale, a "**Potential Transaction**") and in the event the Debtors receive competing qualified bids, scheduled an auction of the Assets (the "**Auction**"); (b) authorized the Debtors' entry into that certain Asset Purchase Agreement, dated as of June 18, 2023, (as amended, supplemented or otherwise modified by the parties thereto, the "**Stalking Horse Agreement**")[3] between the Debtors and Xtant Medical Holdings, Inc., approved the Debtors' selection of Xtant Medical Holdings, Inc. as the "stalking horse" bidder (the "**Stalking Horse Bidder**"), approved the Stalking Horse Agreement as the "stalking horse bid" (the "**Stalking Horse Bid**") for certain of the Debtors' Assets (the "**Stalking Horse Hardware Assets**"); (c) established procedures for the assumption and assignment of executory contracts and unexpired leases (the "**Assumption and Assignment Procedures**"); (d) established the form and manner of notice of the Bid Procedures, the Auction, and the Sale Hearing; (e) scheduled a final hearing for approval of the Sale or Potential Transaction (the "**Sale Hearing**"), and (f) granted related relief.[4]

**ASSETS TO BE AUCTIONED.** The Debtors are offering substantially all of their Assets, including the Stalking Horse Hardware Assets, for sale or to be acquired through another strategic Potential Transaction. Such Potential Transaction can include the proposed acquisition of some or all of the Assets, including the Stalking Horse Hardware Assets. Except as otherwise provided in the Stalking Horse Agreement or any other asset purchase agreement submitted by a Successful Bidder, all of the Debtors' right, title, and interest in and to the Assets shall, to the maximum extent permitted by section 363 of the Bankruptcy Code, be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "**Interests**"), with such Interests attaching to the net proceeds of the sale of the Assets with the same validity, force, effect, and priority as such Interests applied against the Assets before the Sale, subject to any rights, claims, and defenses of the Debtors.

To facilitate the Sale of Assets, the Debtors selected the Stalking Horse Bid as the initial stalking horse bid for the Stalking Horse Hardware Assets. Under the Stalking Horse Agreement, the Stalking Horse Bidder has agreed to effectuate the Sale, which includes the purchase of the Stalking Horse Hardware Assets and the assumption of certain liabilities associated with the Debtors as set forth in the Stalking Horse Agreement, subject to the terms and conditions set forth therein. The Stalking Horse Bid is subject to higher and better offers submitted in accordance with the terms of the Bid Procedures. The Debtors will now conduct a round of open bidding intended to obtain the highest and otherwise best bid for the Assets, including the Stalking Horse Hardware Assets.

**KEY DATES AND DEADLINES**

**Bid Deadline.** To be eligible to participate in the Auction, a person or entity must submit a Qualified Bid, in writing by electronic mail and in accordance with the Bid Procedures, so as to be actually received by the Debtors by July 26, 2023, at 4:00 p.m. (prevailing Central Time) (as may be extended, the "**Bid Deadline**").

**Auction.** If one or more Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline with respect to any portion of the Debtors' Assets, the Debtors will conduct the Auction with respect to such Assets to determine the highest or otherwise best Qualified Bid **on or around July 28, 2023** in a virtual room hosted by the Debtors' counsel, or such other place and time as the Debtors shall notify all Qualified Bidders. Except as otherwise determined by the Debtors or otherwise ordered by the Bankruptcy Court for cause shown, only the applicable Qualified Bidders, including the Stalking Horse Bidder, are eligible to participate at the applicable Auction. The U.S. Trustee and counsel to the Official Committee of Unsecured Creditors (the "**Committee**"), however, shall be permitted to attend the Auction. In addition, any creditor of the Debtors, or any party the Debtors deem appropriate, may observe the Auction(s); *provided, however*, that any such party must provide notice of its intent to observe to the Debtors at least one day before the applicable Auction by electronic mail to proposed counsel to the Debtors, White & Case LLP, Laura E. Baccash (laura.baccash@whitecase.com) and Barrett Lingle (barrett.lingle@whitecase.com), and proposed investment banker to the Debtors, Alvarez & Marsal Securities, LLC (solas363@alvarezandmarsal.com). At least one day prior to the start of the applicable Auction, each Qualified Bidder must inform the Debtors in writing whether it intends to participate in the Auction. Only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any Bids at the Auction.

**Sale Objection Deadline.** Any objections to the Sale, including the sale of any Assets free and clear of Interests pursuant to section 363(f) of the Bankruptcy Code to the Successful Bidder(s) and/or the Back-Up Bidder(s), as applicable, and the entry of any Sale Order (a "**Sale Objection**"), must (a) be in writing and specify the nature of such objection, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all orders of the Bankruptcy Court, and (c) be filed with the Bankruptcy Court and served **so as to be actually received by** (i) proposed counsel to the Debtors, White & Case LLP, 111 S Wacker Dr., Suite 5100, Chicago, IL 60606 Attn: Laura E. Baccash (laura.baccash@whitecase.com) and White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020 Attn: Barrett Lingle (barrett.lingle@whitecase.com); (ii) counsel for the Stalking Horse Bidder, Fox Rothschild LLP, 33 South Sixth Street, Suite 3600, Minneapolis, MN 55402 Attn: Steve Meyer (smeyer@foxrothschild.com), Emily A. Humbert (ehumbert@foxrothschild.com), Phillip B. Martin (pmartin@foxrothschild.com), and Thomas A. Letscher (tletscher@foxrothschild.com); and (iii) counsel for the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, NY Attn: Bradford J. Sandler (bsandler@pszjlaw.com), Robert J. Feinstein (rfeinstein@pszjlaw.com), and Cia Mackle (cmackle@pszjlaw.com) **by 4:00 p.m. (prevailing Central Time) on the date that is three (3) business days after the Debtors file a notice indicating a Successful Bidder** (the "**Sale Objection Deadline**").[5]

**Sale Hearing.** The Sale Hearing is currently scheduled to take place on August 8, 2023 at 1:00 p.m. (prevailing Central Time), before the Honorable Judge Lopez, at the United States Bankruptcy Court for the Southern District of Texas, in Courtroom 401, 4th Floor, 515 Rusk, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection. Audio communication will be by use of the Bankruptcy Court's dial-in facility. You may access the facility at (832) 917 1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez." Click the settings icon in the upper right corner and enter your name under the personal information setting. Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.

At the Sale Hearing, the Debtors will present the results of the Auction and certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that: (1) the Auction (if held) was conducted, and the Successful Bidder(s) and Back-Up Bidder(s) were selected, in accordance with the Bid Procedures; (2) the Auction (if held) was fair in substance and procedure; (3) the Successful Bid(s) and Back-Up Bid(s) were each a Qualified Bid as defined in the Bid Procedures; and (4) consummation of any Sale as contemplated by the Successful Bid(s) or Back-Up Bid(s) in the Auction will provide the highest or otherwise best offer for the Assets subject to such Successful Bid(s) or Back-Up Bid(s) and is in the best interests of the Debtors and their estates. The Sale Hearing may be continued to a later date by the Debtors by filing a notice of adjournment prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).

**SUBMITTING A BID AND OBTAINING ADDITIONAL INFORMATION.** In order to submit a Bid, parties must submit via electronic mail to the Debtors (i) written copies of its Bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) and (ii) reasonable evidence demonstrating the party's financial capability to consummate a Potential Transaction as determined by the Debtors to proposed counsel to the Debtors, White & Case LLP, Laura E. Baccash (laura.baccash@whitecase.com) and Barrett Lingle (barrett.lingle@whitecase.com) and proposed investment banker to the Debtors, Alvarez & Marsal Securities, LLC (solas363@alvarezandmarsal.com) by no later than the Bid Deadline of July 26, 2023, at 4:00 p.m. (Central Time).

Any party interested in submitting a Bid for the Assets should review the Bid Procedures and Bid Procedures Order carefully. **Failure to abide by the Bid Procedures and the Bid Procedures Order may result in the rejection of your Bid.**

Copies of the Stalking Horse Agreement, the Bid Procedures Order, and the Bid Procedures may be obtained from the Debtors' claims agent, Kroll Restructuring Administration LLC, by (i) visiting the case website at https://restructuring.ra.kroll.com/surgalign, (ii) calling Kroll toll-free at (833) 939-6015 (or (646) 440-4843 for calls originating outside of the U.S.), or (iii) sending an email to surgalign info@ra.kroll.com.

**CONSEQUENCES OF FAILING TO OBJECT. ANY PERSON OR ENTITY WHO FAILS TO FILE AND SERVE AN OBJECTION TO THE PROPOSED SALE TRANSACTION IN ACCORDANCE WITH THE BID PROCEDURES ORDER AND THIS NOTICE BY THE SALE OBJECTION DEADLINE SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE PROPOSED SALE AND TRANSFER OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL INTERESTS.**

**NO SUCCESSOR LIABILITY. THE SALE WILL BE FREE AND CLEAR OF, AMONG OTHER THINGS, ANY CLAIM ARISING FROM ANY CONDUCT OF THE DEBTORS PRIOR TO THE CLOSING OF THE SALE, WHETHER KNOWN OR UNKNOWN, WHETHER DUE OR TO BECOME DUE, WHETHER ACCRUED, ABSOLUTE, CONTINGENT OR OTHERWISE, SO LONG AS SUCH CLAIM ARISES OUT OF OR RELATES TO EVENTS OCCURRING PRIOR TO THE CLOSING OF THE SALE. ACCORDINGLY, AS A RESULT OF THE SALE, ANY SUCCESSFUL BIDDER WILL NOT BE A SUCCESSOR TO ANY OF THE DEBTORS BY REASON OF ANY THEORY OF LAW OR EQUITY, AND THE SUCCESSFUL BIDDER WILL HAVE NO LIABILITY, EXCEPT AS EXPRESSLY PROVIDED IN THE SUCCESSFUL BIDDER'S ASSET PURCHASE AGREEMENT, FOR ANY LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AGAINST OR IN ANY OF THE DEBTORS UNDER ANY THEORY OF LAW, INCLUDING SUCCESSOR LIABILITY THEORIES.**

Houston, Texas, July 4, 2023, /s/ *Veronica A. Polnick*, **JACKSON WALKER LLP**, Veronica A. Polnick (TX Bar No. 24079148), J. Machir Stull (TX Bar No. 24070697), Matthew D. Cavenaugh (TX Bar No. 24062656), 1401 McKinney Street, Suite 1900, Houston, Texas 77010, Telephone: (713) 752-4200, Email: vpolnick@jw.com, mstull@jw.com, mcavenaugh@jw.com, *Proposed Co-Counsel to the Debtors and Debtors in Possession* -and- **WHITE & CASE LLP**, Gregory F. Pesce (admitted *pro hac vice*), Laura E. Baccash (admitted *pro hac vice*), 111 South Wacker Drive, Suite 5100, Chicago, Illinois 60606, Telephone: (312) 881-5400, Email: gregory.pesce@whitecase.com, laura.baccash@whitecase.com -and- Charles R. Koster (TX Bar No. 24128278), 609 Main Street, Suite 2900, Houston, Texas 77002, Telephone: (713) 496-9700, Email: charles.koster@whitecase.com -and- Barrett Lingle (admitted *pro hac vice*), 1221 Avenue of the Americas, New York, New York 10020, Telephone: (212) 819-8200, Email: barrett.lingle@whitecase.com, *Proposed Counsel to the Debtors and Debtors in Possession*

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number (if any), are: Surgalign Holdings, Inc. (0607); Surgalign Spine Technologies, Inc. (6543); Pioneer Surgical Technology NewCo Inc.; Spinal Transition and Professional Services LLC; Andi's Belmarall, LLC; Fourth Dimension Spine, LLC (1107); Holo Surgical Inc. (4079); and HoloSurgical Technology Inc. (0952). The location of the debtors' service address in these chapter 11 cases is: 520 Lake Cook Road, Suite 315, Deerfield, Illinois 60015.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed in the Bid Procedures Order.

[3] A copy of the Stalking Horse Agreement is filed on the docket of the chapter 11 cases at Docket No. 26-2. Pursuant to the Bid Protections Order [Docket No. 128] and the Stalking Horse Agreement, the Court approved (x) a break-up fee equal to $150,000 (*i.e.*, 3% of the $5 million purchase price) and (y) the reimbursement from the Debtors of reasonable, documented out of pocket fees, costs and expenses of the Stalking Horse Bidder incurred in connection with the Stalking Horse Bid up to an amount equal to $150,000.

[4] As further set forth in the Bid Procedures Order and Bid Procedures [Docket No. 139], the Debtors reserve the right, without further Court order, to select one or more potential bidders to act as stalking horse bidders in connection with a Sale or other Potential Transaction involving the Assets other than the Stalking Horse Hardware Assets subject to the Stalking Horse Agreement. In such event, the Debtors may enter into an agreement with such stalking horse bidder as they deem necessary and appropriate in the prudent exercise of their business judgment. The Debtors will provide notice of any other stalking horse bidder designation and any other stalking horse agreement by filing a notice with the Bankruptcy Court. Pursuant to the Bid Protections Order, the Debtors reserve the right to offer a break-up fee and/or expense reimbursement to any such stalking horse bidder; *provided*, that such break-up fee shall not equal more than 3% of the cash component of any such bid and such expense reimbursement shall not exceed 2% of the cash component of any such bid for such assets.

[5] As further described in the Bid Procedures Order, objections to the Cure Amounts or to the proposed assumption and assignment of the Potential Assigned Contracts to the Stalking Horse Bidder, including the adequate assurance of the Stalking Horse Bidder, must be filed with the Bankruptcy Court no later than 4:00 p.m. (prevailing Central Time) on July 20, 2023. If a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction for any of the Debtors' assets, objections to the proposed assumption and assignment of Potential Assigned Contracts to such Successful Bidder based only on adequate assurance of future performance with respect to such Successful Bidder must be filed with the Bankruptcy Court no later than the Sale Objection Deadline.

FDIC

**PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA**

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

Advertiser: Legal Notice
Agency: Miller Advertising
Section-Page-Zone(s): A-7-All
Description: FIRST REPUBLIC BANK

Ad Number: 6331229001
Insertion Number: 6331229001
Size: F1/4
Color Type: CMYK

San Francisco Chronicle
Friday, July 7, 2023

# SFPD seeks suspect in death of woman pushed down on street

By Jordan Parker

San Francisco police are investigating the Monday death of a woman near Third Street and Egbert Avenue as a homicide, the department said.

Around 6:40 p.m. Monday, officers from Bayview Station were sent to the area after a report of an aggravated assault.

Police arrived on scene to find the woman, 63, down on the sidewalk.

After receiving medical attention she was transported to a local hospital with life-threatening injuries.

The woman died at the hospital Wednesday.

Witnesses told police that the victim was walking on the sidewalk when she fell and hit her head after being pushed by a female suspect, whose identity is unknown.

Anyone with information is asked to call the SFPD Tip Line at 1-415-575-4444.

*Reach Jordan Parker: jordan.parker@sfchronicle.com; Twitter: @jparkerwrites*

## COLLEGES

*From page A1*

Pepperdine University in Malibu reported to the state that it offered admission to fewer than 10 legacy students who did not meet the school's standards in each of the 2020-2021 and 2021-2022 academic years. A spokesperson for the school said one such student was admitted both years. Vanguard University in Orange County reported fewer than 10 such students admitted in three of the past four academic years.

Other private California schools including Stanford University, Harvey Mudd College and Santa Clara University all reported substantial numbers of legacy admits over the pst four years. But USC, Pepperdine and Vanguard were the only three that indicated they had admitted some legacy students who didn't meet the basic admissions requirements.

The numbers come amid fresh scrutiny of the legacy admissions process, in which the children of alumni and donors receive special consideration, following the Supreme Court's decision last week banning affirmative action in college admissions. California's public colleges already banned affirmative action, but the court's decision broadened those rules to encompass private institutions as well.

The number of legacy students admitted to USC, Pepperdine and Vanguard who didn't meet the school's requirements represents a tiny fraction of the overall group of legacy students admitted, and an even smaller percentage of the total students offered admission. USC offered admission to between 1,739 and 2,435 legacy students over the four years. Pepperdine's legacy admission offers ranged from 86 to 212 students, while Vanguard's ranged from 66 to 140 students per year.

Whereas affirmative action policies allow colleges to consider an applicant's minority race in order to ensure a diverse student body, legacy admissions overwhelmingly favor white candidates.

A lawsuit filed this week challenging Harvard University's legacy admissions policy noted that "nearly 70% of donor-related applicants are white, and nearly 70% of legacy applicants are also white." Supreme Court Justice Neil Gorsuch, who voted with the majority to ban affirmative action, noted in a concurring opinion that legacy admissions policies, "while race-neutral on their face … undoubtedly benefit white and wealthy applicants the most."

California lawmakers in 2019 passed a law requiring most universities in the state to submit annual reports detailing preferential admissions treatment granted to applicants based on their relationship to a donor or alumni. The law came in response to the so-called Operation Varsity Blues scandal, in which wealthy parents and school employees engaged in fraud in order to secure admission for their children to elite colleges, including USC.

USC notes in its reports that students with ties to donors or alumni are given a "special interest tag" on their applications, and the "existence of a tag does not guarantee an applicant's admission, nor does it shift an applicant to a fast-track admission process. Students whose files include a special interest tag are evaluated through the same rigorous process as untagged applicants."

The school justifies giving a "second look" to such students by stressing that philanthropy is key to its efforts to provide student aid, conduct research and hire faculty. It notes, however, that "there cannot be, and will not be, a system that permits any person to 'buy' admission to USC."

Vanguard University's president touted the school's diversity, which includes "68 percent students of color, 51 percent Pell (Grant)-eligible and 35 percent first generation," Michael J. Beals wrote in a statement to The Chronicle. "In the most recent academic year, Vanguard University did not enroll any legacy students who were below standard requirements," he said.

*Reach Sara Libby: sara.libby@sfchronicle.com*

Gary Coronado/Los Angeles Times via Getty Images

**The University of Southern California says students with ties to donors or alumni are given a "special interest tag" on their applications, but the "existence of a tag does not guarantee an applicant's admission."**

# FDIC

## PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

Para más información sobre esta audiencia pública, y cómo este cambio impactará su factura, llame al **1-800-660-6789** • 若要了解更多關於這項變更對您的月付款有何影響，請致電 **1-800-893-9555**

# NOTICE OF PUBLIC PARTICIPATION HEARINGS: POTENTIAL EXTENSION OF DIABLO CANYON POWER PLANT OPERATIONS (R.23-01-007)

**HOW CAN I PARTICIPATE?**

Pacific Gas and Electric Company (PG&E) and the California Public Utilities Commission (CPUC) would like to hear from you. You are invited to participate in Public Participation Hearings about the potential extension of operations at Diablo Canyon pursuant to Senate Bill 846.

At the virtual hearings, you can make comments, raise concerns, and speak with a CPUC Administrative Law Judge regarding this proceeding. Your participation by providing your thoughts on the proceeding can help the CPUC make an informed decision.

**WHERE AND WHEN WILL THESE PUBLIC PARTICIPATION HEARINGS BE HELD?**
**JULY 25 AT 2 AND 6 P.M. (VIRTUAL ONLY)**

The virtual hearings can be viewed via internet, or listened to via phone, with the information below. **If you wish to make a public comment, please participate by phone using the phone number below, press *1, unmute your phone and provide your name when prompted.**

Webcast: **adminmonitor.com/ca/cpuc/**
Phone number: **1-800-857-1917**
Passcode: 1767567#

If you need a language interpreter, contact the CPUC's Public Advisor's Office using the contact information at the end of this notice at least five business days before the hearings.

Written public comments may also be provided at any time during the proceeding in the "Public Comments" tab of the Docket Card for **R.23-01-007**, available at: **apps.cpuc.ca.gov/c/R2301007**. Your participation by providing your thoughts can help the CPUC make an informed decision.

Please note: A quorum of commissioners may attend but no decisions will be made or voted on at these hearings.

**WHY AM I RECEIVING THIS NOTICE?**

Senate Bill 846 was signed into law in September 2022, providing a path to extend DCPP operations beyond the current operating licenses, which are set to expire in 2024 and 2025.

Included in the legislation is the requirement that new retirement dates be set by the end of calendar year 2023.

**HOW COULD THIS AFFECT MY MONTHLY BILL?**

After current operating licenses expire, DCPP will be used to support California statewide electricity customers. Any costs associated with the extension of operations will be included in rates for all load serving entities in California, including customers in the service territories of Bear Valley Electric Service Inc., Liberty Utility (CalPeco Electric) LLC, PacifiCorp, Southern California Edison Company and San Diego Gas & Electric Company.

The CPUC will open a new proceeding for all California electric utilities to address the impact to rates. More information will be provided to customers when it is available.

**HOW DOES THE REST OF THIS PROCESS WORK?**

This proceeding has been assigned to a CPUC Administrative Law Judge who will consider proposals and evidence presented during the formal hearing process.

The Administrative Law Judge will issue a proposed decision that may adopt, modify or deny parties' proposals. Any CPUC Commissioner may sponsor an alternate decision with a different outcome. The proposed decision, and any alternate decisions, will be discussed and voted upon by the CPUC Commissioners at a public CPUC Voting Meeting.

Parties to the proceeding will review the proceeding, including the Public Advocates Office. The Public Advocates Office is an independent consumer advocate within the CPUC that represents customers to obtain the lowest possible rate for service consistent with reliable and safe service levels.

For more information, please call **1-415-703-1584**, email **PublicAdvocatesOffice@cpuc.ca.gov** or visit **PublicAdvocates.cpuc.ca.gov**.

**WHERE CAN I GET MORE INFORMATION?**
**CONTACT PG&E**
If you have questions about PG&E's filing, please contact PG&E at **1-800-743-5000**. For TTY, call **1-800-652-4712**.

If you would like an electronic copy of the filing and exhibits, please write to the address below:
Pacific Gas and Electric Company
Potential Extension of Diablo Canyon
Power Plant Operations (R.23-01-007)
P.O. Box 1018
Oakland, CA 94612-9991

**CONTACT CPUC**
For additional information and any updates on the hearings, please visit **cpuc.ca.gov/pph**.

If you have questions about CPUC processes, you may contact the CPUC's Public Advisor's Office at:
**Phone:** **1-866-849-8390** (toll-free) or **1-415-703-2074**
**Mail:** CPUC Public Advisor's Office
505 Van Ness Avenue
San Francisco, CA 94102
**Email:** **Public.Advisor@cpuc.ca.gov**

Please reference the **Potential Extension of Diablo Canyon Power Plant Operations (R.23-01-007)** in any communications you have with the CPUC regarding this matter.

P2JW188000-0-B00600-1--------XA

BUSINESS & FINANCE

# FIS to Sell Big Worldpay Stake for $11.7 Billion

Funds will be used to pay down debt and return additional capital to investors

By Ben Dummett And AnnaMaria Andriotis

**Fidelity National Information Services** has agreed to sell a majority stake in its **Worldpay Merchant Solutions** segment to private-equity firm **GTCR** for nearly $12 billion, retreating from a big acquisition it made four years ago that quickly soured.

Fidelity National, better known as FIS, said Thursday that the deal values the entire payment-processing business at a so-called enterprise value of around $18.5 billion—less than half the $43 billion valuation it acquired Worldpay for in 2019.

FIS said it would retain a noncontrolling 45% stake in a stand-alone joint venture and receive upfront proceeds of $11.7 billion, which will be used to pay down debt and return additional capital to shareholders via buybacks.

FIS is a provider of data and technology services to banks and other financial institutions. Its software and services are involved in everyday financial activities, like when consumers check their bank-account balances. Worldpay is among the largest payment processors, helping merchants accept card payments.

FIS made a big bet on the merchant-payments market in 2019 when it acquired Worldpay. The vision behind the deal was to create a global giant in payments and back-office financial services in a bid to reach more customers as transactions increasingly move online.

When the deal was announced, the companies said that it would allow them to cross-sell services to each other's clients and that they expected significant cost and revenue benefits.

Instead, Worldpay has suffered from shrinking profit margins and underwhelming revenue growth, challenged by increased competition from other payment-service providers including Fiserv's Clover, Block's Square, Toast, and all-in-one digital-commerce platforms like Shopify.

Shifts to online and card-based payments over cash since the pandemic have given a boost to many payment processors, but Worldpay's growth—particularly with small and midsize businesses, or SMBs—was stunted.

FIS works with big merchants like Kroger and Walmart, but many of its recent challenges have been with SMBs that have gravitated toward Worldpay's competitors. FIS said last year that its SMB portfolio was seeing "significant changes," citing "structural shifts in the industry" since the pandemic.

FIS shares have fallen by more than 50% since its acquisition of Worldpay closed in 2019, shrinking its market capitalization to about $35 billion.

*—Dean Seal contributed to this article.*

ADVERTISEMENT

## The Marketplace

To advertise: 800-366-3975 or WSJ.com/classifieds

PUBLIC NOTICES

## PUBLICATION NOTICE TO CREDITORS AND DEPOSITORS OF FIRST REPUBLIC BANK SAN FRANCISCO, CA

On **May 1, 2023** (the "Closing Date"), the **California Department of Financial Protection and Innovation** closed **FIRST REPUBLIC BANK, San Francisco, CA** (the "Failed Institution") and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

**TO THE CREDITORS OF THE FAILED INSTITUTION**

All creditors having claims against the Failed Institution must submit their claims in writing, together with proof of the claims, to the Receiver **on or before September 5, 2023** (the "Claims Bar Date"). You may submit your proof of claim form via our interactive FDIC Claims Portal at https://resolutions.fdic.gov/claimsportal/s/, or by calling 972-761-8677.

Claims may be submitted through the FDIC Claims Portal, or mailed to the following address:

FDIC as Receiver of
**First Republic Bank**
600 Pearl Street, Suite 700, Dallas, TX 75201
Attention: Claim Agent **10543**

**Under federal law 12 U.S.C. Section 1821(d)(5)(C), failure to file a claim on or before the Claims Bar Date will result in the Receiver disallowing the claim. The disallowance is final.**

NOTE TO CLASS CLAIMANTS: By law, the Receiver will not accept a claim filed on behalf of a proposed class of individuals or entities or a class of individuals or entities certified by a court. EACH individual or entity must file a separate claim with the Receiver.

**TO THE DEPOSITORS OF FIRST REPUBLIC BANK**

The FDIC, which insures your deposits in its corporate capacity (the "FDIC"), arranged for the transfer of all deposits ("Deposits") - including the uninsured amounts - at the Failed Institution to another insured depository institution, **JPMorgan Chase Bank N.A., Columbus, OH 43240** (the "New Institution"). This arrangement should minimize any inconvenience from the closing of the Failed Institution. **You may leave your Deposits in the New Institution, but you must take action to claim ownership of your Deposits.**

Federal law, 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim") your Deposits at the New Institution by taking any of the following actions within eighteen (18) months from the Closing Date, which is **November 1, 2024. Official Items issued by the Failed Institution; such as cashier's checks, dividend checks, interest checks, expense checks, and money orders are considered Deposits and must also be claimed within 18 months from the Closing Date.** You may claim your deposits at **JPMorgan Chase Bank, Columbus, OH** by taking any one of the following actions. If you have more than one account, your action in claiming your Deposit in one account will automatically claim your Deposits in all of your accounts.

1. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account, having an automated direct deposit credited to or an automated withdrawal debited from any account or closing the account;
2. Execute a new signature card on your account(s), enter into a new deposit agreement with the New Institution, change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any);
3. Provide the New Institution with a completed change of address form; or
4. Write to the New Institution and notify it that you wish to keep your account(s) active with the New Institution. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s) and a name and address.

If you do not claim ownership of your Deposits at the New Institution by **November 1, 2024,** federal law requires the New Institution to return your Deposits to the FDIC, which will be required to deliver them as unclaimed property to the State indicated in your address on the Failed Institution's records. If your address is outside of the United States, the FDIC will be required to deliver the Deposits to the State in which the Failed Institution had its main office. According to the Unclaimed Deposits Amendments Act of 1993 (12 U.S.C. Section 1822(e)), **you will have ten years to claim your deposits from the State's Unclaimed Property Division according to the state's unclaimed property laws. If you do not claim your deposits from the State within the ten-year period, federal law prohibits you from claiming your deposits.**

If the State does not take custody of your Deposits after the 18-month period, you may claim your Deposits from the FDIC until the receivership of the Failed Institution is terminated. A receivership may be terminated at any time. Once the receivership terminates, you will not be able to claim your Deposits.

If you have a loan with the Failed Institution, and you would like to discuss offsetting your insured and/or uninsured deposit(s) against the loan, you must contact the FDIC immediately.

In the event you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at the New Institution, you may seek a review of the FDIC's determination in the United States District Court for the federal judicial district where the principal place of business of the Failed Institution was located. **You must file your request for this review no later than 60 days after the date on which your deposit(s) became available to you at the New Institution. Filing a request for review will not prevent you from using the funds in your new account.**

CLASS ACTION

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SANTA CLARA

IN RE MAXAR TECHNOLOGIES INC. SHAREHOLDER LITIGATION

This Document Relates To:

ALL ACTIONS

Case No. 19CV357070

CLASS ACTION

**SUMMARY NOTICE OF PROPOSED SETTLEMENT OF CLASS ACTION**

Judge: Hon. Sunil R. Kulkarni
Dept: 1
Date Action Filed: October 21, 2019

**TO: ALL PERSONS WHO ACQUIRED MAXAR TECHNOLOGIES INC. ("MAXAR" OR THE "COMPANY") COMMON STOCK IN EXCHANGE FOR DIGITALGLOBE, INC. ("DIGITALGLOBE") COMMON STOCK PURSUANT TO THE REGISTRATION STATEMENT AND PROSPECTUS ISSUED IN CONNECTION WITH MAXAR'S OCTOBER 2017 MERGER WITH DIGITALGLOBE.**

**THIS NOTICE WAS AUTHORIZED BY THE COURT. IT IS NOT A LAWYER SOLICITATION. PLEASE READ THIS NOTICE CAREFULLY AND IN ITS ENTIRETY.**

YOU ARE HEREBY NOTIFIED that a hearing will be held on **December 7, 2023**, at 1:30 p.m., before the Honorable Sunil R. Kulkarni at the Superior Court of California, County of Santa Clara, Department 1, 191 North First Street, San Jose, CA 95113, to determine whether: (1) the proposed settlement ("Settlement") of the above-captioned action as set forth in the Stipulation of Settlement ("Stipulation")[1] for $36,500,000 in cash should be approved by the Court as fair, reasonable and adequate; (2) the Judgment as provided under the Stipulation should be entered; (3) to award Class Counsel attorneys' fees and expenses out of the Settlement Fund (as defined in the Notice of Proposed Settlement of Class Action ("Notice"), which is discussed below) and, if so, in what amount; (4) to pay Class Representative out of the Settlement Fund for representing the Class and, if so, in what amount; and (5) the Plan of Allocation should be approved by the Court as fair, reasonable, and adequate.

This Action is a securities class action brought on behalf of those persons who acquired Maxar common stock pursuant to the registration statement and prospectus ("Offering Materials") issued in connection with Maxar's October 2017 merger with and acquisition of DigitalGlobe, against Maxar and certain of its officers and directors (collectively, "Defendants") for, among other things, allegedly misstating and omitting material facts from the registration statement and prospectus filed in connection with the Merger. Plaintiff alleges that these purportedly false and misleading statements resulted in damage to Class Members. Defendants deny all of Plaintiff's allegations and deny that there was any violation of the securities laws.

**IF YOU ACQUIRED MAXAR COMMON STOCK IN THE MERGER WITH DIGITALGLOBE, YOUR RIGHTS MAY BE AFFECTED BY THE SETTLEMENT OF THIS ACTION.**

To share in the distribution of the Settlement Fund, you must establish your rights by submitting a Proof of Claim and Release form ("Proof of Claim") by mail **(postmarked no later than September 27, 2023)** or electronically **(no later than September 27, 2023)**. Your failure to timely submit your Proof of Claim will subject your claim to rejection and preclude your receiving any of the recovery in connection with the Settlement of this Action. If you are a member of the Class and do not request exclusion therefrom, you will be bound by the Settlement and any judgment and release entered in the Action, whether or not you submit a Proof of Claim. If you have not received a copy of the Notice, which more completely describes the Settlement and your rights thereunder (including your right to object to the Settlement), and a Proof of Claim, you may obtain these documents, as well as a copy of the Stipulation (which, among other things, contains definitions for the defined terms used in this Summary Notice) and other settlement documents, online at www.MaxarSecuritiesSettlement.com, or by writing to:

*Maxar Securities Settlement*
c/o A.B. Data, Ltd.
P.O. Box 173131
Milwaukee, WI 53217

**Inquiries should NOT be directed to Defendants, the Court, or the Clerk of the Court.**

Inquiries, other than requests for the Notice or for a Proof of Claim, may be made to Class Counsel:

ADAM E. POLK
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

DAVID W. HALL
**HEDIN HALL LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA 94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

If you wish to be excluded from the Class, you must submit a request for exclusion such that it is **postmarked by August 28, 2023**, in the manner and form explained in the Notice. All members of the Class who have not requested exclusion from the Class will be bound by the Settlement, even if they do not submit a timely Proof of Claim.

If you are a Class Member, you have the right to object to the Settlement, the Plan of Allocation, the Request by Class Counsel for an award of attorneys' fees of up to 35% of the Settlement Fund (or $12,775,000) and expenses not to exceed $600,000, and/or for payment to the Class Representative not to exceed $10,000 for representing the Class. Any written objections must be filed with the Court and sent to Class Counsel and Defendants' counsel by **August 28, 2023**, in the manner and form explained in the Notice. You may also make an oral objection at the Settlement Fairness Hearing without submitting a written objection.

DATED: JUNE 8, 2023

BY ORDER OF THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA

[1] The Stipulation can be viewed and/or obtained at www.MaxarSecuritiesSettlement.com.

CLASS ACTION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSHUA FLYNN, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

EXELON CORPORATION, et al.,

Defendants.

Case No.: 1:19-cv-08209

CLASS ACTION

Judge Virginia M. Kendall
Magistrate Judge Susan E. Cox

SUMMARY NOTICE

TO: ALL PERSONS WHO PURCHASED OR OTHERWISE ACQUIRED EXELON CORPORATION ("EXELON") COMMON STOCK BETWEEN FEBRUARY 8, 2019 AND OCTOBER 31, 2019, INCLUSIVE

**THIS NOTICE WAS AUTHORIZED BY THE COURT. IT IS NOT A LAWYER SOLICITATION. PLEASE READ THIS NOTICE CAREFULLY AND IN ITS ENTIRETY. YOUR RIGHTS WILL BE AFFECTED BY A CLASS ACTION LAWSUIT PENDING IN THIS COURT.**

YOU ARE HEREBY NOTIFIED, pursuant to an Order of the United States District Court for the Northern District of Illinois, Eastern Division (the "Court") and Rule 23 of the Federal Rules of Civil Procedure, that (i) the above-captioned litigation (the "Litigation") has been preliminarily certified as a class action on behalf of a class of all Persons who purchased or otherwise acquired Exelon common stock between February 8, 2019 and October 31, 2019, inclusive, and were damaged thereby, except for certain Persons excluded from the Settlement Class as defined in the full printed Notice of Pendency and Proposed Settlement of Class Action ("Notice"), which is available as described below; and (ii) Lead Plaintiff and Defendants in the Litigation have reached an agreement to settle the Litigation for $173,000,000 in cash (the "Settlement"). If the Settlement is approved it will resolve all claims in the Litigation. Any capitalized terms used in this Summary Notice that are not otherwise defined herein shall have the meanings ascribed to them in the Stipulation of Settlement dated May 26, 2023 (the "Stipulation"), and the Notice.

A hearing will be held on September 7, 2023, at 9:00 a.m., before the Honorable Virginia M. Kendall, at the Everett McKinley Dirksen U.S. Courthouse, in Courtroom 2503, 219 South Dearborn Street, Chicago, IL 60604, for the purpose of determining: (1) whether the proposed settlement of the claims in the Litigation for the sum of $173,000,000 in cash should be approved by the Court as fair, reasonable, and adequate; (2) whether a Settlement Class should be certified for purposes of the Settlement; (3) whether, thereafter, this Litigation should be dismissed with prejudice pursuant to the terms and conditions set forth in the Stipulation; (4) whether the proposed Plan of Allocation is fair, reasonable, and adequate and therefore should be approved; and (5) the reasonableness of the application of Lead Counsel for the payment of attorneys' fees and expenses incurred in connection with this Litigation together with the interest earned thereon (and any payment to the Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 in connection with its representation of the Settlement Class).

If you purchased or acquired Exelon common stock during the period between February 8, 2019 and October 31, 2019, inclusive, your rights may be affected by the settlement of this Litigation. If you have not received a detailed Notice and a copy of the Proof of Claim and Release form ("Proof of Claim"), you may obtain copies (as well as a copy of the Stipulation) by writing to *Exelon Securities Litigation*, Claims Administrator, c/o Gilardi & Co. LLC, P.O. Box 301171, Los Angeles, CA 90030-1171, or by downloading this information at www.ExelonSecuritiesLitigation.com. If you are a Settlement Class Member, in order to share in the distribution of the Net Settlement Fund, you must either submit a Proof of Claim online at www.ExelonSecuritiesLitigation.com by September 28, 2023, or by mail postmarked no later than September 28, 2023, establishing that you are entitled to recovery.

If you desire to be excluded from the Settlement Class, you must submit a request for exclusion postmarked by August 17, 2023, in the manner and form explained in the detailed Notice referred to above. All Members of the Settlement Class who do not timely and validly request exclusion from the Settlement Class will be bound by any judgment entered in the Litigation pursuant to the terms and conditions of the Stipulation.

Any objection to the Settlement must be mailed or delivered to the Clerk of the Court and counsel for the Settling Parties at the addresses below such that it is received no later than August 17, 2023:

*Court:*

Clerk of the Court
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
Everett McKinley Dirksen U.S. Courthouse
219 South Dearborn Street
Chicago, IL 60604

*Counsel for Lead Plaintiff:*

Theodore J. Pintar
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

*Counsel for Defendants:*

Edmund Polubinski III
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017

**PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE REGARDING THIS NOTICE.** If you have any questions about the Settlement, you may contact counsel for Lead Plaintiff at the address listed above, email settlementinfo@rgrdlaw.com, or go to the following website: www.ExelonSecuritiesLitigation.com.

DATED: June 9, 2023

BY ORDER OF THE COURT
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

BUSINESS OPPORTUNITIES

Florida Medical Company
26 yrs licensed for any medical business includes hospital. $2.1 M net $450K. Assumable $500K loan.
Paul 917-213-9622

COMMERCIAL REAL ESTATE

FLORIDA LAND SALE - EAST COAST
HOMESTEAD-RANCH-FARM - 27 LOTS of 12 to 120 Acres Prices $5,500/ac to $16,500/ac
COMMERCIAL - 14 LOTS 3 to 17 Acres Prices $125K/ac to $150K/ac
Act Today! Limited Time Sale
130 Ac Airport, 24 Hangars $9M
Contact Bob Thomas, Watson Realty
Phone / Text 386-341-0423

NOTICE OF SALE

BANKRUPTCY AUCTION
BROOKLYN MIXED-USE CORNER BUILDING
689 ST. MARKS AVE., CROWN HEIGHTS, BROOKLYN, NY
Auction Date: Thursday, July 20th, 2023, 11:00 A.M. (EST)
Bid Deadline: Friday, July 14th, 2023, 4:00 P.M. (EST)
OPENING BID: $2,000,000

North Point Real Estate Group and Rosewood Realty Group have been exclusively retained to run the bankruptcy sale of a prime corner mixed-use building located at 689 St. Marks Ave., Crown Heights, Brooklyn, NY. The property boasts 5,720 SF across 4-floors, 6 retail stores, 1 office, and 2 residential units, and 95 feet of combined frontage between Nostrand Ave. and St. Marks Ave. Close in proximity to multiple subway stations, Pratt Institute, Long Island University (CUNY), and the Brooklyn Museum. Interested bidders must contact Chaya Milworn of North Point Realty Group at Chaya@northpointrep.com for more information on how to participate.

BIDS PROPOSALS

Yamuna Expressway Industrial Development Authority
1st Floor, Commercial Complex, Omega-1 (P-2), Greater Noida, Uttar Pradesh
Toll Free No. 18001808296 Website : www.yamunaexpresswayauthority.com

Reference Number: YEIDA/PO-65/1181/2023 Dated: 30/06/2023

Request for Proposal (RFP) for 'Development of Passenger Personal Rapid Transit (PRT) System from Film City to Noida International Airport, Jewar (YEIDA), Uttar Pradesh on Design, Build, Finance, Operate, and Transfer (DBFOT) Basis'

Detailed RFP document is available on the E-Procurement Portal of Government of UP [https://etender.up.nic.in/] from 01/07/2023 and Yamuna Expressway Industrial Development Authority's website [http://www.yamunaexpresswayauthority.com]. The Authority seeks Selection of Developer for development of Passenger Personal Rapid Transit (PRT) System from Film City to Noida International Airport, Jewar, Uttar Pradesh on Design, Build, Finance, Operate, and Transfer (DBFOT) Basis.

Interested Applicants are required to submit their proposal online on the E-procurement website on or before 10/08/2023, 1700 hrs (IST). In case of any queries, the Bidders are invited to contact on the following email id and number as per the clause 1.3 of the RFP.

Email: gmplng@yamunaexpresswayauthority.com, yeida.planning@gmail.com

CEO, YEIDA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| ALEXANDRA KUSEN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JAMES H. HERBERT, II, HAFIZE GAYE ERKAN, MICHAEL J. ROFFLER, OLGA TSOKOVA, MICHAEL D SELFRIDGE, NEAL HOLLAND, and KPMG, LLP,<br><br>Defendants. | Case No. 3:23-cv-2940-AMO<br><br>**DECLARATION OF PETER L. BARTER**<br><br>CLASS ACTION<br><br>Judge: Hon. Araceli Martínez-Olguín |
|---|---|

# Exhibit C



LEGAL DIVISION
Federal Deposit Insurance Corporation

August 4, 2023

**VIA E-MAIL (reed@hbsslaw.com and lucasg@hbsslaw.com)**
Reed R. Kathrein
Lucas E. Gilmore
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710

**VIA E-MAIL (peretz@bgandg.com)**
Peretz Bronstein
Bronstein, Gewirtz & Grossman, LLC (NY)
60 East 42nd Street, Suite 4600
New York, NY 10165

**VIA E-MAIL (lesleyportnoy@gmail.com)**
Lesley F. Portnoy
Portnoy Law Firm
1800 Century Park East, Suite 600
Los Angeles, CA 90067

**VIA E-MAIL (clinehan@glancylaw.com)**
Charles Henry Linehan
Glancy Prongay and Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

Re:     *Kusen v. Herbert*, Case No. 3:23-2940-AMO (N.D. Cal.)
        *Alcorn v. First Republic Bank*, Case No. 3:23-3013-AMO (N.D. Cal.)
        *Collier v. First Republic Bank*, Case No. 3:23-3096-AMO (N.D. Cal.)

Dear Counsel:

        I am an in-house attorney with the Federal Deposit Insurance Corporation (FDIC) and
am writing regarding the above-referenced cases, which name several former directors and
executives of First Republic Bank (First Republic) and First Republic's outside auditor, KPMG
LLP, as defendants.  As you know, the California Department of Financial Protection and



LEGAL DIVISION
Federal Deposit Insurance Corporation

Innovation closed First Republic on May 1, 2023, and the FDIC was appointed as Receiver for First Republic (FDIC-R) on that same date. The purpose of this letter is to request that Ms. Kusen, Mr. Alcorn, and Mr. Collier (collectively, the Plaintiffs)[1] voluntarily dismiss the pending actions because Plaintiffs do not own the claims alleged and, even assuming *arguendo* that they did, they have not exhausted the mandatory administrative claims process.

**I. Plaintiffs' Claims, and the Claims of Other Shareholders, Belong to the FDIC-R.**

Plaintiffs' claims, and the claims of the other shareholders belong to the FDIC-R under 12 U.S.C. § 1821(d)(2)(A)(i). Under FIRREA,[2] Congress directed that the FDIC as receiver succeeds not only to the assets of a failed institution (here First Republic) but also to "all rights" of stockholders with respect to the institution or its assets. *See* 12 U.S.C. § 1821(d)(2)(A)(i). Under this statutory provision, the FDIC-R owns all of the claims that Plaintiffs or the other purported class members attempt to assert.

As the First Circuit explained in *Zucker v. Rodriguez*, 919 F.3d 649 (1st Cir. 2019), the application of this statute is straightforward: First, the court looks to whether the claim asserted is a right of a stockholder of the failed institution; and, second, the court examines whether the claims relate to or concern the failed institution or its assets. *Id.* at 656–57; *see also Am. W. Bank Members v. Utah*, Case No. 2:16-cv-326, 2023 WL 2108352, at *5–*8 (D. Utah June 21, 2023) (applying *Zucker*). There is no question that Plaintiffs' claims meet both of these tests: each of the Plaintiffs' claims "depends entirely on [his or her] position as a [First Republic] stockholder." *Zucker*, 919 F.3d at 656. Further, to prove their respective claims each of the Plaintiffs would need to show that First Republic made material misstatements and omissions of fact, so those claims necessarily "relate to or concern" First Republic. *Id.* By raising these claims against First Republic, notwithstanding Plaintiffs' attempts at strategic

---

[1] The dockets in these matters note that, in addition to representing Ms. Kusen, Mr. Alcorn, or Mr. Collier, respectively, you also represent other movants to serve as lead plaintiff as well, namely Gaurav Singh; McCadden Investments, LLC; and Strategic Capital Investments, LLC; Nsecur 303 Limited Partnership; and C1 Bundle, Limited Partnership. While the points in this letter are addressed in the names of Ms. Kusen, Mr. Alcorn, and Mr. Collier since they are the plaintiffs named in the complaints, all the points are equally applicable to your other clients and any other members of the purported class as well.

[2] "FIRREA" is the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 1821 et seq.



LEGAL DIVISION
Federal Deposit Insurance Corporation

pleading to the contrary, the Plaintiffs also seek assets of the bank now in receivership, so those claims are necessarily made "with respect to the . . . assets of" First Republic. *Id.* at 656–57. Accordingly, the FDIC-R has succeeded to Plaintiffs' claims, and to the claims of each other purported class member, pursuant to FIRREA. None of the Plaintiffs, nor any other member of the purported class for that matter, has standing to bring these claims because the FDIC-R is now the only real party in interest.

## II. No Court Has Subject Matter Jurisdiction Over the Plaintiffs' Purported Claims Because Even If Plaintiffs Had Any Claims (Which They Do Not), They Have Failed to Exhaust the Mandatory Receivership Claims Process.

Plaintiffs must exhaust the mandatory receivership claims process set forth under FIRREA before commencing any judicial action on the claims—whether or not First Republic or the FDIC-R is named as a defendant. Plaintiffs have not done so. Unless and until Plaintiffs exhaust the mandatory claims process, no court can ever acquire subject matter jurisdiction over their claims.

All claims against a failed depository institution in receivership are subject to the mandatory and exclusive administrative claims procedures established by FIRREA. *See generally* 12 U.S.C. § 1821(d)(3)–(13) (outlining claims process procedures and authority of the receiver). Upon its appointment as Receiver, the FDIC-R was statutorily authorized to determine and allow or disallow claims related to and against First Republic. 12 U.S.C. § 1821(d)(3), (d)(5). FIRREA established in Section 1821 a set of mandatory and exclusive administrative claims procedures for filing and resolving all claims against a failed depository institution in receivership. By statute, any claims against First Republic must be filed with the FDIC-R by the claims bar date, and any claims not filed by that date are forever barred. 12 U.S.C. § 1821(d)(3)(B)(i), (d)(5)(B)–(C).[3]

Moreover, FIRREA strips all courts of jurisdiction to hear claims, such as those alleged by Plaintiffs, related to any acts or omissions of a failed depository institution in FDIC receivership. 12 U.S.C. § 1821(d)(13)(D) ("Except as otherwise provided in this subsection, no court shall have jurisdiction over . . . any claim relating to any act or omission of" "any depository institution for which the [FDIC] has been appointed receiver.") Only once you have submitted a claim with the receiver *and* the receiver has made a determination to allow or disallow that claim (or after 180 days have elapsed without a determination) may you seek a

---

[3] The claims bar date for filing any claims against the First Republic Receivership is September 5, 2023.



LEGAL DIVISION
Federal Deposit Insurance Corporation

*de novo* adjudication. 12 U.S.C. § 1821(d)(6)(A). *See, e.g., Rundgren v. Wash. Mut. Bank, FA,* 760 F.3d 1056, 1060 (9th Cir. 2014) (citing 12 U.S.C. § 1821(d)(13)(D))*; see also Benson v. JPMorgan Chase Bank, N.A.,* 673 F.3d 1207, 1209 (9th Cir. 2012) ("[A] claim asserted against a purchasing bank based on the conduct of a failed bank must be exhausted under FIRREA.").

The Ninth Circuit's decision in *Benson* is dispositive here. The plaintiffs there argued to the Ninth Circuit that their claims were not subject to FIRREA's administrative exhaustion requirement because the claims were not against the failed bank—WaMu—or the FDIC as Receiver. 673 F.3d at 1209. The Ninth Circuit roundly rejected plaintiffs' argument. *See id.* ("Litigants cannot avoid FIRREA's administrative requirements through strategic pleading."). As the court explained, the plaintiffs' claims were barred under the plain text of 12 U.S.C. § 1821(d)(13)(D)(ii), which "distinguishes claims on their factual bases rather than on the identity of the defendant: It asks whether the claims 'relate to any act or omission' of a failed institution or the FDIC." *Id.* at 1212. Specifically, "[b]y relying on WaMu's alleged wrongdoing, plaintiffs' claims plainly 'relat[e] to any act or omission' of 'a depository institution for which the [FDIC] has been appointed receiver.' § 1821(d)(13)(D). And because plaintiffs did not exhaust administrative remedies, their claims are jurisdictionally barred by FIRREA." *Id.* at 1215.

Plaintiffs' claims here are no different. As bases for their claims, Plaintiffs rely on statements by First Republic in press releases, earnings calls, and public securities filings that they allege were materially false or misleading. *See* Kusen Compl. ¶¶ 35–48, 51–65, 67–90; Alcorn Compl. ¶¶ 33–46, 49–63, 67, 69–71, 73–79, 83–84, 86–87; Alcorn First Am. Compl. ¶¶ 32–45, 48–62, 66, 68–70, 72–78, 82–83, 85–86; Collier Compl. ¶¶ 33–46, 49–63, 67, 69–71, 73–79, 83–84, 86–87. Moreover, Plaintiffs' claims under § 20(a) of the Exchange Act make clear that alleged misrepresentations by First Republic are the real basis of their suits. *See, e.g.*, Kusen Compl. ¶ 127 ("As described above, the Company[, i.e., First Republic,] and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act."); Alcorn Compl. ¶ 124 (same); Alcorn First Am. Compl. ¶ 123 (same); Collier Compl. ¶ 134 (same). By their own admissions, Plaintiffs' claims plainly "relat[e] to any act or omission" of First Republic and are therefore barred unless and until Plaintiffs exhaust the FDIC administrative claim procedure with respect to those claims. 12 U.S.C. § 1821(d)(6), (d)(13)(D)(ii).

For the reasons stated in *Benson*, Plaintiffs' efforts to avoid the administrative claims process will fail. As of today's date, none of the Plaintiffs has exhausted the FIRREA-



LEGAL DIVISION
Federal Deposit Insurance Corporation

mandated administrative claims process. As a result, no court currently possesses subject matter jurisdiction to consider any of the Plaintiffs' purported claims. *See* 12 U.S.C. § 1821(d)(13)(D) ("except as otherwise provided in this subsection, no court shall have jurisdiction over…(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [FDIC] has been appointed receiver…or (ii) any claim relating to any act or omission of such institution or the [FDIC] as receiver").

**III. Plaintiffs May Not Prosecute Claims on Behalf of a Class Because Each Class Member Must Separately Exhaust Administrative Remedies.**

As explained above, all claimants against a failed depository institution in FDIC receivership must first exhaust the administrative claims procedures established by FIRREA before bringing any action in court. One consequence of this administrative exhaustion requirement is that each member of a purported class of claimants against a failed depository institution in FDIC receivership must exhaust administrative remedies in order to maintain their claim. *See Cassese v. Wash. Mut., Inc.*, 711 F. Supp. 2d 261, 271–72 (E.D.N.Y. 2010) (decertifying a class of claimants against WaMu because only the four named plaintiffs had exhausted administrative remedies with the FDIC, and thus the class no longer met the numerosity requirement of Fed. R. Civ. P. 23(a)(1)). Accordingly, Plaintiffs may each only bring a federal claim on his or her own behalf, and even then only once he or she has exhausted the administrative claims procedure as required by FIRREA.

In view of the facts and law set forth above, we request that each of the Plaintiffs agree to voluntarily discontinue the pending federal court actions. In order to avoid needless motion practice, we request that you notify the undersigned as to your intentions in that regard by August 18, 2023. **In any case, should your client wish to maintain an individual claim, he or she must file an administrative claim as described above with the FDIC-R on or before the claims bar date, September 5, 2023.**



LEGAL DIVISION
Federal Deposit Insurance Corporation

Please contact me directly if you have any questions or would like to discuss any of the foregoing. By providing this information to you, the FDIC, either in its Receiver or Corporate capacities, does not waive any rights, claims, or defenses, whether procedural or substantive, that it may have.

Sincerely,

Joshua H. Packman
Senior Attorney

cc: Legal Counsel for Movants in *Kusen v. Herbert*, Case No. 3:23-2940, listed below:

Rachele R. Byrd
Wolf Haldenstein Adler Freeman & Herz LLP
Symphony Towers
750 B Street, Suite 1820
San Diego, CA 92101
byrd@whafh.com
*Counsel to Movant Rami E. Geffner*

Lisa Tamiko Omoto
Faruqi & Faruqi, LLP
1901 Avenue of the Stars, Suite 1060
Suite 1060
Los Angeles, CA 90067
lomoto@faruqilaw.com
*Counsel to Movant The Investor Group*

Jennifer Pafiti
Pomerantz LLP
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
jpafiti@pomlaw.com
*Counsel to Movants Philippe D. Katz, Terumah Foundation, United Equities Commodities Co., 111 John Realty Corp., and Marneu Holding Co.*



LEGAL DIVISION
Federal Deposit Insurance Corporation

Adam Marc Apton
Levi & Korsinsky, LLP
75 Broadway, Suite 202
San Francisco, CA 94111
aapton@zlk.com
*Counsel to Movant John Tu*

Jennifer Lauren Joost
Kessler Topaz Meltzer and Check LLP
One Sansome Street, Suite 1850
San Francisco, CA 94104
jjoost@ktmc.com
*Counsel to Movant Alecta Tjanstepension Omsesidigt*

**Packman, Joshua H.**

---

**From:** Packman, Joshua H.
**Sent:** Friday, August 4, 2023 5:15 PM
**To:** reed@hbsslaw.com; lucasg@hbsslaw.com; peretz@bgandg.com; lesleyportnoy@gmail.com; clinehan@glancylaw.com
**Cc:** byrd@whafh.com; lomoto@faruqilaw.com; jpafiti@pomlaw.com; aapton@zlk.com; jjoost@ktmc.com; Forester, Aaron; McEwan, Brittany A.
**Subject:** Re: Kusen v. Herbert, Alcorn v. First Republic Bank, & Collier v. First Republic Bank
**Attachments:** Letter to Counsel re Kusen, Alcorn, and Collier Matters (8-4-23).pdf

**Tracking:**

| Recipient | Delivery |
|---|---|
| reed@hbsslaw.com | |
| lucasg@hbsslaw.com | |
| peretz@bgandg.com | |
| lesleyportnoy@gmail.com | |
| clinehan@glancylaw.com | |
| byrd@whafh.com | |
| lomoto@faruqilaw.com | |
| jpafiti@pomlaw.com | |
| aapton@zlk.com | |
| jjoost@ktmc.com | |
| Forester, Aaron | Delivered: 8/4/2023 5:15 PM |
| McEwan, Brittany A. | Delivered: 8/4/2023 5:15 PM |

Dear Counsel:

Please see the attached correspondence concerning *Kusen v. Herbert*, Case No. 3:23-2940-AMO (N.D. Cal.); *Alcorn v. First Republic Bank*, Case No. 3:23-3013-AMO (N.D. Cal.); and *Collier v. First Republic Bank*, Case No. 3:23-3096-AMO (N.D. Cal.).

Best regards,

Joshua Packman
Senior Attorney
Professional Liability & Financial Crimes Section
Legal Division, FDIC
jpackman@fdic.gov
(703)-562-2816